**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | No. 3:02-CR-116 |
| Respondent, | : | |
| | : | |
| **v.** | : | **CAPITAL 2255 PROCEEDINGS** |
| | : | |
| **ODELL CORLEY, a/k/a** | : | Hon. Rudy Lozano, USDJ |
| **NASIH RA'ID,** | : | Hammond Division |
| Movant. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE,
OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

JENNIFER CHICCARINO
LEOR VELEANU
AYANNA WILLIAMS
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545West
Philadelphia, PA 19106
 (215) 928-0520

**TABLE OF CONTENTS**

Preliminary Statement.................................................................................................... 1

Standard Review of Claims of Ineffective Assistance of Counsel .................................. 1

Procedural History .......................................................................................................... 3

Argument ......................................................................................................................... 4

Ground One: Mr. Ra'id was convicted and sentenced to death on the basis of inaccurate and unreliable scientific evidence............................................................................................. 4

    A.    Mr. Ra'id's rights under the Due Process Clause and the Eighth Amendment were violated by the introduction of unreliable fingerprint evidence......................................... 5

    B.    The error had a substantial and injurious effect on the determination of Mr. Ra'id's guilt and sentence ..................................................................................................... 7

Ground Two: Appellate counsel was ineffective due to his failure to raise and argue the prosecutorial misconduct committed by the Government during their rebuttal closing argument. 9

Ground Three: 18 U.S.C. § 2113(e) is unconstitutional as applied to Mr. Ra'id because it permits a capital murder conviction without requiring proof of any mens rea; the Court erred by failing to instruct the jury as to Counts III and IX that malice was a required element of murder and had to be proved beyond a reasonable doubt; and counsel was ineffective for failing to object to the unconstitutional and erroneous charge.......................................................................... 14

    A.    Section 2113(e) as applied is unconstitutional, and the Court erred in failing to charge the jury that malice was a required element of murder............................................ 15

    B.    Prior counsel were ineffective for failing to object to the instructions and to litigate these issues on appeal........................................................................................................ 18

Ground Four: The erroneous conspiracy charge permitted a conviction for capital murder without requiring the Government prove each element beyond a reasonable doubt, and counsel unreasonably failed to raise, preserve, and argue the error........................................... 19

    A.    The conspiracy charge absolved the Government of its burden to prove all elements of the substantive offense ................................................................................................. 19

    B.    Prior counsel were ineffective for failing to object to these errors and to litigate these issues on appeal........................................................................................................ 22

Ground Five: The Court erred by allowing the prosecution to proceed on multiple bank robbery murder and firearm murder charges, and counsel unreasonably failed to seek dismissal of the multiplicitous counts................................................................................................... 24

    A.    The bank robbery murder and the firearm murder counts were multiplicitous ................ 24

B.    The ambiguous language of § 2113(e) warrants lenity and prevents the imposition of multiple punishments for the same offense ................................................................. 27

C.    Counsel's failure to object to the multiplicitous counts prejudiced Mr. Ra'id ................. 30

Ground Six: Mr. Ra'id was denied due process of law, the right to be free of cruel and unusual punishment, and the effective assistance of counsel because the federal death penalty, as administered, is disproportionately and unconstitutionally applied by race; trial and appellate counsel failed to properly object based on this fact ...................................................................... 32

Ground Seven: Trial counsel did not effectively develop and present mitigating evidence ........ 35

A.    Legal standards ................................................................................................................ 36

    1.    Deficient performance ............................................................................................ 36

    2.    Prejudice ................................................................................................................. 37

B.    Trial counsel failed to conduct an adequate investigation and thus failed to develop and present readily available mitigation ................................................................................. 38

    1.    Counsel ignored obvious red flags warranting further investigation ......................... 38

    2.    Counsel mishandled the mental health investigation and presentation ...................... 40

C.    Mr. Ra'id was prejudiced by counsel's deficient performance ........................................ 42

Ground Eight: Counsel unreasonably failed to ensure that Mr. Ra'id's jury was not influenced by the Government's improper closing argument commenting on the victims' family members' opinion regarding the appropriate punishment .................................................................. 49

A.    The prosecutor's improper closing argument violated Mr. Ra'id's constitutional rights. 50

B.    Prior counsel were ineffective in litigating this claim ..................................................... 53

Ground Nine: The Court erred in failing to instruct the jury that it could consider the out-of-court statement of Wanda McNeal, identifying William Johnson as her assailant, for the truth of the matter asserted .......................................................................................................................... 57

Ground Ten: In light of *Dimaya*, Mr. Ra'id's § 924(c) convictions cannot be sustained because bank robbery under § 2113 does not qualify as a "crime of violence" ........................................ 60

A.    Section 924(c)'s residual clause is unconstitutionally void for vagueness ....................... 61

B.    Federal bank robbery fails to categorically qualify as a "crime of violence" under the elements clause of section 924(c) .................................................................................... 62

Conclusion .................................................................................................................................. 64

## TABLE OF AUTHORITIES

**Federal Cases**

*Aguilar v. Woodford*, 725 F.3d 970 (9th Cir. 2013) ........................................................ 48

*Alcorta v. Texas*, 355 U.S. 28 (1957)........................................................................... 5

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)................................................................ 14

*Baer v. Neal*, 879 F.3d 769 (7th Cir. 2018) ................................................................... 54

*Ball v. United States*, 470 U.S. 856 (1985).................................................................... 24

*Bell v. United States*, 349 U.S. 81 (1955) ................................................................ 29, 30

*Berger v. United States*, 295 U.S. 78 (1935) .............................................................. 9, 51

*Blockburger v. United States*, 284 U.S. 299 (1932)....................................................24-25

*Blystone v. Horn*, 664 F.3d 397 (3d Cir. 2011)............................................................... 37

*Bobby v. Van Hook*, 558 U.S. 4 (2009)............................................................................ 2

*Bolling v. Sharpe*, 347 U.S. 497 (1954)......................................................................... 33

*Booth v. Maryland*, 482 U.S. 496 (1987)....................................................................... 50

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978)............................................................... 32

*Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) ...................................................................... 50

*Boyde v. California*, 494 U.S. 370 (1990) ..................................................................... 20

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)........................................................ 7, 8, 22

*Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001) .......................................................... 30

*Cage v. Louisiana*, 498 U.S. 39 (1990)............................................................. 14, 19, 22

*Caldwell v. Mississippi*, 472 U.S. 320 (1985)................................................................ 51

*California v. Brown*, 479 U.S. 538 (1987)..................................................................... 51

*California v. Ramos*, 463 U.S. 992 (1983) .................................................................... 51

*Chambers v. Armontrout*, 907 F.2d 825 (8th Cir. 1990)................................................. 23

*Coker v. Georgia*, 433 U.S. 584 (1977 ......................................................................... 20

*Corley v. United States*, 550 U.S. 1140 (2009)................................................................ 3

*Darden v. Wainwright*, 477 U.S. 168 (1986)....................................................... 8, 10, 52

*Davis v. Ayala*, 135 S. Ct. 2187 (2015) ................................................................. 8

*Dennis v. United States*, 341 U.S. 494 (1951) ..................................................... 17

*Descamps v. United States*, 570 U.S. 254 (2013) ............................................... 62

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ................................................. 5

*Enmund v. Florida*, 458 U.S. 782 (1982) ........................................................... 20

*Estelle v. McGuire*, 502 U.S. 62 (1991) ............................................................. 20

*Francis v. Franklin*, 471 U.S. 307 (1985) ............................................ 14, 19, 20, 21

*Furman v. Georgia*, 408 U.S. 238 (1972) ........................................................... 33

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................................... 5

*Glebe v. Frost*, 135 S. Ct. 429 (2014) ................................................................... 8

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ............................................................. 5

*Gray v. Greer*, 800 F.2d 644 (7th Cir. 1985) .......................................... 9, 13, 18, 31

*Gray v. Netherland*, 518 U.S. 152 (1996) ............................................................ 3

*Gregg v. Georgia*, 428 U.S. 153 (1976) ............................................................ 5, 51

*Griffin v. Pierce*, 622 F.3d 831 ......................................................................... 48

*Hall v. Washington*, 106 F.3d 742 (7th Cir. 1997) ............................................. 42

*Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015) ................................. 7

*Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989) ............................................... 42

*Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) ........................................... 2, 40

*Hodge v. Hurley*, 426 F.3d 363 (6th Cir. 2005) ................................................. 14

*In re Winship*, 397 U.S. 358 (1970) .......................................................... 14, 19, 22

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) .......................................... 34

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ..................................................... 6

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ............................................... 3

*Jones v. Basinger*, 635 F.3d 1030 (7th Cir. 2011) ............................................... 8

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) ...................................................... 20

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .................................................. 30

*Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989) ............................... 18, 22, 23, 30

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...................................................................... 38

*Ladner v. United States*, 358 U.S. 169 (1953) ............................................................ 28

*Liparota v. United States*, 471 U.S. 419 (1985) ......................................................... 17

*Martin v. Grosshans*, 424 F.3d 588 (7th Cir. 2005) ................................................... 55

*Mason v. Hanks*, 97 F.3d 887 (7th Cir. 1996)............................................... 9, 13, 18, 31

*Mattox v. United States*, 156 U.S. 237 (1895) ........................................................... 57

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ............................................... 6

*Middleton v. Duggar*, 849 F.2d 491 (11th Cir. 1988)................................................... 35

*Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir.),

   *vacated on other grounds*, 268 F.3d 485 (7th Cir. 2001) .......................................... 59

*Mills v. Maryland*, 486 U.S. 367 (1988)................................................................. 5, 33

*Mooney v. Holohan*, 294 U.S. 103 (1935) .................................................................... 5

*Morissette v. United States*, 342 U.S. 246 (1952)................................................... 16, 17

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................................ 5

*O'Neal v. McAninch*, 513 U.S. 432 (1995)................................................................... 8

*Owens v. Duncan*, 781 F.3d 360 (7th Cir. 2015) ........................................................7-8

*Oyler v. Boles*, 368 U.S. 448 (1962) ......................................................................... 33

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................................... 2

*Payne v. Tennessee*, 501 U.S. 808 (1991)......................................................... 49, 50, 52

*Porter v. McCollum*, 558 U.S. 30 (2009)............................................................. passim

*Prince v. United States*, 352 U.S. 322 (1957)........................................................ 27, 29

*Pruitt v. Neal*, 788 F.3d 248 (7th Cir. 2015).......................................................... 37, 48

*Pyle v. Kansas*, 317 U.S. 213 (1942) .......................................................................... 5

*Rewis v. United States*, 401 U.S. 808 (1971) .............................................................. 17

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007)...................................................... 40

*Rompilla v. Beard*, 545 U.S. 374 (2005)............................................... 36, 37, 43, 49

*Rutledge v. United States*, 517 U.S. 292 (1996) .......................................................... 24

*Sanders v. Cotton*, 398 F.3d 572 (7th Cir. 2005)................................................... 23, 31

*Sandstrom v. Montana*, 442 U.S. 510 (1979) ..................................................... 14, 19, 22

*Sears v. Upton*, 561 U.S. 945 (2010) ........................................................ 37, 42-43, 46

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .......................................................... 4, 61

*Shaw v. Wilson*, 721 F.3d 908 (7th Cir. 2013) ......................................................... 13-14

*Shepard v. United States*, 290 U.S. 96 (1933) ........................................................... 57

*Siehl v. Grace*, 561 F.3d 189 (3d Cir. 2009) ............................................................. 40

*Smith v. Texas*, 311 U.S. 128 (1940) ......................................................................... 32

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ................................................ 34

*Stallings v. United States*, 536 F.3d 624 (7th Cir. 2008) ........................................... 60

*Staples v. United States*, 511 U.S. 600 (1994) ........................................................... 16

*Stevens v. McBride*, 489 F.3d 883 (7th Cir. 2007) ...................................................... 48

*Strickland v. Washington*, 466 U.S. 688 (1984) ................................................... passim

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ............................................................... 22

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ...................................... 34

*Thompson v. City of Louisville*, 362 U.S. 199 (1960) .................................................... 5

*Trest v. Cain*, 522 U.S. 87 (1997) ................................................................................ 3

*Trop v. Dulles*, 356 U.S. 86 (1958) ............................................................................ 33

*United States v. Armour*, 840 F.3d 904 (7th Cir. 2016) ............................................... 62

*United States v. Bailey*, 444 U.S. 394 (1980) ............................................................. 16

*United States v. Batchelder*, 442 U.S. 114 (1979) ...................................................... 32

*United States v. Bolden*, 545 F.3d 609 (8th Cir. 2008) ........................................... 51, 55

*United States v. Cardena*, 842 F.3d 959 (7th Cir. 2016) ............................................. 61

*United States v. Cerna*, No. 08-0730, 2010 WL 3448528 (N.D. Cal. Sept. 1, 2010) ...................... 6

*United States v. Corley*, 519 F.3d 716 (7th Cir. 2008) ................................. 3, 53, 55, 56

*United States v. Cusimano*, 148 F.3d 824 (7th Cir. 1998) ...................................... 10, 52

*United States v. Delay*, 500 F. 2d 1360 (8th Cir. 1974) .............................................. 28

*United States v. Dixon*, 509 U.S. 688 (1993) ............................................................. 25

*United States v. Fleming*, 504 F.2d 1045 (7th Cir. 1974) ......................................... 28-29

*United States v. Fountain*, 642 F.2d 1083 (7th Cir. 1981)............................................................ 60

*United States v. Gaudin*, 515 U.S. 506 (1995)............................................................. 14

*United States v. Granados*, 12 F.3d 1016 (7th Cir. 1998) ..................................................... 10, 52

*United States v. Harris*, 832 F.2d 88 (7th Cir. 1987).................................................................. 26

*United States v. Herrera*, No. 08-0730, 2011 WL 175887 (N.D. Cal. Jan. 19, 2011) ................... 6

*United States v. Jackson*, 736 F.3d 953 (10th Cir. 2013) ........................................................... 27

*United States v. Kelly*, 991 F.2d 1308 (7th Cir. 1993)........................................................... 51, 53

*United States v. Loniello*, 610 F.3d 488 (7th Cir. 2010)......................................................... 28, 29

*United States v. Massaro*, 538 U.S. 500 (2003) ............................................................................ 3

*United States v. Miller*, 673 F.3d 688 (7th Cir. 2012) ................................................................. 10

*United States v. Mobley*, 421 F.2d 345 (5th Cir. 1970) ............................................................... 58

*United States v. Morgan*, 113 F. 3d 85 (7th Cir. 1997) ............................................................... 51

*United States v. Ottersburg*, 76 F.3d 137 (7th Cir. 1996)............................................................ 48

*United States v. Parks*, 583 F.3d 923 (6th Cir. 2009).................................................................. 15

*United States v. Poindexter*, 44 F.3d 406 (6th Cir. 1995)............................................................ 17

*United States v. Richards*, 719 F.3d 746 (7th Cir. 2013)........................................................ 10, 13

*United States v. Santos*, 553 U.S. 507 (2008)............................................................................. 29

*United States v. Serfling*, 504 F.3d 672 (7th Cir. 2007)......................................................... 10, 52

*United States v. Tucker*, 820 F.2d 234 (7th Cir. 1987) ................................................................ 11

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978)......................................................... 16, 17

*United States v. Wolf*, 787 F.2d 1094 (7th Cir. 1986)............................................................. 14, 55

*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) .......................................................... 54-55

*Wayte v. United States*, 470 U.S. 598 (1985).......................................................................... 32, 34

*Webb v. Lane*, 922 F.2d 390 (7th Cir. 1991)........................................................................... 57, 58

*Whalen v. United States*, 445 U.S. 684 (1980) ....................................................................... 26, 27

*Wharton v. Vaughn*, 722 F. App'x 268 (3d Cir. 2018) ................................................................ 48

*White v. Illinois*, 502 U.S. 346 (1992) .......................................................................................... 5

*Wiggins v. Smith*, 539 U.S. 510 (2003).............................................................................. passim

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................................. passim

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ................................................................... 5, 51

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................................ 32, 33

**State Cases**

*Commonwealth v. Gambora*, 933 N.E.2d 50 (Mass. 2010) ........................................................ 6-7

*Porter v. State*, 788 So. 2d 917 (Fla. 2001) ................................................................................ 47

*State v. McPhaul*, 808 S.E.2d 294 (N.C. 2017) ........................................................................... 7

**Statutes**

18 U.S.C. § 2113 ...................................................................................... 15, 24, 27, 60

18 U.S.C. § 254 ............................................................................................................. 28

18 U.S.C. § 924 ............................................................................................... 24, 60, 61

18 U.S.C. §1111 ........................................................................................................... 20

21 U.S.C. § 848 ............................................................................................................ 33

28 U.S.C. § 2255 ............................................................................................................ 1

**Rules**

FED. R. EVID. 804(b)(2) ................................................................................................. 57

**Other Authorities**

American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) .................................................. passim

AM. ASS'N FOR THE ADVANCEMENT OF SCI., LATENT FINGERPRINT EXAMINATION: A QUALITY AND GAP ANALYSIS, 11 (2017) ................................................................................. 5

NAT'L ACAD. OF SCIS., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (2009) ................................................................................................. 4, 6

PRESIDENT'S COUNCIL OF ADVISORS ON SCI. & TECH., EXEC. OFFICE OF THE PRESIDENT, FORENSIC SCIENCE IN CRIMINAL COURTS: ENSURING SCIENTIFIC VALIDITY OF FEATURE COMPARISON METHODS, 9-11 (2016) ................................................................... 5

## PRELIMINARY STATEMENT

On January 19, 2010, Movant Nasih Ra'id filed a *Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody* ("*Motion*") (ECF No. 883). Mr. Ra'id now files this *Memorandum of Law* ("*Memorandum*") in support.

As in the *Motion*, transcripts of the trial proceedings are cited as "Tr." followed by the volume and page number. Other proceedings are cited as "Tr." followed by the date of the proceeding and page number. Mr. Ra'id also cites a number of documents that are not currently of record. These documents are included in the *Appendix* filed on June 13, 2014 (ECF No. 924), and the *Supplemental Appendix* filed on February 2, 2015 (ECF No. 930), and are cited as "A" followed the page number.

Mr. Ra'id is referred to by name, and the United States of America is referred to as the Government. Parallel citations are omitted. All other citations are either self-explanatory or are explained. All emphasis is supplied unless otherwise indicated.

## STANDARD REVIEW OF CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Under 28 U.S.C. § 2255(a), a federal conviction and sentence must be vacated if obtained in violation of the Constitution or laws of the United States.

The majority of Mr. Ra'id's grounds for relief allege violations of his right to the effective assistance of counsel as guaranteed by the Sixth Amendment. These claims are governed by *Strickland v. Washington*, 466 U.S. 688 (1984). Counsel is ineffective where: 1) his performance falls below objective standards of reasonableness, and 2) as a result of that deficiency, the petitioner suffered prejudice. *Id.* at 694.

In determining whether counsel's performance was deficient, the Supreme Court has repeatedly cited the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. Feb. 2003) ("ABA

Guidelines"), as guides for determining the reasonableness of counsel's conduct.[1] "Although they are 'only guides,' . . . and not 'inexorable commands,' . . . these standards may be valuable measures of the prevailing professional norms of effective representation . . . ." *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (quoting *Strickland*, 466 U.S. at 688; *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009)). The Guidelines relied upon herein were promulgated in 2003, before Mr. Ra'id was tried for these offenses. Accordingly, "they describe the professional norms prevailing when the representation took place." *Van Hook*, 558 U.S. at 7; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (applying 1989 Guidelines in existence at time of trial where "[c]ounsel's conduct similarly fell short of the standards for capital defense work articulated by the [Guidelines] – standards to which we long have referred as 'guides to determining what is reasonable'" (quoting *Strickland*, 466 U.S. at 688)).

To establish *Strickland* prejudice, a petitioner must show that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Prejudice is shown where the evidence counsel failed to present was reasonably probable to create a reasonable doubt about guilt. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089-90 (2014). With regard to sentencing phase ineffectiveness, prejudice is established if there is a reasonable probability that even one juror would have voted for life imprisonment instead of death. *Wiggins*, 539 U.S. at 537.

Claims of ineffective assistance of counsel properly are pursued in a § 2255 proceeding and are not waived even though they were not presented on direct appeal. *United States v. Massaro*, 538 U.S. 500, 509 (2003) ("[F]ailure to raise an ineffective-assistance-of-counsel claim

---

[1] The ABA Guidelines are published in 31 Hofstra L. Rev. 913 (2003) and are available at www.ABAnet.org.

on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255.").[2]

## PROCEDURAL HISTORY

Mr. Ra'id was convicted of a number of charges, including bank robbery and capital murder, and was sentenced to death on October 27, 2004.[3] The Seventh Circuit affirmed the convictions and death sentences. *United States v. Corley*, 519 F.3d 716, 730 (7th Cir. 2008). Mr. Ra'id sought certiorari review which was denied on January 21, 2009. *Corley v. United States*, 550 U.S. 1140 (2009). On January 19, 2010, Mr. Ra'id filed the *Motion* pursuant to 28 U.S.C. §2255 (ECF No. 883). On June 13, 2014, Mr. Ra'id filed an appendix to the *Motion* (ECF No. 924) and a supplement to the appendix on February 2, 2015 (ECF No. 930). On June 23, 2016, Mr. Ra'id filed an amendment to the *Motion* (ECF No. 956), amending with a claim pursuant to *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015). During this time period following the filing of the *Motion*, Mr. Ra'id requested and received several extensions of time to finalize the *Appendix* and then to litigate a civil FOIA action in the Eastern District of Pennsylvania.

---

[2] In this *Memorandum*, Mr. Ra'id does not address any procedural defenses, such as procedural bar or waiver, which may be asserted by the Government. The Government is obliged to raise any such defenses, if they exist, and the failure to do so may constitute a waiver of such defenses. *Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a 'defense' that the [Government] is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'" (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996))). Accordingly, should the Government raise procedural defenses to any of Mr. Ra'id's grounds for relief, he will address them in a reply, which is permitted by Rule 5(d) of the Rules Governing Section 2255 Proceedings for the United States District Courts.

[3] Mr. Ra'id was convicted of conspiracy to commit bank robbery under 18 U.S.C. § 371 (Count I); bank robbery under 18 U.S.C. § 2113(d) (Count II); two counts of murder during the course of a bank robbery under 18 U.S.C. § 2113(e) (Counts III, IX); possession of a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c) (Count IV); two counts of murder in the course of possessing a firearm during a crime of violence under 18 U.S.C. § 924(c) and 18 U.S.C. § 924(j)(1) (Counts V, X); and felon in possession of a firearm under 18 U.S.C. § 922(g) and 18 U.S.C. § 924(a)(2) (Count VI).

Most recently, Mr. Ra'id's moved to stay the filing of this *Memorandum* on October 25, 2016 (ECF No. 969). That motion was based on his amended claim pursuant to *Johnson* and the impact the United States Supreme Court's decision in *Lynch v. Dimaya*, No. 15-1498, would have on that claim. *Dimaya* was decided on April 17, 2018. *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Mr. Ra'id now files this *Memorandum* in support of his motion to vacate his convictions and sentences.

## ARGUMENT

### GROUND ONE: MR. RA'ID WAS CONVICTED AND SENTENCED TO DEATH ON THE BASIS OF INACCURATE AND UNRELIABLE SCIENTIFIC EVIDENCE

At trial, the Government relied heavily on fingerprint evidence to establish not only that Mr. Ra'id was inside the Pines Branch of the First State Bank of Porter but that he was the assailant who vaulted over the teller counter to shoot Kay Peckat and Chandler Simpson. Tr. Vol. 7 at 30 (opening statement)[4]; Tr. Vol. 8 at 268 (analyst agreeing that there were over twenty-six ridge characteristics that "matched" between the latent print and Mr. Ra'id's prints)[5]. As discussed in the *Motion*, the National Academy of Sciences Report on forensic evidence, which was issued in 2009, undermines the reliability of the Government's fingerprint evidence. *See* ECF No. 883, 18-24 (describing the deficiencies in friction ridge analysis, including the lack of repeatability and transparency in the ACE-V methodology); NAT'L ACAD. OF SCIS., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (2009) ("NAS

---

[4] In the opening statement, the Government stated that the evidence would prove that Mr. Ra'id "vaulted himself over onto the teller counter, leaving his palm print behind. And as he laid [sic] over the teller counter, he fired his gun three additional times. He shot Kay Peckat twice, killing her. He shot Chandler Simpson in the head, mortally wounding him." *Id.*

[5] *See id.* at 260 (the prints "were made by the same source"); *id.* at 269 (stating that fingerprints are "unique" to the individual and not "random").

4

Report"), A1.[6] Mr. Ra'id's conviction and sentence rest on unreliable fingerprint evidence, in violation of the Due Process Clause and Eighth Amendment.

### A. Mr. Ra'id's rights under the Due Process Clause and the Eighth Amendment were violated by the introduction of unreliable fingerprint evidence

"Reliability is . . . a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, due process requires that criminal convictions be reliable and trustworthy. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *Thompson v. City of Louisville*, 362 U.S. 199, 204 (1960). The use of exaggerated, inaccurate, or misleading testimony, such as that provided by FBI fingerprint analyst Danielle Archambault in this case, deprives the defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *see also Giglio v. United States*, 405 U.S. 150 (1972); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935).

Similarly, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Mills v. Maryland*, 486 U.S. 367, 383-84 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980). This need for heightened reliability requires "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die . . . [,]" *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates death sentences imposed as a result of

---

[6] *See also* PRESIDENT'S COUNCIL OF ADVISORS ON SCI. & TECH., EXEC. OFFICE OF THE PRESIDENT, FORENSIC SCIENCE IN CRIMINAL COURTS: ENSURING SCIENTIFIC VALIDITY OF FEATURE COMPARISON METHODS, 9-11 (2016) (concluding that fingerprint analysis should not be presented in court without evidence of its error rates and of the proficiency and reliability of the method and examiner); AM. ASS'N FOR THE ADVANCEMENT OF SCI., LATENT FINGERPRINT EXAMINATION: A QUALITY AND GAP ANALYSIS, 11 (2017) (stating that examiners should not use terms like "match" or "identification," nor should they make conclusions that "claim or imply" that only a "single person" could be the source of a print).

5

the jury's consideration of materially inaccurate evidence. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (Eighth Amendment does not permit a death sentence to be imposed by a jury that was allowed to consider materially inaccurate evidence). The jury's death verdict here was based in significant part on materially inaccurate and unreliable evidence.

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 318 (2009), the Supreme Court recognized the impact of the NAS Report on courts' assessment of the reliability of evidence. In holding that the Confrontation Clause requires prosecutors to produce forensic examiners and lab analysts to testify about their laboratory reports, the Court relied on the NAS Report to emphasize that "[f]orensic evidence is not uniquely immune from the risk of manipulation." *Id.* The Court noted that "the National Academy Report concluded: '*The forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country.*'" *Id.* (quoting NAS Report at P-1) (emphasis in original).

Relying on the NAS Report, courts have limited fingerprint evidence, and in particular, have prevented experts from testifying, as Agent Archambault did, that a latent print conclusively matched a known print. *See United States v. Herrera*, No. 08-0730, 2011 WL 175887, at *2 (N.D. Cal. Jan. 19, 2011) (preventing expert from testifying "as to whom the fingerprints . . . matched unless and/or until the government satisfactorily demonstrates reliability on *voir dire*"); *United States v. Cerna*, No. 08-0730, 2010 WL 3448528, at *7 (N.D. Cal. Sept. 1, 2010) (limiting fingerprint examiner to testifying to a reasonable degree of certainty in the fingerprint field); *Commonwealth v. Gambora*, 933 N.E.2d 50, 66 (Mass. 2010) (Spina, J., concurring) ("[I]n the interest of maintaining the integrity of the fact-finding process, in the interests of justice and fair play, fingerprint experts be prohibited from expressing the results of

their analysis as absolutely establishing identity, or individualizing fingerprints to a particular individual to the exclusion of all others. They should be confined to an expression of personal opinion that the latent print belongs to the defendant."); *State v. McPhaul*, 808 S.E.2d 294, 305 (N.C. 2017) (holding that the latent fingerprint analysis was inadmissible because the examiner failed to explain "how she arrive at her actual conclusions *in this case*"); *see also Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015) (granting habeas relief where murder conviction based on discredited fire-science and gas-chromatography evidence). The NAS Report demonstrates that the techniques used by Agent Archambault to link Mr. Ra'id to the processed latent print were deficient and unreliable, and her testimony should have been circumscribed accordingly.

> **B.      The error had a substantial and injurious effect on the determination of Mr. Ra'id's guilt and sentence**

A review of the record as a whole establishes that the due process violation had a substantial and injurious effect and influence on the determination of Mr. Ra'id's guilt and sentence. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Since his arrest and throughout these proceedings, Mr. Ra'id has maintained his innocence. While a jury could discount the self-serving testimony of Mr. Ra'id's co-defendants, the jury would have little reason to be skeptical of the "scientific" testimony declaring a match between Mr. Ra'id's known palm print and the latent print found at the crime scene. Therefore, the fingerprint evidence was critical to the Government's case – not merely cumulative to the accomplice testimony.

The Government presented the evidence as scientific, independent, unbiased, and infallible. The NAS Report shows that this fingerprint evidence was not reliable; indeed, it was unscientific. The unreliable fingerprint evidence had a substantial influence on the verdict. *Owens v. Duncan*, 781 F.3d 360, 365 (7th Cir. 2015) (under *Brecht*, the correct inquiry is

whether the error had a substantial and injurious influence on the verdict despite sufficient evidence to support the result apart from the error); *Jones v. Basinger*, 635 F.3d 1030, 1053 (7th Cir. 2011) (same). The fingerprint testimony was a key part of the Government's efforts to prove beyond a reasonable doubt that Mr. Ra'id vaulted over the teller counter to shoot Kay Peckat and Chandler Simpson.

To the extent the Court may be uncertain regarding the harmlessness of this error, habeas relief must be granted. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995) (habeas relief is due where the court is "in grave doubt as to the harmlessness of [the] error"). "[T]he uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict." *Id.* at 435. Moreover, a habeas petitioner does not have the burden of proving the errors prejudicial. Rather, *Brecht* "places the burden on prosecutors to explain why those errors were harmless[.]" *Brecht*, 507 U.S. at 640 (Stevens, J. concurring); *see also Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) ("[R]elief is appropriate only if the prosecution cannot demonstrate harmlessness."); *Glebe v. Frost*, 135 S. Ct. 429, 430 (2014) ("Most constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness." (citing *Neder v. United States*, 527 U.S. 1, 8 (1999))); *Darden v. Wainwright*, 477 U.S. 168, 197 (1986) (in "[e]very harmless-error standard that this Court has employed, . . . once serious error has been identified, the burden shifts to the beneficiary of the error to show that the conviction was not tainted").

The error here cannot be deemed harmless. The fingerprint testimony added substantial weight to the Government's case, and it was not subject to adequate cross-examination because the evidence undermining the science – the NAS Report – had not yet been released. Mr. Ra'id is entitled to a new trial and sentencing.

**GROUND TWO: APPELLATE COUNSEL WAS INEFFECTIVE DUE TO HIS FAILURE TO RAISE AND ARGUE THE PROSECUTORIAL MISCONDUCT COMMITTED BY THE GOVERNMENT DURING THEIR REBUTTAL CLOSING ARGUMENT**

Mr. Ra'id's appellate counsel was ineffective when he failed to raise a claim of prosecutorial misconduct on direct appeal. Ineffective assistance of appellate counsel claims are reviewed under *Strickland v. Washington*, 466 U.S. 668 (1984). The deficiency of appellate counsel's performance can be established by showing that counsel "failed to raise a significant and obvious issue[.]" *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985). Furthermore, "[i]f an issue which was not raised may have resulted in a reversal of the conviction, or an order for a new trial, the failure was prejudicial." *Id.* "[T]he ultimate question . . . is whether, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding . . . would have been different." *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996) (quotations and citations omitted).

As set forth in the *Motion*, the Government engaged in prejudicial misconduct that deprived Mr. Ra'id of a fair trial. A prosecutor's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Id.* As part of this duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's role as representative of the Government – and the mantle of respect and authority this creates in the eyes of the jury – jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." *Id.*

This Court's review of a claim of improper prosecutorial argument involves a two-step analysis. First, this Court must decide whether or not the prosecutor made an improper remark. If the Court determines that an improper remark was made, then it must determine if the remark, in light of the entire record, deprived Mr. Ra'id of a fair trial. *United States v. Cusimano*, 148 F.3d 824, 831 (7th Cir. 1998). "Prejudice does not require an ironclad guarantee that, absent the prosecutorial misconduct, the outcome of trial would have differed." *United States v. Richards*, 719 F.3d 746, 765 (7th Cir. 2013). Mr. Ra'id does not need to show that a jury would not have sentenced him to death absent the prosecutorial misconduct; he simply must demonstrate that he was prejudiced by the impropriety. *See United States v. Miller*, 673 F.3d 688, 701 (7th Cir. 2012) ("Doubts – a lack of 'fair assurance' – call for a new trial.").

In determining whether Mr. Ra'id's rights have been affected, this Court must consider "(1) the nature and seriousness of the prosecutorial misconduct[7]; (2) whether the conduct of the defense counsel invited the prosecutor's remarks; (3) whether the trial court's instructions to the jury were adequate to cure any prejudice that might otherwise result from the improper comments; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant." *Cusimano*, 148 F.3d at 831-32 (quoting *United States v. Granados*, 12 F.3d 1016, 1021-22 (7th Cir. 1998)); *see also Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986).

In Mr. Ra'id's case, appellate counsel was ineffective in failing to raise a meritorious claim of prosecutorial misconduct on direct appeal. To begin, the prosecutor's statements were clearly improper. In closing argument, "the prosecutor may make any comments supported by

---

[7] Whether the prosecutor misstated evidence or implicated a specific right of the accused is relevant to the seriousness of the prosecutor's improper remarks. *See United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007).

the evidence" and "may in argument suggest *reasonable* inferences from the evidence previously admitted." *United States v. Tucker*, 820 F.2d 234, 237 (7th Cir. 1987) (quotations and citations omitted). The inferences "must be fair comment on the evidence, and not akin to the presentation of wholly new evidence." *Id.* at 238 (quotations and citations omitted). If the comments are not supported by the evidence or based on reasonable inferences from such evidence, then the statement should be considered improper.

Here, the defense proved that Mr. Ra'id was right-handed and nearsighted, requiring the use of corrective glasses at all times. Tr. Vol. 12 at 6-7, 144. This evidence contradicted the Government's video evidence which showed the assailant shooting Keith Hill with his left hand while wearing sunglasses and was critical to the defense's case at trial. *See* Tr. Vol. 13 at 136-37 (defense closing argument emphasizing that Mr. Ra'id is right-handed). In rebuttal closing argument, and without any evidentiary support, the prosecution argued that when, as in the case of Mr. Ra'id, "you are trained in the military . . . you are often times trained in both hands." *Id.* at 157. This was not a statement based on the evidence in the record. While Mr. Ra'id was in the military, there was absolutely no record evidence to support the prosecutor's argument that the military training involved learning to shoot a gun with either hand. Although the prosecution attempted to argue that ambidextrous gun training would be part of military training because it would be a useful skill, *id.*, there was no evidence in the record to support this assertion. The prosecutor's remark was "akin to the presentation of wholly new evidence," and therefore should be considered improper.

Moreover, consideration of the *Cusimano* factors demonstrates that Mr. Ra'id was deprived of a fair trial. First, the prosecutor did not merely misstate facts in Mr. Ra'id's case; he asserted something with no basis in evidence. The very nature of the Government's false

argument – that Mr. Ra'id was trained to shoot with both hands – explained away a fact that was crucial to the defense's case that the Government could not explain away with actual evidence. As the defense argued in closing, it defies common sense that an assailant in a life threatening and stressful situation would instinctively use his weaker hand to shoot a large caliber weapon. The Government's improper remarks falsely contradicted the undisputed record evidence, and thus "the nature and seriousness of the comments" should be weighed heavily in favor of granting a new trial.

Second, defense counsel did not invite the Government's improper argument. Counsel discussed the fact that Mr. Ra'id is right-handed and that the video showed a left-handed assailant. However, pointing to evidence in the record does not invite countervailing speculation. While the Government can ask the jury to use its experience to evaluate the evidence, the Government cannot falsely argue a damaging "fact" that completely undermines the defense case.

Third, the Court's refusal to give a curative instruction exacerbated the prejudicial effects of the prosecution's improper remarks. When the prosecution claimed, without evidence, that Mr. Ra'id is "someone who is equally skilled with both hands," trial counsel immediately objected. Tr. Vol. 13 at 157. The Court overruled the objection, allowing the prosecution to again argue that military training necessarily enables someone to shoot a gun with both hands, despite there being no evidence that Mr. Ra'id was either trained or able to do so. *Id.* No curative instruction was given for this clearly improper statement, which must be weighed in Mr. Ra'id's favor.

Fourth, "whether the defense was able to counter the improper arguments through rebuttal" also weighs in favor of granting Mr. Ra'id a new trial. Because the misconduct

occurred in the rebuttal closing argument, the defense had no opportunity to refute this false argument. Without the opportunity to rebut these improper arguments, the prosecution's unfounded arguments were the last words the jury heard on this important issue and were all the jury needed to reject the undisputed evidence that Mr. Ra'id was right-handed while the assailant depicted in the bank video was left-handed.

Finally, the evidence against Mr. Ra'id consisted of the self-serving testimony of his co-defendants, a scientifically questionable palm print, and the bank video, which was strongly challenged by the defense. The Government's unfounded and unsupported statements completely undermined the defense, going to the strength of the Government's remaining evidence. For that reason, this factor, like all the others, should be weighed in favor of granting Mr. Ra'id a new trial. *See Richards*, 719 F.3d at 767 (granting a new trial where the factors "call into question the fairness of [the defendant's] trial and raise doubts that the jury would have convicted him absent the government's improper . . . argument at closing").

The prosecutorial conduct fundamentally deprived Mr. Ra'id of a fair trial, and appellate counsel had a duty to raise this issue on appeal. *Gray*, 800 F.2d at 647. "That this issue was an obvious one to raise on appeal is beyond dispute. [Counsel] had, of course, objected to . . . [it] at trial." *Mason*, 97 F.3d at 894. Because the misconduct struck at the heart of the defense's case, and because the defense had no opportunity to contest the prosecution's unsupported claims during rebuttal closing argument, it fell upon appellate counsel to challenge this trial error. There can be no strategic rationale for appellate counsel's failure to raise this meritorious issue. Had counsel raised this issue on appeal, there is a reasonable probability that the court would have reversed Mr. Ra'id's conviction, for the reasons set forth above. *Shaw v. Wilson*, 721 F.3d 908, 919 (7th Cir. 2013) (counsel ineffective for failing to raise "carefully" preserved claim that "had

13

a reasonable chance of success on appeal but for [counsel's] deficient performance"); *see also United States v. Wolf*, 787 F.2d 1094, 1098-1100 (7th Cir. 1986) (failure to object to prosecutor's misconduct, including questioning without any record evidence, constituted ineffective assistance); *Hodge v. Hurley*, 426 F.3d 363, 388 (6th Cir. 2005) (same).

**GROUND THREE: 18 U.S.C. § 2113(E) IS UNCONSTITUTIONAL AS APPLIED TO MR. RA'ID BECAUSE IT PERMITS A CAPITAL MURDER CONVICTION WITHOUT REQUIRING PROOF OF ANY MENS REA; THE COURT ERRED BY FAILING TO INSTRUCT THE JURY AS TO COUNTS III AND IX THAT MALICE WAS A REQUIRED ELEMENT OF MURDER AND HAD TO BE PROVED BEYOND A REASONABLE DOUBT; AND COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE UNCONSTITUTIONAL AND ERRONEOUS CHARGE**

Due process prohibits the criminal conviction of any person "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Jury instructions that relieve the prosecution of its burden on any element of an offense therefore violate due process. *E.g.*, *Cage v. Louisiana*, 498 U.S. 39, 41 (1990); *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). Further, where a jury is the factfinder, the jury must determine every element of the offense beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000); *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995).

Here, Mr. Ra'id was convicted of capital murder under 18 U.S.C. § 2113(e) notwithstanding the fact that the Government never had to prove – and the jury was never asked to consider – whether he had any culpable mental state with respect to the deaths of Kay Peckat and Chandler Simpson. Because § 2113(e) does not impose any burden on the Government to prove some state of mind justifying the imposition of the punishment sought, Mr. Ra'id's convictions and sentences are unconstitutional. Trial counsel were ineffective for failing to ensure that the jury was instructed that it must find some culpable mental state before it could

14

convict Mr. Ra'id under § 2113(e), and appellate counsel were ineffective for failing to litigate these issues on appeal.

### A. Section 2113(e) as applied is unconstitutional, and the Court erred in failing to charge the jury that malice was a required element of murder

Section 2113(e) provides in relevant part that anyone who "in committing any offense defined in this section . . . kills any person . . . shall be punished by death or life imprisonment." As written, the statute imposes no burden on the Government to prove the defendant was the proximate cause of death or that the defendant possessed any requisite state of mind. The Court failed to instruct the jury that it was required to find that Mr. Ra'id acted with intent in order to convict him of bank robbery resulting in death under § 2113(e). And, in contrast to Counts V and X, which referenced the federal felony murder statute, the Court failed to cross-reference any other provision to clarify its instructions.

> The Court charged the jury as follows:

> To sustain the charge of murder during an attempted bank robbery as charged in Count III of the superseding indictment, the Government must prove the following propositions: First, the defendant killed Kay Peckat; second, the defendant performed such act or acts during the course of committing the offense of aggravated attempted bank robbery as charged in Court II; and third, that at the time charged in the superseding indictment, the First State Bank of Porter had deposits insured by the Federal Deposition Insurance Corporation.

Tr. Vol. 13 at 173; *see id.* at 177 (Chandler Simpson). The Court's instructions limited the jury's consideration to these "propositions," and then told the jury that "[i]f you find from your consideration of all of the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty." *Id.* at 173. "Under this reading, a person would seemingly violate § 2113(e) if he jovially slapped his accomplice on the back to congratulate him on a job well done and thereby inadvertently caused food to lodge in his windpipe, resulting in his death." *United States v. Parks*, 583 F.3d 923, 925 (6th Cir. 2009)

15

(Merritt, J., concurring and dissenting in part). This cannot be correct; the Court should have instructed the jury that malice was a required element of murder under § 2113(e).

First, there is a longstanding presumption that criminal offenses require some proof of mens rea, and the omission of intent in a statute "will not be construed as eliminating that element from the crimes denounced." *Morissette v. United States*, 342 U.S. 246, 263 (1952). Indeed, silence on mens rea does not mean "that [the statute in question] defines a 'strict liability' crime for which punishment can be imposed without proof of *mens rea* at all." *United States v. Bailey*, 444 U.S. 394, 406 n.6 (1980). "Certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978).

Courts may dispense with the longstanding requirement of proof of mens rea only if doing so is consistent with congressional intent, either "express or implied." *Staples v. United States*, 511 U.S. 600, 606 (1994). This holds particularly true where the statute, as here, authorizes significant punishment. *Id.* Because strict liability crimes "generally are disfavored," ascribing strict liability for a killing pursuant to § 2113(e) would contravene a long line of Supreme Court cases that disfavor dispensing with a scienter requirement. *See id.* at 607-10; *U.S. Gypsum Co.*, 438 U.S. at 438.

The requirement of proof of mens rea "is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette*, 342 U.S. at 250; *id.* at 250-51 (tracing the requirement of a "relation between some mental element and punishment for a harmful act" to common law principles). It "'is the rule of,

16

rather than the exception to, the principles of Anglo-American criminal jurisprudence.'" *U.S. Gypsum Co.*, 438 U.S. at 436 (quoting *Dennis v. United States*, 341 U.S. 494, 500 (1951)).

For that reason, "Congress will be presumed to have legislated against the background of our traditional legal concepts which render intent a critical factor, and 'absence of contrary direction [will] be taken as satisfaction with widely accepted definitions, not as a departure from them.'" *Id.* at 437 (quoting *Morissette*, 342 U.S. at 263 (alteration in original)); *see Liparota v. United States*, 471 U.S. 419, 426 (1985) (Congress's failure "explicitly and unambiguously to indicate whether *mens rea* is required does not signal a departure from this background assumption of our criminal law"). *But see United States v. Poindexter*, 44 F.3d 406, 408-09 (6th Cir. 1995) (concluding that the plain meaning of "kills," which the legislature used instead of "murders," suggested that "the legislature did not intend to add an additional scienter requirement" to § 2113(e)).

In *Liparota*, the Supreme Court determined that the offense had a mens rea requirement that obliged the prosecution to prove that the defendant knew that his acquisition or possession of food stamps was unauthorized. *Liparota*, 471 U.S. at 433. Similarly, the Government should have been required to prove – and the jury required to find – that Mr. Ra'id possessed some culpable mental state.

Should this Court find Congress's intent ambiguous with respect to the mens rea requirement of § 2113(e), it should hold that the rule of lenity requires a showing of mens rea. Indeed, "requiring *mens rea* is in keeping with our longstanding recognition of the principle that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Id.* at 427 (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)).

Because § 2113(e) as applied is unconstitutional, and the Court failed to remedy the constitutional violation by instructing the jury that malice was a required element of murder, Mr. Ra'id's rights under the Fifth and Sixth Amendments were violated.

**B.      Prior counsel were ineffective for failing to object to the instructions and to litigate these issues on appeal**

Trial counsel's failure to call attention to this constitutional infirmity was both deficient and prejudicial to Mr. Ra'id. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). By objective standards of reasonableness, counsel should have objected to the Court's jury instruction when it was issued. *See Kubat v. Thieret*, 867 F.2d 351, 371, 373-74 (7th Cir. 1989) (counsel's failure to object to erroneous capital sentencing jury instruction was ineffective). Even operating under the assumption that any objection would have been overruled, reasonable counsel would have still raised the issue to preserve it for subsequent review. Moreover, at the appellate stage, counsel had a second opportunity to address the earlier failure and correct it by raising the claim for plain error review before the appellate court. *See Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985); ABA Guideline 10.15.1.

Had the matter been raised at any of these stages, Mr. Ra'id would have been in a very different position. The identity of Kay Peckat's and Chandler Simpson's actual shooter was a central issue in the case. The jury may have very well convicted Mr. Ra'id for aggravated attempted robbery but concluded that he carried out one of the lesser roles in the crime. As instructed, the jury did not have to consider whether the mens rea he would have harbored under that scenario was also sufficient to convict him for the resulting deaths. Instead the jury instruction as given permitted a conviction for the "death results" charge irrespective of Mr. Ra'id's role in the attempted robbery. If the Government had been held to its burden of proving that some mens rea existed for the deaths, the jury might well have then acquitted Mr. Ra'id of

the "death results" due to uncertainty about the participants' respective roles in the robbery. For these reasons, counsel's unreasonable failure to object to the unconstitutional jury charge and to litigate the error on appeal prejudiced Mr. Ra'id.

**GROUND FOUR: THE ERRONEOUS CONSPIRACY CHARGE PERMITTED A CONVICTION FOR CAPITAL MURDER WITHOUT REQUIRING THE GOVERNMENT PROVE EACH ELEMENT BEYOND A REASONABLE DOUBT, AND COUNSEL UNREASONABLY FAILED TO RAISE, PRESERVE, AND ARGUE THE ERROR**

Mr. Ra'id's jury was improperly instructed that it could convict – not only of the conspiracy but also of capital murder – by merely demonstrating that the murder was a "foreseeable consequence" of the conspiracy. Tr. Vol. 13 at 170. This erroneous instruction relieved the Government of its duty to prove each element beyond a reasonable doubt. Furthermore, the charge led the jury to believe that it could convict Mr. Ra'id of *all* offenses with which he was charged if it found him guilty of *any* of the offenses. This erroneous charge, and counsel's failure to object, deprived Mr. Ra'id of his rights under the Fifth, Sixth, and Eighth Amendments.

    **A.**    **The conspiracy charge absolved the Government of its burden to prove all elements of the substantive offense**

Due process requires the Government to prove every element of the offense beyond reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). Jury instructions that lessen this burden violate due process. *Cage v. Louisiana*, 498 U.S. 39, 41-41 (1990); *Sandstrom v. Montana*, 442 U.S. 510, 523-24 (1979). The jury instructions in this case violated Mr. Ra'id's right to due process and rendered the trial constitutionally unfair because they relieved the Government of its burden to prove every element beyond a reasonable doubt. *Francis v. Franklin*, 471 U.S. 307, 316-17 (1985); *Sandstrom*, 442 U.S. at 523-24.

19

An element of murder with a firearm, as charged in Counts V and X, is that the Government prove murder as defined under 18 U.S.C. §1111. Section 1111 states "murder is the unlawful killing of a human being with malice aforethought." Comparably, as to Counts III and IX, every charge of murder requires proof of malice and at least some degree of mental culpability. To sustain the charge of murder via the conspiracy charge, the Government needed to show Mr. Ra'id possessed the requisite mental state necessary to prove murder. It was therefore incumbent upon the Government to prove criminal intent and upon the Court to instruct the jury accordingly. The Court did not meet its obligations. The jury was charged as follows:

> A conspirator is a person who knowingly and intentionally agrees with one or more persons to accomplish an unlawful purpose. A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy. Therefore, if you find beyond a reasonable doubt that the defendant was a member of a conspiracy at the time that one of his fellow conspirators committed the offenses – the offense charged in Counts II, III, IV, V, IX, and X, in furtherance of and as a foreseeable consequence of that conspiracy, then you should find him guilty of Counts II, III, IV, V, IX, and X.

Tr. Vol. 13 at 170-71.

In evaluating a claim that jury instructions violate due process, the inquiry focuses "initially on the specific language challenged," *Francis*, 471 U.S. at 315, and then considers the constitutionality of the infirm language "in the context of the instructions as a whole," *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Due process is violated if "there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that lessens the Government's burden. *Boyde v. California*, 494 U.S. 370, 380 (1990). Additionally, the Eighth Amendment is violated where, as here, a death sentence is sanctioned even though the criminal conduct proved did not encompass a killing. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 413 (2008); *Enmund v. Florida*, 458 U.S. 782, 797 (1982); *Coker v. Georgia*, 433 U.S. 584, 592 (1977).

20

Here, under a fair reading of the Court's instructions, there is a reasonable likelihood that the jury convicted of Mr. Ra'id of capital murder without finding proof of malice or intent to kill beyond a reasonable doubt. Even if the Court instructed the jury of these elements at another point in the trial, the conspiracy charge seemingly supersedes these requirements and likely led members of the jury to believe that *foreseeability* was all that was necessary for a capital murder conviction. Instructional "[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Francis*, 471 U.S. at 322.

The jury charge also was erroneous because it could have been understood to have instructed the jury to convict Mr. Ra'id of *all* counts if the conspiracy extended to *any* count. It broadly defined conspiracy "as an agreement to accomplish an unlawful purpose" and instructed the jury, after listing all counts, that if it found Mr. Ra'id was a member of a conspiracy at the time that one of his fellow conspirators committed "the offense"[8] charged, then it "should find him guilty of Counts II, III, IV, V, IX, and X." Thus, even if the conspiracy extended to only one count, the instruction seemingly charged the jury to convict of all counts. This is not a trivial distinction. Neither Count II nor Count IV required that a killing occur. Conversely, Count V alleged murder with a firearm during a crime of violence. If the jury believed it could convict Mr. Ra'id of Count V simply because it believed him to be guilty of Counts II or IV, this would have substantially lowered the Government's burden of proof for the latter crime and relieved the Government of its burden of proving each element of the crime beyond a reasonable doubt.

---

[8] The court initially used the plural form "offenses" before correcting itself and employing the singular "offense." Tr. Vol. 13 at 170-71.

Mr. Ra'id was entitled to a jury finding of all elements of the offenses beyond a reasonable doubt. The Court's instructions permitted a capital murder conviction by substituting "foreseeability" for the elements of the offense. Most errors in habeas proceedings are subject to harmless error review under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Where, as here, the prosecution's burden is diminished, and a defendant's conviction is not based "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," constitutional error occurs. *Winship*, 397 U.S. at 364. Such error is not harmless, as a matter of federal constitutional law; it is structural, and requires reversal without regard to a prejudice determination. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993).

**B.      Prior counsel were ineffective for failing to object to these errors and to litigate these issues on appeal**

As the Court's failure to properly instruct the jury violated Mr. Ra'id's due process rights, trial counsel's failure to object to this unconstitutional instruction and request a proper instruction, and appellate counsel's failure to raise this claim on direct appeal, constitutes ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Trial counsel performed deficiently by failing to ensure that the jury was properly instructed on the Government's burden of proof. Instructions that reduce the prosecution's burden of proof are devastating to the defendant. *See, e.g.*, *Cage*, 498 U.S. at 40-41; *Sandstrom*, 442 U.S. at 523-24; *Winship*, 397 U.S. at 363-64. Counsel has a duty to raise timely objections to such constitutional violations. *See Kubat v. Thieret*, 867 F.2d 351, 371, 373-74 (7th Cir. 1989) (counsel's failure to object to erroneous capital sentencing jury instruction was ineffective); ABA Guideline 10.8.

Counsel could have no reasonable tactical or strategic basis for failing to object to unconstitutional and erroneous jury instruction. Counsel's failure to object prejudiced Mr. Ra'id,

as it reduced the Government's burden of proving each element beyond a reasonable doubt. *See Kubat*, 867 F.2d at 371; *Chambers v. Armontrout*, 907 F.2d 825, 832-33 (8th Cir. 1990) (petitioner prejudiced where petitioner might have been acquitted or found guilty of a lesser charge had counsel performed effectively). Moreover, even if trial counsel's objection had been overruled by this Court, there exists a reasonable probability that a similar claim would have succeeded on direct appeal had counsel preserved the error for subsequent review.

Appellate counsel's performance also was deficient, regardless of trial counsel's failure to preserve the issue in this Court. The instructions absolved the Government of its burden to prove each and every element of the offense and thus should have been raised as "plain error." At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that were arguably meritorious. *See* ABA Guideline 10.15.1. Prevailing decisional law recognized that appellate counsel could be ineffective for failing to raise a meritorious claim, even where the claim would have been reviewed under the plain error standard. *Sanders v. Cotton*, 398 F.3d 572, 583-85 (7th Cir. 2005) (appellate counsel's failure to challenge the trial court's refusal to instruct the jury that the state had the burden to prove the absence of sudden heat as an element of murder under Indiana law was deficient and prejudiced the defendant). There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. The error was plain, and would have resulted in the vacating of Mr. Ra'id's convictions and/or death sentences had it been raised on appeal.

**GROUND FIVE: THE COURT ERRED BY ALLOWING THE PROSECUTION TO PROCEED ON MULTIPLE BANK ROBBERY MURDER AND FIREARM MURDER CHARGES, AND COUNSEL UNREASONABLY FAILED TO SEEK DISMISSAL OF THE MULTIPLICITOUS COUNTS**

The imposition of multiple punishments for the same offense violated Mr. Ra'id's rights under the Double Jeopardy Clause of the Fifth Amendment. Even if a defendant does not receive an additional sentence for the extraneous charge, the conviction itself constitutes an extraneous "punishment" for double jeopardy purposes. *Rutledge v. United States*, 517 U.S. 292, 302 (1996). Mr. Ra'id was punished under both 18 U.S.C. § 924 (Count IV) and 18 U.S.C. § 2113(e) (Counts III and IX). Because these counts proscribed the same offense, punishing Mr. Ra'id under both statutes violated his rights to due process and against cruel and unusual punishment. Moreover, because both deaths for which Mr. Ra'id was punished arose from the same bank robbery, the correct unit of prosecution for the events in this case was one count of bank robbery resulting in death under 18 U.S.C. § 2113(e). The Court erred by failing to require the prosecution to elect between these counts, and prior counsel were ineffective for failing to object to the multiplicitous charges and sentences and to litigate the errors on appeal. Mr. Ra'id is entitled to a new trial and sentencing proceeding.

> **A.    The bank robbery murder and the firearm murder counts were multiplicitous**

While the Government may charge a defendant with indictments under multiple statutes, regardless of whether the statutes proscribe the same offense, the defendant may not be punished for both offenses. *Ball v. United States*, 470 U.S. 856, 865 (1985) (emphasizing that "while the Government may seek a multiple-count indictment . . . where a single act establishes [both counts], the accused may not suffer two convictions or sentences on that indictment"). However, where one statute "requires proof of a fact which the other does not," "the same act or transaction constitutes a violation of two distinct statutory provisions." *Blockburger v. United States*, 284

24

U.S. 299, 304 (1932); *see also United States v. Dixon*, 509 U.S. 688, 696-97 (1993) (affirming

*Blockburger*'s "same evidence" test).

Here, Mr. Ra'id was punished under both § 924, murder with a firearm during a crime of

violence, and § 2113(e), murder during an attempted bank robbery. Both crimes can be proven

by the same elements, and should consequently be considered to be the same offense under

*Blockburger.*

With regard to § 2113(e), murder during an attempted bank robbery, the Court instructed

the jury that the Government must prove:

> First, the defendant killed [the victims]; second, the defendant performed such act
> or acts during the course of committing the offense of aggravated attempted bank
> robbery as charged in Count II; and third, that at the time charged in the
> superseding indictment, the First State Bank of Porter had its deposits insured by
> the Federal Deposit Insurance Corporation.

Tr. Vol. 13 at 173, 177. Count II required proof that the robbery entailed theft by "means of force

and violence" and use of a dangerous weapon. *Id.* at 171-172, 174. The jury also was instructed

that bank robbery is a crime of violence. *Id.* at 174.

In order to convict Mr. Ra'id under § 924, murder with a firearm during a crime of

violence, the jury was instructed that the Government must prove:

> First, that the defendant committed a crime of violence, as I have described that
> term for you; second, that in the commission of that crime of violence, the
> defendant used a firearm; third, that such use resulted in death of [the victims];
> and fourth, that the homicide constituted murder within the meaning of Title 18,
> United States Code, Section 1111.

*Id.* at 175. The Court stated these elements were satisfied by proof of murder committed in

perpetration of or in an attempt to perpetrate any robbery. *Id.*

Thus, the jury clearly was instructed that a conviction under § 924 could be sustained

based solely on the evidence used to establish a violation of § 2113(e). Evidence of robbery in

§ 2113(e) satisfies the "crime of violence" element of § 924, and evidence that the defendant

killed someone during the course of the robbery in § 2113(e) can be used to demonstrate murder with a firearm under § 924. All of the elements of § 924 have analogues in the elements of § 2113(e); the only difference is that § 2113(e) contains the element of theft by "means of force and violence" and § 924 (incorporating § 1111) speaks of robbery generally. Because §§ 2113(e) and 924 can be proven by the same elements, they constitute the same offense under *Blockburger*.

"[W]here two statutory provisions proscribe the 'same offense,' they are construed *not* to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." *Whalen v. United States*, 445 U.S. 684, 692 (1980). There is no "clear indication" that Congress intended to impose multiple punishments for violations of § 924 and § 2113(e) that occurred during the same act or transaction. Intent cannot be inferred simply because the statutes appear in different sections of the United States Code. *Id.* at 692, 694.

In contrast, on a case of first impression, the Seventh Circuit held that Congress clearly intended to authorize an additional penalty for the use of a firearm during an armed robbery of a bank because Congress altered the language of § 924(c), demonstrating a specific intent "to authorize an additional penalty for use of a firearm in the commission of the already enhanced charge of armed robbery of a savings and loan institution." *United States v. Harris*, 832 F.2d 88, 90 (7th Cir. 1987). Consequently, a defendant could be punished under both § 2113(d) and § 924(c). *Id.* at 90-91. Indeed, it is logical that Congress would have intended an enhanced punishment when a firearm is used during a bank robbery, as it increases the likelihood of injury

or death. However, when the crimes being charged already involve death as an element, the use of a firearm poses no additional risk.[9]

Because Congress's intent is unclear, any doubt must be resolved in favor of lenity. *Whalen*, 445 U.S. at 691-92 ("The assumption underlying the [*Blockburger*] rule is that Congress ordinarily does not intend to punish the same offense under two different statutes.").

**B.    The ambiguous language of § 2113(e) warrants lenity and prevents the imposition of multiple punishments for the same offense**

Section 2113(e) states, in pertinent part, that "whoever, in committing any offense defined in this section . . . or in avoiding or attempting to avoid apprehension for the commission of such offense, kills *any person*" shall be punished by life imprisonment. While neither the Supreme Court nor the Seventh Circuit has addressed whether the phrase "any person" is intended to be singular or plural, other circuit courts that have specifically analyzed § 2113(e) have held that the statute's ambiguous language prevents the imposition of multiple punishments for the killing of multiple people during a single bank robbery.

The Tenth Circuit has held that the rule of lenity limits §2113(e) to only one unit of prosecution, even if multiple deaths occur during the course of a single bank robbery, because the statute is ambiguous. *See United States v. Jackson*, 736 F.3d 953, 956 (10th Cir. 2013) ("[W]e conclude that 'any person' as used in §2113(e) could be interpreted either in the singular or plural, making it sufficiently ambiguous as to require lenity."). The Eighth Circuit also has found that "the rationale prohibiting the pyramiding of violations of the various sections of

---

[9] The Supreme Court has held that it is improper to impose cumulative sentences for the same bank robbery under the Federal Bank Robbery Act. *Prince v. United States*, 352 U.S. 322, 329 (1957). In *Prince*, the defendant was convicted and sentenced for entering a bank with intent to commit robbery under 18 U.S.C. § 2113(a) and armed bank robbery under 18 U.S.C. § 2113(d). The Court held the unlawful entry and robbery do not become consecutively punishable if the robbery is consummated. *Id.* at 328-29. The same logic applies to punishing a defendant twice for the same deaths that occurred during the course of a robbery.

§ 2113 also prohibits the pyramiding of offenses on the basis of separate victims of the crime." *United States v. Delay*, 500 F. 2d 1360, 1368 (8th Cir. 1974) (vacating two sentences imposed under §2113(e) for a defendant who shot three hostages during a bank robbery).

Although the Seventh Circuit has not explicitly addressed the ambiguity of the phrase "any person" in the specific context of §2113(e), it has noted that the pyramiding of offenses across various sections of §2113 is improper. *See United States v. Loniello*, 610 F.3d 488, 496 (7th Cir. 2010) (stating that "if §2113 establishes many offenses, only the most serious . . . should lead to punishment"). Moreover, both the Supreme Court and the Seventh Circuit have found statutory language similar, and sometimes identical, to § 2113(e) ambiguous and therefore warranting lenity.

For example, in *Ladner v. United States*, 358 U.S. 169 (1953), the Supreme Court held that a defendant who wounded two officers with a single shotgun discharge could only be punished for one violation of assault under former 18 U.S.C. § 254. Section 254 stated: "Whoever shall forcibly resist, oppose, impede, intimidate or interfere with *any person* . . . while engaged in the performance of his official duties . . ." is guilty of an offense. The Supreme Court held that the "any person" language was sufficiently ambiguous as to invoke the rule of lenity and permit only a single prosecution when two individuals were injured by one act. *Ladner*, 358 U.S. at 177-78.

Similarly, the Seventh Circuit held that placing the lives of two tellers in jeopardy during a single bank robbery does not constitute the commission of two separate offenses under §2113(d) because the purpose of the § 2113 is to prevent bank robbery, not personal assault. *United States v. Fleming*, 504 F.2d 1045, 1054 (7th Cir. 1974) ("Congress' concern was penalizing the robbery of the institution, perpetrated by whatever means, and not penalizing the

28

robbery of each individual teller."). Just as the Seventh Circuit in *Fleming* found that §2113(d) is single unit of prosecution, regardless of how many tellers' lives are placed in jeopardy, §2113(e) should only be interpreted as one unit of prosecution, regardless of whether one or two people are killed, so long as the killings occur during the course of the same attempted bank robbery.

However, even if this Court finds that the analysis in *Fleming* does not apply to prosecutions under §2113(e), the language of §2113(e) is still sufficiently ambiguous as to warrant lenity. The Supreme Court repeatedly has held that when statutory language is ambiguous and the court cannot be certain of the legislative intent, the statute must be interpreted in favor of the defendant. *E.g.*, *Bell v. United States*, 349 U.S. 81, 83 (1955) ("When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity."). In *Bell*, the Supreme Court found that the Mann Act, 18 U.S.C. §2421, was ambiguous when it referred to the illegal transportation of "any woman or girl." Consequently, the Supreme Court applied the rule of lenity, punishing the defendant once for the offense even though two women were illegally transported.

Here, there is no indication of any specific congressional intent to give individuals multiple punishments for multiple deaths under § 2113(e). Indeed, the legislative history of § 2113(e) is "meager." *Prince v. United States*, 352 U.S. 322, 328 (1957). The dearth of legislative history is partially due to the fact that both the wording and structure of § 2113 are the work of Law Revision Counsel rather than Congress itself. *Loniello*, 610 F.2d 492. Because the legislative history of § 2113 is inconclusive, this Court should not "play the part of a mind reader" and attempt to discern some alternate congressional intent. *See United States v. Santos*, 553 U.S. 507, 515 (2008). Without an indication of statutory intent to permit multiple

29

punishments stated "clearly and without ambiguity, doubt [should] be resolved against turning a single transaction into multiple offenses." *Bell*, 349 U.S. at 84.

### C.      Counsel's failure to object to the multiplicitous counts prejudiced Mr. Ra'id

"[T]rial counsel in a death penalty case must be especially aware . . . of the heightened need to fully preserve all potential issues for later review." ABA Guideline 10.8 (cmt) (internal quotation omitted). In light of this duty, counsel's failure to raise a timely objection to a constitutional violation at trial constitutes ineffective assistance. *See, e.g.*, *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (counsel's failure to timely file motion to suppress was deficient); *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989) (counsel's failure to object to erroneous capital sentencing jury instruction was ineffective); *Burns v. Gammon*, 260 F.3d 892, 897 (8th Cir. 2001) ("No sound trial strategy could include failing to make a constitutional objection . . . .").

Despite these well-established principles, trial counsel ineffectively failed to object the multiplicitous counts. There could be no reasonable tactical basis for counsel's failure to object to the multiplicitous counts. Indeed, counsel's silence allowed to the Government to proceed on duplicative charges, put Mr. Ra'id in jeopardy of twice being convicted and sentenced to death for the same offense, and violated his rights to due process and against cruel and unusual punishment by unduly emphasizing the option of a death sentence to a jury. Moreover, even if trial counsel's objection had been overruled by this Court, there exists that a reasonable probability that a similar claim would have succeeded on direct appeal – had counsel preserved the error for appellate review.

Raising this constitutional objection also would have compelled the Government to elect between the multiplicitous counts and favorably altered the trial landscape for the defense. Counsel vigorously contested the evidence identifying Mr. Ra'id as the actual shooter. If the

Government elected the firearms murder, counsel may have concentrated on other weaknesses in the Government's case, including the biases of the witnesses, the poorly supported forensic conclusions, and the weak and otherwise incongruous motive relied upon by the prosecution, instead of defending the predicate bank robbery. Counsel's failure to take this important step unfairly prejudiced Mr. Ra'id at trial and at sentencing.

Indeed, the error in this case cannot simply be remedied by vacating the duplicitous counts. The same jury that convicted Mr. Ra'id was also responsible for his sentencing. It is likely that the psychological impact of believing Mr. Ra'id was guilty of four counts of capital murder (two for each victim) tipped the scale in favor of the death penalty in one or more of the jurors' sentencing decisions. It also violated Mr. Ra'id's rights to due process and against cruel and unusual punishment by unduly emphasizing the option of a death sentence to a jury. And by permitting the jury to improperly double count, the death sentence was arbitrary and capricious in violation of the Eighth Amendment. Had counsel properly objected, and the extraneous counts not been considered, there is a possibility that at least one juror would have voted for life imprisonment instead of the death. *See Wiggins v. Smith*, 539 U.S. 510, 536 (2010) (prejudice is shown if counsel's deficient performance would have caused even one juror to vote for life).

Appellate counsel's performance also was deficient. The imposition of multiple punishments for the same offense was plain error and should have been raised as such. At the time of direct appeal, it was standard practice that appellate counsel in capital cases were expected to litigate all arguably meritorious issues, even when the claim would be reviewed under the plain error standard. *See Sanders v. Cotton*, 398 F.3d 572, 583-85 (7th Cir. 2005); *Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985); ABA Guideline 10.15.1. There was not, and could not be, any tactical or strategic reason

31

for counsel not to raise this meritorious claim. The error was plain, and would have resulted in the appeals court vacating Mr. Ra'id's convictions and/or sentences. The prejudicial effect of counsel's failure to object the multiplicitous counts, along with appellate counsel's failure to raise the underlying claim on appeal, entitles Mr. Ra'id to relief.

**GROUND SIX: MR. RA'ID WAS DENIED DUE PROCESS OF LAW, THE RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT, AND THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE FEDERAL DEATH PENALTY, AS ADMINISTERED, IS DISPROPORTIONATELY AND UNCONSTITUTIONALLY APPLIED BY RACE; TRIAL AND APPELLATE COUNSEL FAILED TO PROPERLY OBJECT BASED ON THIS FACT**

Mr. Ra'id has demonstrated that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by race, in violation of due process, equal protection and the Eighth Amendment. *See* ECF No. 883, 41-44.

A prosecutor has wide discretion in the exercise his power. *Wayte v. United States*, 470 U.S. 598, 607 (1985). Ordinarily, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). However, that discretion is not limitless but is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979). Invoking the Equal Protection Clause, the Supreme Court has long sought to eliminate all forms of government-sanctioned discrimination "whether accomplished ingeniously or ingenuously." *Smith v. Texas*, 311 U.S. 128, 132 (1940); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886).

Accordingly, prosecutorial decisions may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962); *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). When a defendant demonstrates that the administration of a criminal law is "directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive[,]" then the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo*, 118 U.S. at 373.

Racial discrimination in the administration of the death penalty also violates the Eighth Amendment which requires that death penalty statutes be applied fairly. The Eighth Amendment is violated if "there is no meaningful basis for distinguishing the few cases in which [capital punishment] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring); *id.* at 256 (Douglas, J., concurring) ("The high service rendered by the 'cruel and unusual' punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups.").

A capital prosecution and resulting sentence that is unduly influenced by race is arbitrary and capricious in violation of the Eighth Amendment, *see Furman*, *supra*, and is inconsistent with the evolving standards of decency protected by the Eighth Amendment. *See Mills v. Maryland*, 486 U.S. 367, 383-84 (1988); *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

Furthermore, Congress enacted 21 U.S.C. § 848(o)[10] in order to expressly grant capital defendants the "right . . . to justice without discrimination," requiring juries to certify that racial discrimination played no role in the imposition of the death penalty in specific cases. Thus, the

---

[10] This subsection was repealed in 2006, after Mr. Ra'id's conviction.

prosecution of and imposition of the death sentence against Mr. Ra'id violated his rights under 21 U.S.C. § 848 to "justice without discrimination" and also contributed to "the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).

Since the filing of the *Motion*, racial disproportionality in the application of the federal death penalty has not changed. Of the 503 defendants against whom the Attorney General has authorized the DOJ to request the death penalty as of February 2017, 135 have been white, 93 Hispanic, 21 Asian/Indian/Pacific Islander/Native American, 3 Arab and 237 African American. Thus, the DOJ has sought death sentences against almost twice as many African Americans as whites, despite a national population where whites outnumber African Americans by about five times. Further, 368 of the 503 authorizations, or 73%, of defendants approved for capital prosecution have been non-white. Of the 60 defendants on federal death row under active death sentences, 35, or 58%, are non-white. *See* Death Penalty Information Center, *Disposition of Federal Cases Since Reinstatement of Federal Death Penalty in* 1988, https://deathpenaltyinfo.org/federal-death-penalty (last visited June 15, 2018).

In view of the allegations contained in the *Motion* and herein, Mr. Ra'id has made a prima facie showing that the administration of the federal death penalty is unduly influenced by race. *See* ECF No. 883, 41-44. Following the standards governing the resolution of any discrimination claim, Mr. Ra'id submits that it is now incumbent upon the Government to show that race did not play a factor in the decisions to seek the death penalty in this case. *Wayte*, 470 U.S. at 608 ("It is appropriate to judge selective prosecution claims according to ordinary equal protection standards." (footnote omitted)); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

**GROUND SEVEN: TRIAL COUNSEL DID NOT EFFECTIVELY DEVELOP AND PRESENT MITIGATING EVIDENCE**

Mr. Ra'id's childhood and adolescence were plagued by instability, trauma, abuse, abandonment, and neglect. Mr. Ra'id was abandoned by his father at an early age. His mother, who had five children by four different men, worked odd hours, leaving the children to fend for themselves. As a result, Mr. Ra'id and his siblings suffered deprivations that included lack of nutrition, proper clothing and proper shelter. When his mother was home, she physically, verbally and emotionally abused her children – brutally beating Mr. Ra'id and his siblings. In addition to the abuse, Mr. Ra'id and his siblings were exposed to constant inappropriate sexual behavior, including "stag parties," and were encouraged to engage in acts of molestation and incest. *See* ECF No. 883, 46-70.

Mr. Ra'id's life history has had severe consequences for his mental health. He began coping with his chaotic and dysfunctional childhood by using drugs and alcohol at an early age. He suffers from major depression, generalized anxiety disorder and psychoactive substance abuse and dependence. He also suffers from post-trauma symptomatology, an inability to adjust, underlying psychological disarray and mentally and emotionally disordered thinking and functioning. His mood is unstable, and he is prone to bizarre behavior, delusional thinking, irrational impulses, blurring of reality and psychotic symptoms. He also has schizotypal symptoms. *Id.*

Mr. Ra'id's life history and resulting impairments are highly mitigating in the context of a capital trial. They are particularly mitigating in a capital trial in which the crimes of conviction were impulsive and poorly thought out. *See*, *e.g.*, *Middleton v. Duggar*, 849 F.2d 491, 495 (11th Cir. 1988) ("[P]sychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors." (quotations and citations omitted)). Although

35

counsel had substantial red flags for the development of this significant mitigating evidence, counsel failed to ask either of the appointed mental health experts to develop and prepare to present Mr. Ra'id's full traumatic life history and mental health impairments to the jury. Counsel also failed to present any expert testimony that could contextualize and explain Mr. Ra'id's traumatic life history from a mitigating and mental health perspective and lessen the weight of the Government's case in aggravation. Counsel had no reasonable basis for failing to uncover and/or present this evidence in mitigation, and there is a reasonable probability that had counsel effectively presented the mitigation evidence described in the *Motion* and herein "at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

### A.    Legal standards

#### 1.    Deficient performance

As part of a "thorough investigation" for "all reasonably available" mitigation, counsel should, well before trial, seek out and thoroughly interview family members and others familiar with the client's life history and background. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 395-96, 416 (2000) (counsel performed deficiently where, despite obtaining three mental health evaluations of defendant and interviewing his family members, counsel failed to discover available evidence of his difficult childhood); ABA Guideline 10.11 ("[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.").

An attorney, who obtains only "rudimentary knowledge . . . from a narrow set of sources," despite awareness that other mitigating evidence is reasonably available, is deficient. *Wiggins*, 539 U.S. at 524; *see also Rompilla v. Beard*, 545 U.S. 374, 383-84 (2005). "In assessing the reasonableness of an attorney's investigation," a court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead

36

a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter v. McCollum*, 558 U.S. 30, 40 (2009). Fulfilling the duty to investigate is the predicate for all subsequent decisions, including what evidence to present: "if counsel has failed to conduct a reasonable investigation to prepare for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to *present* at sentencing." *Blystone v. Horn*, 664 F.3d 397, 420 (3d Cir. 2011) (emphasis in original).

Where counsel fails to discover mitigating evidence that was "reasonably available," counsel's performance can be deficient even where they have made significant efforts. *See Wiggins*, 539 U.S. at 524, 546 (counsel deficient even where they tracked down social services records on defendant and his family, obtained a presentence report that included an account of defendant's personal history, and had investigators interview defendant's family); *Rompilla*, 545 U.S. at 389-90 (counsel deficient even where they extensively interviewed defendant's family members and obtained three mental health evaluations); *Pruitt v. Neal*, 788 F.3d 248, 275 (7th Cir. 2015) ("Although we recently recognized that it is difficult to establish ineffective assistance [of counsel] when counsel's overall performance indicates active and capable advocacy, even an isolated error can establish ineffective assistance if it is sufficiently egregious and prejudicial." (alteration in original) (quotations and citations omitted)).

### 2.    Prejudice

The presentation of some mitigating evidence at trial does not preclude a finding of deficient performance or prejudice. *Sears v. Upton*, 561 U.S. 945, 954 (2010) ("We have never limited the prejudice inquiry under Strickland to cases in which there was only 'little or no mitigation evidence' presented." (citation omitted)); *Williams*, 529 U.S. at 369, 396. Prejudice requires only "a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different. *Strickland*, 466 U.S. at 694. This standard is not a stringent one, and is less demanding than the preponderance standard. *See Williams*, 529 U.S. at 405-06; *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

In determining whether a petitioner was prejudiced by his counsel's deficient performance, a court must "evaluate the totality of the evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Wiggins*, 539 U.S. at 536 (alteration in original) (quotation omitted). In a capital sentencing proceeding, where a sentence of death can be found by only a unanimous jury, prejudice is established where there is a reasonable probability that at least one juror, after hearing the unpresented mitigating evidence, "would have struck a different balance." *Id.* at 537; *Porter*, 558 U.S. at 42.

**B.      Trial counsel failed to conduct an adequate investigation and thus failed to develop and present readily available mitigation**

Trial counsel was obliged to conduct a thorough investigation for all reasonably available mitigation and to follow-up on the investigative leads developed along the way. *Wiggins*, 539 U.S. at 521-22. Here, trial counsel's performance fell short of this standard in at least two ways: (1) counsel failed to conduct a thorough investigation of Mr. Ra'id's childhood, background and upbringing; and (2) counsel badly mishandled the investigation of his resulting mental health impairments. *Id.* at 527; *Porter*, 558 U.S. at 40.

**1.      Counsel ignored obvious red flags warranting further investigation**

Counsel had substantial red flags for the development of a mitigation defense based on Mr. Ra'id's compelling social history. In the February 2003 Memorandum to the Department of Justice (DOJ), written more than a year before trial by then-appointed counsel Jerry Jarrett, Esq. and P. Jeffrey Schlesinger, Esq., counsel stated the following as reasons why the Government should not pursue the death penalty:

> [W]hile he was permitted periodic visits with his father, those visits were frequently the source of trauma to him. One such incident occurred when he was just two years of age. His father allowed him to swing by his hands from an exterior second story stair railing. The toddler, unable to hold himself, fell in excess of fifteen feet to the ground and sustained multiple injuries. We believe a traumatic brain injury was sustained as a result of this fall. . . .

> Ra'id's mother was physically violent with her children. It was not uncommon for her to hit them with skillets, belts, extension cords, hammers or anything else that might be within her reach. If one of the children ran from her, it was her practice to order another child to catch and bring that child back to her for punishment. Many times she would instruct the retrieving child to hit the child who had run. If in her opinion, the child who had done the hitting had not hit hard enough, that child would also receive the blows.

> Sexual boundaries were not clearly established within Ra'id's family. Ra'id himself was sexually violated prior to his teenage years. He also was traumatized by witnessing his mother engaged in sexual activities with the various men she brought into their home.

Memo to DOJ at 3-5. Even at this preliminary stage of the investigation, counsel had both red flags for the development of a full life history and mental health mitigation presentation and the knowledge that such information would be critical to Mr. Ra'id's case.

Counsel was aware that the Government would present evidence from Mr. Ra'id's journal in its case in aggravation. Nevertheless, counsel failed to seize upon the red flags in the journal to fully develop a mitigation case based on Mr. Ra'id's dysfunctional and traumatic family history and his resulting psychological deficiencies. *See* ECF No. 883, 4. Counsel's investigator/mitigation specialist, Cheri Hodson, provided additional red flags that put counsel on notice of the existence of a mitigation case based on Mr. Ra'id's traumatic life history, A365-71; counsel, however, failed to provide Ms. Hodson any guidance in how this evidence should be developed. As Ms. Hodson explained:

> During the course of my pre-trial investigation, I uncovered a mountain of evidence regarding Mr. Ra'id's background. I was concerned that defense counsel was not providing a lot of feedback regarding the information I was developing. They were not giving me guidance and I did not feel we had an appropriate theory of mitigation for the penalty phase.

39

A365 at ¶ 4 (Hodson).

As counsel concedes, Ms. Hodson "did not receive specific directions . . . as to what mitigation factors should be developed. I did not provide her with an overall mitigation defense theory. Neither did I ask Ms. Hodson to prepare a specific social history affidavit or report for provision to a mental health expert or for the jury." A358 at ¶ 7 (Schlesinger); A353-54 at ¶ 7 (Theis). Counsel further explains, Ms. Hodson "looked to me for opinions and feedback about how to develop a penalty phase defense in the most compelling way. Unfortunately, this was my first capital penalty phase, and I just did not have the needed answers for her." A361 at ¶ 11 (Schlesinger); A372 at ¶42 (Hodson). Counsel's inadequate performance continued with the investigation, development and presentation of Mr. Ra'id's mental health impairments.

**2.      Counsel mishandled the mental health investigation and presentation**

The duty to investigate extends to the professional reasonable investigation and presentation of relevant expert testimony. *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014); *Siehl v. Grace*, 561 F.3d 189 (3d Cir. 2009). This duty also includes "work[ing] with the expert to understand the basics of the science involved[.]" *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007). Trial counsel was deficient in their duty here.

As described above, counsel had ample reason to suspect that Mr. Ra'id suffered from mental health impairments due to his history of trauma. Counsel had Dr. Bryan Hudson appointed as a mental health expert. Like Ms. Hodson, "Dr. Hudson gave [counsel] red flags for a mitigation defense." A359 at ¶ 8 (Schlesinger); A352 at ¶ 3 (Theis). In his April 2004 report, Dr. Hudson reported that Mr. Ra'id was privy to his mother's sexual encounters with different men; there was a significant history of incest, sexual abuse, physical abuse and family dysfunction; and he had a history of drug abuse and employment instability. A389-90. Dr.

Hudson also noted that Mr. Ra'id had psychological problems though he maintained "some psychological resources." A391-92.

Rather than seizing upon these red flags, counsel failed to "ask Dr. Hudson to develop a full psycho-social history" or "to address life history and psychological mitigation factors beyond the neuropsychological screening." A359 at ¶ 8 (Schlesinger); *see also* A395 at ¶ 8 (Dr. Hudson). As Mr. Schlesinger explains:

> I should have had Dr. Hudson fully develop a presentation concerning Mr. Ra'id's traumatic childhood history and Mr. Ra'id's resulting psychological problems, with additional testing and a thorough psycho-social mitigation assessment, before we proceeded to the penalty phase. Such evidence would have provided the jury with a compelling mitigation case, given Mr. Ra'id's horrendous environment and its long-lasting effects on him. Further, such evidence would have countered the government's negative use of Mr. Ra'id's life history, including its use of Mr. Ra'id's own journal against him.

A360 at ¶ 9 (Schlesinger); A352-53 at ¶5 (Theis).[11] Counsel also acknowledges that they did not retain or have an expert "explain the significance of Mr. Ra'id's exposure to his toxic environment and its psychological effects on him, as Ms. Hodson suggested. A361 at ¶ 10 (Schlesinger); A371 at ¶ 7 (Hodson).

Similarly, the other defense expert, Dr. Mark Cunningham, a psychologist who testified about Mr. Ra'id's non-dangerousness within the Bureau of Prisons, was not asked to develop Mr. Ra'id's life history or mental health mitigation. Indeed, as counsel explains, Dr. Cunningham was not even asked to conduct a clinical interview of Mr. Ra'id:

> We did not ask [Dr. Cunningham] to develop any evidence of our client's psycho-social history. As with Dr. Hudson, this was due to my inexperience. I . . . never asked him if he could have presented both the future non-dangerousness testimony he did present . . . and also specific mitigation testimony about Mr. Ra'id's traumatic history.

---

[11] Dr. Hudson also was available to speak with Mr. Ra'id's family and friends "in an attempt to develop and validate his reported psychosocial history. Trial counsel did not ask [him] to do so, nor did counsel provide [him] with a through history as described in the social history and affidavit provided by Ms. Hodson." A395 at ¶ 8 (Dr. Hudson).

A361-62 at ¶ 12 (Schlesinger); A353 at ¶6 (Theis); Tr. Vol 19 at 149 (Dr. Cunningham testifying that "[w]hat [he] was asked to do in this case was not evaluate all of the mitigation . . . or even to do a risk assessment that incorporated [an] interview of the defendant"). As a result, his testimony was "generalized," "sterile" and "not particularly persuasive." A361 at ¶ 12 (Schlesinger); A353 at ¶ 6 (Theis).

In sum, trial counsel did not work or even confer with their expert witnesses after the initial consultations, nor did counsel utilize their experts or retain an expert to explain the significance of Mr. Ra'id's traumatic childhood and its psychological effects on him. Counsel's failure to present expert testimony to contextualize the mitigating nature of Mr. Ra'id's life history was not the result of any reasonable strategic decision. Counsel's "failure to present or investigate mitigation evidence resulted not from an informed judgment, but from neglect." *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989); *see also Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) ("Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance."). Counsel concedes as much. A360 at ¶ 9 (Schlesinger); A354 at ¶¶ 8-9 (Theis).

## C.     Mr. Ra'id was prejudiced by counsel's deficient performance

Had Mr. Ra'id's counsel conducted an investigation into mitigation and presented the proffered mitigation evidence, the sentencing court "would have learned of the 'kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability.'" *Porter*, 558 U.S. at 41 (quoting *Wiggins*, 539 U.S. at 535). The Supreme Court repeatedly has found deficient investigations prejudicial, at least in part because counsel failed to uncover mitigating mental health evidence. *See Sears*, 561 U.S. at 956 ("proper analysis of prejudice

42

under *Strickland* would have taken into account the newly uncovered evidence of Sears' 'significant' mental and psychological impairments," along with other evidence); *Porter*, 558 U.S. at 41 (deficient investigation prejudicial, in part, because it failed to uncover petitioner's "brain abnormality"); *Rompilla*, 545 U.S. at 391 (adequate investigation would have disclosed mental health mitigation); *Wiggins*, 539 U.S. at 535 (adequate investigation would have uncovered petitioner's "diminished mental capacities"); *Williams*, 529 U.S. at 396 (constitutionally adequate investigation would have disclosed that petitioner was "borderline mentally retarded"). For similar reasons, Mr. Ra'id was prejudiced by trial counsel's failures to develop and present the mental health mitigation set forth in the *Motion* and below.

Dr. Jethro Toomer, a psychologist with expertise in the development of psycho-social mitigating evidence; Dr. Richard Dudley, a forensic psychiatrist; and Dr. Jonathan Mack, a neuropsychologist, all evaluated Mr. Ra'id and his case, and each report that Mr. Ra'id's family and childhood history has had a severe, debilitating impact on him.

Dr. Toomer performed a clinical evaluation of Mr. Ra'id in an effort to assess and explain Mr. Ra'id's life history from a mitigating and mental health perspective. Dr. Toomer concluded from his testing of Mr. Ra'id and his interviews with Mr. Ra'id's family members that Mr. Ra'id suffers from serious psychological impairments with "symptomatology consistent with a mood disorder, a history of depression, post-trauma symptomatology, and borderline personality disorder. His history and functioning are characterized by a pattern of enduring and marked instability and impulsivity with respect to interpersonal relationships, problems with self-image, difficulties with executive functioning, and disturbed affect manifested in a variety of contexts." A374.

43

Dr. Toomer found that "Mr. Ra'id suffers from ongoing trauma, first inflicted when he was a child." A380. Mr. Ra'id was raised in a chaotic environment without structure, nurturance or guidance, and the absence of parental oversight was complicated by a pattern of physical, emotional and sexual abuse. A376-79; A380-81. Individuals suffering from ongoing trauma may, for example, suffer from impaired cognitive abilities, impaired social and emotional health, an impaired ability to form interpersonal relationships and an impaired capacity to regulate behavior. In Mr. Ra'id's case, his dysfunctional childhood experiences molded his perceptions of the world and of other people. He could not form or maintain appropriate adult relationships because of his constant anticipation of rejection, abandonment or abuse. A381. Further, Dr. Toomer found that Mr. Ra'id exhibits developmental delays and deficits in all areas of functioning to the point where he experiences the world at an emotional and intellectual equivalent of an adolescent. A382.

Another way in which ongoing trauma can damage an individual is by altering the way in which brain reacts to minor stimuli.

> Being raised in such a violent, hostile, chaotic and unpredictable environment left Mr. Ra'id insecure, paranoid and distrustful of others and their motives. His experience of unpredictable and unprovoked violence from the very people that should have protected him from harm rendered him hypervigilant for signs of aggression and danger. Hypersensitivity to signs of aggression from others begins as a defense mechanism in a violent childhood home and creates paranoia and a tendency to misinterpret even benign events as being the product of aggression and ill will from others. . . . As a result of his background, Mr. Ra'id learned to expect violence from others. Because of this, he is likely to respond to others in ways that seem overreactive. This extreme reactivity is a symptom of the mental and emotional disorders from which he suffers.

*Id.* Dr. Toomer found that throughout his adult life, Mr. Ra'id suffered from a substantially impaired ability to reason, think clearly, control impulses, regulate his emotions or conform his conduct to the requirements of law. A382. Neuropsychological testing confirmed these deficits.

Dr. Dudley's clinical evaluation of Mr. Ra'id also supported Dr. Toomer's findings. Dr. Dudley found that, as a result of his traumatic, chaotic and dysfunctional childhood, Mr. Ra'id developed a Personality Disorder, Mixed Type, with Borderline, Narcissistic and Schizotypal features. A386. His disorders are characterized by frantic efforts to avoid abandonment, a pattern of unstable and intense interpersonal relationships, extremes of emotional attachment and withdrawal from others and reality, and self-damaging behaviors and chronic feelings of emptiness. *Id.* He also suffers from odd thinking and a lack of close confidants. *Id.* Moreover, Dr. Dudley explains:

> Given this mixture of personality difficulties and the multitude of traumatic experiences he endured during his childhood and adolescent years, Mr. Ra'id's mood has always been extremely unstable; he is chronically depressed and subject to even more severe bouts of depression; and it at least appears that there have been times when his depression has been so severe that he warrants the additional diagnosis of Depressive Disorder, NOS.

*Id.* Dr. Dudley noted that Mr. Ra'id began using/abusing drugs as a form of self-medication but over time his use became abusive.[12] Moreover, the drugs "ultimately contributed to his being even more distressed, unstable and vulnerable to rather severe deterioration when under stress." *Id.*

As a result his traumatic life history, "especially the ongoing traumas, physical and psychological abuse and neglect that he endured during his childhood and early adolescent years," Dr. Dudley found that Mr. Ra'id developed "clinically significant psychiatric difficulties" that impaired his ability to function. *Id.*

Dr. Mack's examination revealed that Mr. Ra'id suffers from multiple neuropsychological impairments, including frontal lobe dysfunction affecting his executive

---

[12] Dr. Dudley also diagnosed Mr. Ra'id with Polysubstance Abuse, involving marijuana and cocaine. A386.

functioning. At trial, Dr. Hudson could have explored these deficits had he been asked to conduct additional mental health and neuropsychological testing.

Together, the reports of Drs. Dudley, Toomer and Mack represent the type of compelling mental health mitigation that counsel recognized was missing from the trial presentation. This mental health mitigation was available to be presented at the time of trial. Drs. Hudson and Cunningham have explained that they could have provided such evidence to the jury had they been asked. A396-97 at ¶¶ 12-14 (Dr. Hudson); A399-400 at ¶¶ 6-10 (Dr. Cunningham); A401-404 at ¶¶4-9 (Dr. Cunningham).

Trial counsel's penalty phase presentation looked much different. In addition to Dr. Cunningham's "sterilized testimony," counsel presented several lay witnesses, including Mr. Ra'id's mother and siblings. Although these lay witnesses conveyed isolated facts about Mr. Ra'id's life history, their testimony was superficial, incomplete and not presented as part of a coherent narrative. More troubling, their testimony painted a sugar-coated and inaccurate image of Mr. Ra'id's childhood. For example, Barbara Aldridge, Mr. Ra'id's mother, minimized the physical abuse she inflicted on her children, only admitting to "spanking" Mr. Ra'id. Tr. Vol. 19 at 76. The "stag parties" and orgies in which she participated were sanitized to men "visiting" or "spending the night." *Id.* at 114 (Kim Aldridge); *id.* at 141 (Regina Aldridge).

While the Supreme Court has found prejudice when trial counsel presented "little or no mitigation evidence," it "certainly ha[s] never held that counsel's effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Sears*, 561 U.S. at 955. As in *Porter*, "[t]his is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing [jury]." *Porter*, 558 U.S. at 41 (quoting *Strickland*, 466 U.S. at 700).

Rather, this is a case in which "there exists too much mitigating evidence that was not presented to now be ignored." *Id.* at 43 (quoting *Porter v. State*, 788 So. 2d 917, 937 (Fla. 2001) (Anstead, J., concurring in part and dissenting in part)).

Moreover, in its sentencing case, the Government relied heavily on Mr. Ra'id's alleged involvement in a prior murder and the writings in his journal to paint him as a dangerous predator. In its rebuttal arguments to the jury, the Government read from portions of the "journal" – portions in which Mr. Ra'id referred to his mother as a "vile[] whore," made statements regarding how little boys lust after their aunts and cousins, stated that he "became the aggressor towards [his] younger cousins and nieces, participating in the perpetual onslaught of incest and molestation" and said that he had to fight hard to prevent himself from becoming a "baby molester." Tr. Vol. 21 at 47-49. The Government even faulted Mr. Ra'id for criticizing his mother – "the woman who came in here and cried for his life." *Id.* at 47. The evidence the jury did not hear would have explained the basis for Mr. Ra'id's writings about his mother, addressed the Government's aggravation case and humanized Mr. Ra'id.

Counsel's failure to present the available evidence regarding their client's social history and mental health impairments was prejudicial. As the Seventh Circuit explained in *Stevens v. McBride*:

> Competent evidence of Stevens's mental illness would have strengthened the general mitigation evidence presented by defense counsel concerning Stevens's difficult background by focusing the jury on the concrete results of years of abuse on Stevens's psyche. There was, in addition, little downside risk of presenting such evidence to the jury; evidence of the most damning sort was already before the jury. . . . And unlike general mitigation evidence concerning Stevens's background, evidence about Stevens's severely dissociated condition and impaired ability to appreciate the wrongfulness of his conduct at the time of the killing would have provided his lawyers a basis for rebutting the aggravating factors highlighted by the State.

489 F.3d 883, 897-98 (7th Cir. 2007); *see also Pruitt*, 788 F.3d at 272 (counsel's failure to have defendant evaluated by an expert in psychosis was prejudicial where the defense strategy was to show that defendant's intellectual disability, serious mental illness and brain damage warranted a sentence less than death); *Griffin v. Pierce*, 622 F.3d 831, 844-45 (7th Cir. 2010) (defendant prejudiced by counsel's failure to investigate and present evidence abuse and neglect and serious mental health impairments).

Finally, this was not a strong case for the death penalty. Mr. Ra'id did not enter the premises planning to commit murder. And despite the ineffective investigation and presentation of mitigation evidence, which lacked ample mitigation evidence that counsel could have presented, the jury struggled to reach a verdict. The jury retired for deliberations mid-day on October 22, 2004, Tr. Vol. 21 at 118, and did not reach a verdict until two days later. Tr. Vol. 23 at 2. The length of the deliberations indicates a reasonable probability that the psycho-social testimony that counsel could have presented would have caused one or more jurors to spare Mr. Ra'id's life. *See, e.g.*, *Wharton v. Vaughn*, 722 F. App'x 268, 283 (3d Cir. 2018) (considering the length of deliberations and the fact that the jury at one point was deadlocked in determining whether counsel's deficient performance was prejudicial); *Aguilar v. Woodford*, 725 F.3d 970, 984 (9th Cir. 2013) (questions and notes over four days of deliberations showed the case was close) (citing *Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999) (deliberations of nine hours over the course of three days indicate that the jury "did not find the case to be clear cut")); *United States v. Ottersburg*, 76 F.3d 137, 140 (7th Cir. 1996) (nine hours of deliberations "makes clear that this case was not an easy one for those called to serve as finders of fact").

Even in highly aggravated cases, the Supreme Court has found prejudice resulting from counsel's failure to investigate and introduce mitigating evidence. *See, e.g.*, *Porter*, 558 U.S. at

32-33 (double murder committed during burglary); *Rompilla*, 545 U.S. at 378, 383 (torture-murder during robbery of bar; petitioner had history of violent felony convictions, including prior conviction for rape and assault); *Williams*, 529 U.S. at 367-68 (petitioner beat elderly man to death with mattock and robbed him; prior convictions for armed robbery, burglary, and assaults on other elderly victims).

For all of the reasons set forth above and in the *Motion*, Mr. Ra'id was prejudiced by counsel's deficient performance; a new sentencing phase is warranted.

**GROUND EIGHT: COUNSEL UNREASONABLY FAILED TO ENSURE THAT MR. RA'ID'S JURY WAS NOT INFLUENCED BY THE GOVERNMENT'S IMPROPER CLOSING ARGUMENT COMMENTING ON THE VICTIMS' FAMILY MEMBERS' OPINION REGARDING THE APPROPRIATE PUNISHMENT**

During the penalty phase of Mr. Ra'id's trial, the Government introduced witness after witness to testify about the impact of the victims' deaths on their family and friends. In rebuttal closing argument, the Government went further and suggested to the jury that the victims' family members thought that the death penalty was the appropriate punishment for Mr. Ra'id, in violation of the Eighth Amendment as construed in *Payne v. Tennessee*, 501 U.S. 808, 827-30 & n.2 (1991). Trial counsel objected, arguing that the statement violated an agreement that both parties would refrain eliciting any testimony from penalty phase witnesses regarding their opinions on whether Mr. Ra'id should receive the death penalty. The Court overruled the objection. Tr. Vol. 21 at 39.

At the conclusion of closing arguments – and outside the presence of the jury – counsel moved for a mistrial based on the prosecutor's statement, explaining that the statement indicated that the victims' family members "would not be satisfied with a sentence of life without parole." *Id.* at 52. After briefing, the Court issued an order denying a mistrial motion. The prosecutor's comment was improper and in violation of the Eighth Amendment, and prior counsel failed to

49

take the appropriate steps at trial and on appeal to ensure that Mr. Ra'id's constitutional rights were protected.

### A. The prosecutor's improper closing argument violated Mr. Ra'id's constitutional rights

In *Payne*, the Supreme Court recognized that evidence about the victim and the impact on the victim's family may be relevant in capital sentencing proceedings but left undisturbed its holding in *Booth v. Maryland*, 482 U.S. 496 (1987), barring any evidence of the family's opinions regarding the defendant, the offense, and the appropriate punishment as *per se* violative of the Eighth Amendment due to its inflammatory nature. 501 U.S. at 827-30 & n.2 (citing *Booth*, 482 U.S. at 508); *Bosse v. Oklahoma*, 137 S. Ct. 1, 1-2 (2016) (reaffirming that *Booth*'s holding barring evidence of victims' family members' views on the appropriate punishment survived *Payne*).

When the Supreme Court declared such evidence and argument unconstitutional, it was acutely aware of the impact that it could have on the jury:

> One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. As we have noted, any decision to impose the death sentence must be, and appear to be, based on reason rather than caprice or emotion. The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases.

*Booth*, 482 U.S. at 508-09 (quotations and citations omitted).

Here, the victim impact evidence undeniably was used by the prosecutor to argue for the imposition of the death penalty on behalf of the victims' families. The prosecutor told the jury that just "[b]ecause there were no histrionics, because there was no raw emotion, don't assume for a minute that the sentence of life will be perceived as justice by the victims of this case." Tr.

Vol. 21 at 39. The prosecutor's argument played on the jurors' sympathies for the families struggling with the loss of a loved one, emphasized these families' need for justice and inhibited the jury's ability to make the "reasoned moral response" to the evidence before it that the Eighth Amendment requires. *See California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring); *see also United States v. Bolden*, 545 F.3d 609, 630 (8th Cir. 2008) (prosecutor "improperly" asked "the jury to impose the death penalty on behalf of the [victim's] family").

Furthermore, the argument violated Mr. Ra'id's due process rights because the prejudicial effect greatly outweighed its probative value. As set forth in Ground II, *ante*, due process requires that a prosecutor's proper concern in a criminal case is "that justice shall be done." *Berger v. United*, 295 U.S. 78, 88 (1935). This is especially true in capital cases because of the Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), and that the sentencing process "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury," *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality opinion); *see also Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) ("'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination'" (quoting *California v. Ramos*, 463 U.S. 992, 998-99 (1983))).

Thus, even setting aside the outright prohibition of this argument under *Payne*, the prosecutor's closing argument ran afoul of *Berger*'s admonition because it impermissibly appealed to the jury's emotions and "invited the jury to consider issues beyond the guilt or innocence of the defendant." *United States v. Morgan*, 113 F. 3d 85, 89 (7th Cir. 1997); *see also United States v. Kelly*, 991 F.2d 1308, 1314 (7th Cir. 1993) (holding a comment that appealed to jury's emotions was improper).

In determining whether the misconduct deprived Mr. Ra'id of a fair trial, "(1) the nature and seriousness of the prosecutorial misconduct[13]; (2) whether the conduct of the defense counsel invited the prosecutor's remarks; (3) whether the trial court's instructions to the jury were adequate to cure any prejudice that might otherwise result from the improper comments; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant." *United States v. Cusimano*, 148 F.3d 824, 831 (7th Cir. 1998) (quoting *United States v. Granados*, 12 F.3d 1016, 1021-22 (7th Cir. 1998)); *see also Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986). The application of those factors to this case shows that the prosecutor's argument deprived Mr. Ra'id of a fair and reliable sentencing proceeding.

First, the prosecutor did not merely argue something with no basis in evidence; he asserted something that was constitutionally prohibited. *See Payne*, 501 U.S. at 830 n.2. Second, the prosecutor's statements were not invited by the conduct of defense counsel. The defense never speculated about the families' feelings regarding the defendant's sentencing. When the Court questioned the prosecutor as to what the comment was a response to, he could not point to a specific instance of conduct. Instead, he simply stated his comment was a reaction to "what Mr. Schlesinger said about the death issues and all that went with it." Tr. Vol. 20 at 53. Thus, even if the statement were not prohibited under *Payne*, the prosecutor could not point to a single specific instance that warranted a response. *Cf. Darden*, 477 U.S. at 168 (noting that "much of [the prosecutor's] objectionable content was responsive to the opening summation of the defense (available under a state procedural rule)").

---

[13] Whether the prosecutor misstated evidence or implicated a specific right of the accused is relevant to the seriousness of the prosecutor's improper remarks. *See United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007).

Third, the Court did not tell the jury not to consider the improper statements. Although the Court provided a curative instruction with regards to other improper evidence, *United States v. Corley*, 519 F.3d 716, 726 (7th Cir. 2008), no such instruction was given to the jury after the prosecutor suggested that the families' wanted Mr. Ra'id to be sentenced to death. The Court simply overruled defense counsel's objection and instructed counsel to submit a written motion for mistrial at a later date. The Court never told the jury to disregard the improper statement, nor did it offer any kind of curative instruction with regards to the improper closing argument. *Cf. Kelly*, 991 F.2d at 1314 ("The AUSA's argument was plainly inappropriate. . . . Nevertheless, we believe the court's prompt instruction to the jury cured any possible prejudice the comment may have created.").

Fourth, the prosecutor chose to introduce this improper evidence at the last possible moment, leaving defense counsel with no opportunity to counter it. The prosecutor's assertion that the jury should not "assume for a minute that the sentence of life will be perceived as justice by the victims of this case" was among the last words the jury heard before deliberating. This argument – without curative instructions or the opportunity to rebut – impermissibly skewed the weighing process towards death and violated Mr. Ra'id's rights under the Due Process Clause and the Eighth Amendment.

**B.      Prior counsel were ineffective in litigating this claim**

Although trial counsel objected to the improper statement, he did not reference the Eighth Amendment, let alone any relevant precedent, including *Booth* or *Payne*, regarding the inadmissibility of statements as to the opinions of the victims' family members on the death penalty. Counsel merely relied on an agreement he made with opposing counsel. Tr. Vol. 21 at 39. Trial counsel, however, also was ineffective in failing to ensure that the terms of the alleged agreement with the Government were formally memorialized and presented to the Court, for

failing to ask for a sidebar to explain the objection and the alleged agreement, for failing to ask for a curative or limiting instruction, and for failing to ask for any remedy less than a mistrial.

Counsel's ineffectiveness continued after trial, as counsel failed to raise an Eighth Amendment argument in subsequent motions. In the *Motion for Mistrial Based on Improper Prosecution Closing Argument* filed on October 25, 2004, trial counsel argued that the statement violated due process because it was not based on evidence and violated the understanding between counsel. Trial counsel repeated this allegation in the *Motion for Judgment of Acquittal under Rule 29, or in the Alternative, for New Trial under Rule 33 and for Other Relief* filed on November 11, 2004, but the court deemed the one-sentence argument "insufficiently developed to permit consideration[.]" 12/08/04 Order at 5. These failures were not a "strategic choice" on the part of trial counsel.

In order for a choice to be strategic, it must first be informed. *Strickland v. Washington*, 466 U.S. 668, 680 (1984) (holding that "reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options"). Even in the absence of an agreement between the defense and the Government, trial counsel had clear constitutional grounds on which to base his objection. However, the only explanation defense counsel made with regards to his objection was, "I thought we had eliminated that argument earlier in our discussions." Tr. Vol. 21 at 39. This is not a strategic choice; it is an uninformed argument. *See Baer v. Neal*, 879 F.3d 769, 784-86 (7th Cir. 2018) (counsel's failure to object to prosecutor's statement that the victim's family was "here seeking justice and the[y] believe that's the death penalty" was deficient); *Washington v. Hofbauer*, 228 F.3d 689, 703 (6th Cir. 2000) ("The prosecution's tactics and challenged statements amounted to unfair and prejudicial misconduct plainly meriting an objection and curative instruction, yet [trial

54

counsel] sat silent. At the most pivotal moments, we conclude, his silence was due to incompetence and ignorance of the law rather than as part of a reasonable trial strategy.").

Given that trial counsel clearly wished to keep this argument away from the jury, there is no reasonable explanation or strategic choice for failing to rely on Eighth Amendment jurisprudence at the time counsel made his initial objection to the Government's argument or at the time counsel argued for a mistrial and for a new trial and sentencing. Because jurors likely were influenced by their sympathies for the victims' families, a clear jury instruction could have led one or more jurors to vote for life in prison as opposed to death. *See Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir. 2005) (counsel ineffective for failing to object to "irrelevant and prejudicial testimony" and the prosecutor's "inflammatory and improper" closing argument); *United States v. Wolf*, 787 F.2d 1094, 1099-1100 (7th Cir. 1986) (prosecutor's improper cross-examination and counsel's silence prejudiced defendant); *cf. Bolden*, 545 F.3d at 630 (finding no reversible error where the prosecutor "did improperly ask the jury to impose the death penalty on behalf of the [victim's] family" but counsel requested and the court delivered a curative instruction that the jury "not speculate about the family's wishes").

Appellate counsel, citing applicable Supreme Court case law, raised a claim about the Government's improper argument on direct appeal. Appellate counsel, however, lumped this argument into a general prosecutorial misconduct claim (citing three incidents of misconduct on the part of the Government), and, according to the Seventh Circuit opinion, appellate counsel "[did] not really argue that the statement alone is reversible error" under *Booth* or *Payne*. *Corley*, 519 F.3d at 729. The court also faulted appellate counsel for failing to "present[] any argument" addressing the prosecutor's statements regarding the opinions of the victims' family during closing argument as opposed to victim impact testimony. *Id.* The court denied the claim,

55

seemingly on due process grounds, stating that "the one, isolated, ambiguous statement by the government . . . is not reversible error in the context in which it was made and in the context of the closing argument and limiting instructions as a whole." *Id.*

The court was wrong. To the extent that appellate counsel raised an Eighth Amendment challenge, as noted above, *Payne* left undisturbed *Booth*'s holding that opinions regarding the defendant, the offense, and the appropriate punishment *per se* violate the Eighth Amendment. Moreover, the prosecutor's remark was not "ambiguous" – he told the jury that the victims' family members thought a death sentence was the appropriate penalty for "justice." And, victim impact was more than just an "isolated" aspect of the Government's case in aggravation. To the contrary, sixteen of the twenty-eight witnesses the Government called during the penalty phase were friends or family members of the victims.[14] The prosecutor's closing argument reinforced their testimony and encouraged the jury when deliberating to grant those victims "justice" in the form of a death sentence.

Both trial and appellate counsel failed to adequately preserve, brief and argue that the Government's statement regarding the victims' family members' opinions on the appropriate sentence in the case violated the Eighth Amendment. Had trial and appellate counsel reasonably raised and preserved this issue at trial and/or on appeal, there is a reasonable probability that a mistrial would have been granted, that a curative instruction would have been issued, or that the sentence would have been reversed on appeal. Relief is warranted.

---

[14] Of the remaining witnesses, six pertained to the death of Wanda McNeal, and six were from law enforcement and probation and parole.

**GROUND NINE: THE COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT IT COULD CONSIDER THE OUT-OF-COURT STATEMENT OF WANDA MCNEAL, IDENTIFYING WILLIAM JOHNSON AS HER ASSAILANT, FOR THE TRUTH OF THE MATTER ASSERTED**

At the penalty hearing, Mr. Ra'id was compelled to defend himself against prejudicial evidence that he previously murdered Wanda McNeal. Despite the patent unfairness of requiring Mr. Ra'id to defend this charge in front of a jury when he had not been charged and convicted of Ms. McNeal's death, Mr. Ra'id was able to put forth a compelling defense, including testimony that Ms. McNeal had identified someone else – William Johnson – as her assailant in a dying declaration. Tr. Vol. 17 at 98. Mr. Ra'id was entitled to an instruction that Ms. McNeal's dying declaration was admissible, not just to impeach the Government's case, but for its truth. The Court failed to instruct the jury on how this evidence could be received, and trial and appellate counsel were ineffective for failing to litigate the error. A new penalty phase is warranted.

A dying declaration is "a statement that the declarant, while believing that the declarant's death [is] imminent, made about its cause or circumstances." FED. R. EVID. 804(b)(2); *see Webb v. Lane*, 922 F.2d 390, 395 (7th Cir. 1991) (statement made while "conscious of impending death and under the belief that there is no chance of recovery"). In order for a statement to qualify under this hearsay exception, the United States Supreme Court has explained:

> [T]he declarant must have spoken without hope of recovery and in the shadow of impending death . . . . Fear or even belief that illness will end in death will not avail itself to make a dying declaration. There must be a "settled hopeless expectation" that death is near at hand, and what is said must have been spoken in the hush of its impending presence . . . . The patient must have spoken with the consciousness of a swift and certain doom.

*Shepard v. United States*, 290 U.S. 96, 99-100 (1933). A court may infer knowledge of the seriousness of a declarant's condition from the "nature and extent of the wounds inflicted." *Webb*, 922 F.2d at 395 (quoting *Mattox v. United States*, 156 U.S. 237, 251 (1895)).

57

Here, Ms. McNeal was murdered by someone who threw gasoline on her and lit her on fire. The testimony indicates that she suffered from severe burn injuries at the time she identified Mr. Johnson as her attacker. *E.g.*, Tr. Vol. 17 at 90 (describing a photograph of Ms. McNeal that "shows a mesh that has been placed upon her abdomen and front torso in order to keep her vital organs inside her body"); *id.* at 90-91 (describing her "painful, agonizing injuries" and "slow, tortuous death"). The seriousness of Ms. McNeal's injuries supports an inference that she believed her death was imminent when she made the identification. *Webb*, 922 F.2d at 396 ("reasonable to infer that [declarant] knew about the seriousness of his condition" when he suffered from multiple gunshot wounds); *see also United States v. Mobley*, 421 F.2d 345, 347-48 (5th Cir. 1970) (court examining the gravity of the declarant's wounds to determine his awareness of death).

Nonetheless, the Court did not instruct the jury on how to receive evidence that she identified someone other than Mr. Ra'id as her attacker. The little guidance the jury did receive suggested that the evidence could be considered only to impeach the Government's case – not as affirmative evidence of Mr. Ra'id's innocence. At the penalty phase the *only* instruction the jury received as to out-of-court statements concerned statements that were inconsistent with in-court testimony. There the jury was specifically instructed it could utilize this evidence only in "deciding the truthfulness and the accuracy of the witness's [in-court] testimony." Tr. Vol. 20 at 75. At the guilt phase, the jury was specifically instructed that inconsistent out-of-court statements could not be considered for their truth:

> You have heard evidence that before the trial, certain witnesses made statements that may be inconsistent with the witness's testimony here in court. If you find any witness's earlier statement is inconsistent with the witness's testimony, you may consider the earlier statement only in deciding the truthfulness and accuracy of that witness's testimony in this trial. You may not use it as evidence of the truth of the matters contained in their prior statements.

Tr. Vol. 13 at 165. It is unclear from this instruction whether the prohibition against using an inconsistent statement was limited to the witnesses' own inconsistencies, as opposed to statements impeaching the testimony of other witnesses.

The jury received several out-of-court statements that impeached the Government's case and received only this general instruction as to all witnesses (except the defendant). As to the fact that Wanda McNeal identified someone else as her attacker, the jury's use of this powerful defense evidence was circumscribed by the instructions given which did not explain that a dying declaration could be considered for its truth under the rules of evidence and statutory law.

Counsel's unreasonable failure to request a proper charge prejudiced Mr. Ra'id and deprived him of his right to effective assistance of counsel. Counsel filed multiple sealed motions in limine to prohibit the introduction of the McNeal homicide. Counsel also challenged the reliability of the evidence at a two-day hearing on October 13-14, 2004. Counsel clearly wanted to limit introduction of this incident. Once the Court denied the motions, counsel could have no strategic or tactical reason for failing to request that the jury be instructed that it could consider Ms. McNeal's statement identifying someone other than Mr. Ra'id as her attacker for its truth. *See Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir.), *vacated on other grounds*, 268 F.3d 485 (7th Cir. 2001) (given defense at trial, no tactical reason in calling witness to testify that defendant was incapable of committing violence who could be impeached with defendant's prior criminal history).

Mr. Ra'id was prejudiced by counsel's deficient performance. The Court's instruction effectively precluded the jury from considering the testimony as proof that someone else committed the crime. If the jury had been permitted to consider this evidence, there is a reasonable probability that at least one juror would have voted for life. Instead, the jury was left

with the impression that Mr. Ra'id committed another homicide, which was highly prejudicial. *See United States v. Fountain*, 642 F.2d 1083, 1091 (7th Cir. 1981) ("Evidence of a premeditated murder conviction usually is highly prejudicial.").

Even if counsel's objection had been overruled by this Court, there exists a reasonable probability that a similar claim would have succeeded on direct appeal (had counsel preserved the error for subsequent review). Additionally, appellate counsel had an independent duty to raise the claim as "plain error," regardless of counsel's failure to preserve the issue in this Court. Had counsel raised the claim on direct appeal, there is a reasonable probability that relief would have been granted. *See Stallings v. United States*, 536 F.3d 624, 627-28 (7th Cir. 2008) (finding appellate counsel's performance fell below an objective standard of reasonableness where he failed to raise a sentencing claim that was not properly preserved at trial).

## GROUND TEN: IN LIGHT OF *DIMAYA*, MR. RA'ID'S § 924(C) CONVICTIONS CANNOT BE SUSTAINED BECAUSE BANK ROBBERY UNDER § 2113 DOES NOT QUALIFY AS A "CRIME OF VIOLENCE"

Mr. Ra'id was charged and convicted of assaulting and putting in jeopardy the life of another person during the commission of a bank robbery in violation of 18 U.S.C. § 2113(d) (Count II), possessing of firearm during a "crime of violence" in violation of 18 U.S.C. § 924(c) (Count IV), possessing a firearm during a "crime of violence" that resulted in a murder, in violation of 18 U.S.C. § 924(j) & (c)(3) (Counts V and X). Mr. Ra'id was sentenced to death on Counts V and X.

To qualify as a crime of violence, the underlying § 2113 bank robbery must fall under either § 924(c)(3)(A)'s "elements clause" or under § 924(c)(3)(B)'s "residual clause." Mr. Ra'id's capital convictions cannot be upheld under the elements clause because § 2113 bank robbery lacks the scienter and violent force elements that § 924(c)(3)(A) requires. Mr. Ra'id's capital convictions likewise cannot be upheld under § 924(c)(3)(B) because that section's

definition of a "crime of violence" is unconstitutionally vague. For these reasons, Mr. Ra'id's §

924(c) convictions are invalid.

### A.      Section 924(c)'s residual clause is unconstitutionally void for vagueness

Section 924(c) defines "crime of violence" in two ways:

(3)      For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –

> (A)      has an element the use, attempted use, or threatened use of physical violence against the person property of another, or
>
> (B)      that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).

The first clause, § 924(c)(3)(A), is known as the force or elements clause. The second, §

924(c)(3)(B), is the residual clause. Mr. Ra'id's capital conviction cannot fall under §

924(c)(3)(B)'s residual clause because that clause is unconstitutionally vague. *United States v.*

*Cardena*, 842 F.3d 959, 996 (7th Cir. 2016). In *Cardena*, the Seventh Circuit held that the

residual clause of § 924(c)(3)(B) is unconstitutionally vague. *Id.* ("Accordingly, we hold that the

residual clause in 18 U.S.C. § 924(c)(3)(B) is also unconstitutionally vague."). The question of

the residual clause's vagueness can no longer be seriously disputed following the Unites States

Supreme Court's recent decision in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Because § 2113

no longer qualifies as a crime of violence under the residual clause, the "crime of violence"

element of Mr. Ra'id's § 924(j) & (c)(3) convictions are no longer satisfied, and Mr. Ra'id is

innocent of the crimes for which he is sentenced to death.

**B.      Federal bank robbery fails to categorically qualify as a "crime of violence" under the elements clause of section 924(c)**

Mr. Ra'id's conviction for bank robbery under § 2113(a) does not fall under § 924(c)(3)(A)'s elements clause. In determining whether a statute qualifies as a "crime of violence" courts apply a categorical approach and look to the elements of the offense to see whether the elements of the offense satisfy § 924(c)(3)(A). This approach requires that courts "look only to the statutory definitions – *i.e.*, the elements – of a defendant's . . . offense and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a crime of violence. *Descamps v. United States*, 570 U.S. 254, 261 (2013) (quotations and citations omitted). In applying the categorical approach, courts must presume the conviction rested on the least serious acts that could satisfy the statute. *United States v. Armour*, 840 F.3d 904, 908 (7th Cir. 2016). Thus, if the most innocent conduct penalized by a statute does not constitute a "crime of violence," then the statute categorically fails to qualify as a "crime of violence."

In *Armour*, the court held that armed bank robbery, in violation of § 2113(a) & (d), as defined by the Seventh Circuit, falls under § 924(c)(3)(A)'s elements clause. *Id.* Mr. Ra'id acknowledges that under the Seventh Circuit's current framework his convictions qualify as a "crime of violence." However, even if this Court finds that *Armour* controls, Mr. Ra'id submits that *Armour* was wrongly decided because it failed to consider that bank robbery under § 2113(a) can be committed by means which does not qualify as physical force as required by § 924(c)(3)(A).

First, federal bank robbery in which a killing occurs, as defined by § 2113(a) & (d), can be accomplished by intimidation, and the killing can be accidental or by happenstance. Thus, the crime does not require the use, attempted use or threatened use of "violent force." Additionally,

62

because both the intimidation and the killing can be accomplished without an intentional threat or use of physical force, it fails to satisfy the mens rea required under § 924(c)'s elements clause.

Second, armed bank robbery, as defined by § 2113(d), can be accomplished by merely openly carrying a dangerous weapon and likewise fails to qualify as a "crime of violence" under § 924(c)'s force clause. The Government must establish that during the commission of the bank robbery, the defendant either assaulted another person by use of a dangerous weapon, *or* the defendant put another person's life in jeopardy by the use of a dangerous weapon. The Government need not prove both. However, neither of these converts a bank robbery into a "crime of violence" because (1) assaulting another person by the use of a dangerous weapon does not require the threat or use of violent physical force, and (2) putting another person's life in jeopardy by the use of a dangerous weapon does not require the intentional threat of violent physical force.

Mr. Ra'id's convictions and sentences under § 924(c) should be vacated. Additionally, his convictions and sentences on the remaining counts cannot stand. When weighing the evidence against him, Mr. Ra'id's jury did not consider each count in isolation. The jury's guilt and penalty phase determinations as to the other counts were improperly tainted by its consideration of the unconstitutional charges under §924(c) and (j).

## CONCLUSION

For all of the reasons above, those set forth in the *Motion*, and based upon the entire record of these proceedings, Mr. Ra'id respectfully requests that this Court grant habeas relief.

Respectfully submitted,


/s/ Jennifer Chiccarino
JENNIFER CHICCARINO
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545W
(215) 928-0520
(215) 928-0826 (fax)
Jennifer_Chiccarino@fd.org



Dated: June 18, 2018
       Philadelphia, PA

## CERTIFICATE OF SERVICE

I, JENNIFER CHICCARINO, hereby certify that on this 18th day of June, 2018, I

electronically filed the instant pleading with the Clerk of Court using the CM/ECF system which

sent notification of such filing to counsel of record.

Respectfully submitted,


/s/ Jennifer Chiccarino
JENNIFER CHICCARINO
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545W
(215) 928-0520
(215) 928-0826 (fax)
Jennifer_Chiccarino@fd.org