## No. 3:02-CR-116

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

ODELL CORLEY
A.K.A.
NASIH RA'ID
Petitioner,

v.

UNITED STATES OF AMERICA,
Respondent.

## GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S MOTION TO VACATE HIS CONVICTION

THOMAS L. KIRSCH II
United States Attorney

CAITLIN M. PADULA
Assistant United States Attorney
United States Attorney's Office
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
(219) 937-5500

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ................................................................................................ 1

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................... 3
  A.  Background ................................................................................................ 3
  B.  The Attempted Robbery and Murders....................................................... 4

SUMMARY OF ARGUMENT ............................................................................ 7

ARGUMENT ...................................................................................................... 11
  Ground One:  This Court's Admission of the Government's Palm Print
  Evidence Was Proper and Did Not Violate Due Process. ............................ 11
    A.    Procedural Default ............................................................................. 11
    B.    Corley Received a Fair Trial ............................................................. 13
  Ground Two: Appellate Counsel Exercised Appropriate Professional
  Judgment, and Did Not Violate the Sixth Amendment, in Omitting a
  Meritless Claim of Prosecutorial Misconduct .............................................. 17
    A.    Appellate Counsel had no Duty to Attack the Prosecutor's
    Argument ................................................................................................ 19
    B.    Corley Suffered No Prejudice............................................................ 21
  Ground Three: 18 U.S.C. § 2113(e) Is Constitutional, Particularly Since It
  Is Overwhelmingly Obvious That Corley Deliberately Killed Simpson and
  Peckat. ......................................................................................................... 23
  Ground Four: The Conspiracy Charge Was Proper, And Any Error Was
  Harmless as the Jury Plainly Did Not Convict on a *Pinkerton* Theory. ..... 26
    A. The Conspiracy Instruction is Accurate ............................................... 27
    B.    The Government met its burden of proving all elements of the
    substantive offense ................................................................................. 29
  Ground Five: Corley's Dual Convictions for Using a Firearm to Commit
  Murder and Killing a Person during a Bank Robbery are Not
  Multiplicitous. ............................................................................................. 30

i

Ground Six: The Federal Death Penalty is Constitutional. .......................... 35

Ground Seven: Corley's Trial Counsel's Development and Presentation of Mitigating Evidence at Sentencing Was Sufficient to Comply with the Sixth Amendment. ........................................................................................... 37

    A.    Counsel's Penalty Phase Arguments Focused on Corley's Positive Traits ...................................................................................................... 39

    B.    Corley's Proffered Mitigation Evidence is Unconvincing ................. 41

    C.    Counsel's Strategy was Reasonable ................................................. 44

Ground Eight: The Seventh Circuit Has Already Rejected Corley's Incorrect Claim that the Prosecutor's Penalty Phase Statements Constitute Reversible Error. ...................................................................................... 48

Ground Nine: This Court Properly Instructed the Jury on How to Consider Wanda McNeal's Statement. ........................................................................ 53

Ground Ten: Because Bank Robbery is a "Crime of Violence," Corley's Section 924(c) Convictions Are Valid. ......................................................... 55

CONCLUSION ............................................................................................. 57

# TABLE OF AUTHORITIES

**CASES**

*Allen v. United States*, 536 U.S. 953 (2002) .................................................. 24

*Blake v. United States*, 723 F.3d 870 (7th Cir. 2013) ............................. 7, 9, 10

*Blockburger v. United States,* 284 U.S. 299 (1932) ........................................ 31

*Bolden v. United States*, 171 F. Supp. 3d 891 (E.D. Mo. 2016) ...................... 47

*Booth v. Maryland*, 482 U.S. 496 (1987) ........................................................ 52

*Boyde v. California*, 494 U.S. 270 (1990)........................................................ 29

*Brown v. Finnan*, 598 F.3d 416 (7th Cir. 2010) .............................................. 19

*Burger v. Kemp,* 483 U.S. 776, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987) ....... 48

*Cabello v. United States*, 884 F. Supp. 298 (N.D. Ind. 1995) .......................... 7

*California v. Green*, 399 U.S. 149 (1970)........................................................ 16

*Conner v. McBride*, 375 F.3d 643 (7th Cir. 2004) ..................................... 38, 39

*Corley v. United States*, 555 U.S. 1140 (2009)................................................... 3

*Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).............................................. 21

*Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010) .............................................. 16

*Gregg v. Georgia,* 428 U.S. 153 (1976)............................................................ 36

*Harrington v. Richter*, 562 U.S. 86 (2011)................................................ 8, 9, 39

*Howard v. Gramley,* 225 F.3d 784 (7th Cir.2000).......................................... 22

*Hummel v. Rosemeyer,* 564 F.3d 290 (3d Cir.2009) ....................................... 44

*In re Colon*, 826 F.3d 1301 (11th Cir. 2016) ...................................................... 57

*Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008) ............................................. 13

*Jones v. Barnes*, 463 U.S. 745 (1983)................................................. 9, 13, 19, 26

*Jordan v. Hepp*, 831 F.3d 837 (7th Cir. 2016)................................................... 22

*Kafo v. United States*, 467 F.3d 1063 (7th Cir. 2006) ..................................... 10

*Knox v. United States*, 400 F.3d 519 (7th Cir. 2005) ........................... 19, 22, 26

*Koons v. United States*, 639 F.3d 348 (7th Cir. 2011).................................... 8, 9

*Laux v. Zatecky*, 890 F.3d 666 (7th Cir. 2018) ..................................... 38, 39, 46

*Lee v. Davis*, 328 F.3d 896 (7th Cir. 2003) ...................................................... 19

*Levine v. United States,* 25 F. Supp. 2d 905 (N.D. Ind. 1998)......................... 20

*Makiel v. Butler,* 782 F.3d 882 (7th Cir. 2015)................................................. 26

*Martin v. United States*, 789 F.3d 703 (7th Cir. 2015) ................................... 10

*Mason v. Hanks*, 97 F.3d 887 (7th Cir. 1996)............................................. 19, 25

*Massaro v. United States*, 538 U.S. 500 (2003) ............................................. 7, 8

*McCleskey v. Kemp*, 481 U.S. 279 (1987).................................................... 35-37

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ................................... 16

*Mertz v. Williams,* 771 F.3d 1035 (7th Cir. 2014) .......................................... 46

*Michel v. Louisiana,* 350 U.S. 91 (1955)......................................................... 47

*Payne v. Tennessee,* 501 U.S. 808 (1991) ............................................. 48, 49, 52

*People v. Jennings*, 96 N.E. 1077 (1911)......................................................... 12

*Pinkerton v. United States,* 328 U.S. 640 (1946)............................................ 28

*Pole v.* Randolph, 570 F.3d 922 (7th Cir.2009).................................................. 39

*Resnover v. Pearson,* 965 F.2d 1453 (7th Cir. 1992) ........................................ 25

*Rutledge v. United States,* 517 U.S. 292 (1996)................................................ 31

*Schad v. Arizona,* 501 U.S. 624 (1991) ............................................................ 24

*Schlup v. Delo,* 513 U.S. 298 (1995).................................................................. 12

*Sears v. Upton,* 561 U.S. 945 (2010) ................................................................ 52

*Sessions v. Dimaya,* 138 S.Ct. 1204 (2018)................................................. 55, 56

*Showers v. Beard,* 635 F.3d 625 (3d Cir.2011) ................................................ 45

*Smith v. Murray,* 477 U.S. 527 (1986)........................................................ 19, 26

*Smith v. Robbins,* 528 U.S. 259 (2000) ....................................................... 18, 25

*Strickland v. Washington*, 466 U.S. 668 (1984) ............. 8-10, 18, 24, 25, 38, 39,
...................................................................................... 44, 45, 47, 52, 53

*Tison v. Arizona,* 481 U.S. 137, (1987)........................................................... 24

*United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008 (7th Cir.1987)........ 25

*United States v. Allen,* 247 F.3d 741 (8th Cir. 2001) ....................................... 24

*United States v. Armour*, 840 F.3d 904 (7th Cir. 2016) ................................... 56

*United States v. Ashimi*, 932 F.2d 643 (7th Cir. 1991) .................................... 37

*United States v. Berry*, 624 F.3d 1031 (9th Cir. 2010).................................... 13

*United States v. Butler*, 71 F.3d 243 (7th Cir. 1995) ...................................... 20

*United States v. Campbell*, 865 F.3d 853 (7th Cir. 2017) ............................... 56

*United States v. Corley*, 519 F.3d 716 (7th Cir. 2008). 2, 4, 5, 20, 22, 49, 53, 54

*United States v. Cronic,* 466 U.S. 648 (1984) .................................................. 47

*United States v. Curtis*, 324 F.3d 501, (7th Cir. 2003) .................................... 28

*United States v. Deiter*, 890 F.3d 1203 (10th Cir. 2018) ................................. 57

*United States v. Frady*, 456 U.S. 152 (1982) ................................. 11, 12, 13, 35

*United States v. Garcia-Ortiz*, 904 F.3d 102 (1st Cir. 2018) ........................... 57

*United States v. Glover*, 479 F.3d 511 (7th Cir. 2007) .................................... 14

*United States v. Griffin,* 84 F.3d 912 (7th Cir.1996) ....................................... 29

*United States v. Herrera*, 704 F.3d 480 (7th Cir. 2013) ...................... 14, 15, 16

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) ............................... 13, 33

*United States v. Irorere*, 228 F.3d 816 (7th Cir. 2000) .................................... 55

*United States v. Jackson,* 736 F.3d 953 (10th Cir. 2013) ......................... 24, 32

*United States v. Kehm,* 799 F.2d 354 (7th Cir.1986) ...................................... 29

*United States v. Kelly,* 991 F.2d 1308 (7th Cir. 1993) ..................................... 52

*United States v. Kovic*, 830 F.2d 680 (7th Cir. 1987) ...................................... 12

*United States v. LeFevre*, 483 F.2d 477 (3d Cir.1973) .................................... 20

*United States v. McMath*, 559 F.3d 657 (7th Cir. 2009) ................................. 22

*United States v. Morgan,* 113 F.3d 85 (7th Cir.1997) ............................... 22, 52

*United States v. Requarth*, 847 F.2d 1249 (7th Cir. 1988) ............................. 29

*United States v. Richardson*, 906 F.3d 417 (6th Cir. 2018) ............................ 57

*United States v. Rivas*, 2013 WL 5700742 (N.D. Ill. Oct. 18, 2013) ............... 14

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir.1990) ........................ 20

*United States v. Sutton*, 337 F.3d 792 (7th Cir. 2003).......................................... 14

*Valenzuela v. United States*, 261 F.3d 694 (7th Cir. 2001).............................. 37

*Wiggins v. Smith,* 539 U.S. 510, (2003) ............................................................. 38

*Woods v. McBride*, 430 F.3d 813 (7th Cir. 2005)................................................ 39

*Yu Tian Li v. United States*, 648 F.3d 524 (7th Cir. 2011).............................. 10

**STATUTES**

18 U.S.C. § 2(a) ................................................................................................ 56

18 U.S.C. § 371................................................................................................... 2

18 U.S.C. § 922(g) .............................................................................................. 2

18 U.S.C. § 924................................................................................................. 31

18 U.S.C. § 924(c)................................................................ 2, 31, 32, 55, 56

18 U.S.C. § 924(c)(3) ...................................................................................... 55

18 U.S.C. § 924(j) ............................................................................................ 55

18 U.S.C. § 924(j)(1) .......................................................................................... 2

18 U.S.C. § 1111............................................................................................... 31

18 U.S.C. § 2113............................................................................................ 31, 32

18 U.S.C. § 2113(a) ......................................................................................... 56

18 U.S.C. § 2113(d) ........................................................................................... 2

18 U.S.C. § 2113(e)........................................................................... 2, 23, 24, 31

21 U.S.C. § 848(o).......................................................................................... 35

28 U.S.C. § 2255.................................................................... 1, 8, 10, 11, 13

## RULES

Federal Rule of Criminal Procedure 30........................................................... 29

Federal Rule of Evidence 702......................................................................... 14

## OTHER AUTHORITIES

United States Attorney's Manual, § 9-10.080 ................................................. 36

## INTRODUCTION

On August 27, 2002, Odell Corley armed himself with a .45 caliber semiautomatic handgun and entered a bank in Town of Pines, Indiana, intending to commit a robbery.[1]  Within twenty-nine seconds of entering the bank Corley had murdered Kay Peckat and Chandler Simpson and paralyzed Keith Hill. A jury subsequently convicted and imposed death sentences on Corley for four charged offenses stemming from the two murders. He seeks to vacate those convictions pursuant to 28 U.S.C. § 2255, based primarily on allegations of ineffective assistance of counsel. All his arguments fail either on their merits or for want of demonstrable prejudice: he cannot show a reasonable probability that any supposed error affected the guilt or penalty verdicts. This Court should therefore deny Petitioner's motion to vacate his convictions without an evidentiary hearing.

## PRELIMINARY STATEMENT

On November 21, 2002, a grand jury in this district returned a ten count superseding indictment against Corley and four co-defendants. DE 69. Corley was charged in eight of those counts as follows: Count 1, conspiracy to

---

[1] Although tried and convicted under the name Odell Corley, Petitioner calls himself Nasih Ra'id. Because this Court has not to date formally recognized a name change, the government continues to refer to Petitioner as Corley.

commit bank robbery, in violation of 18 U.S.C. § 371; Count 2, aggravated attempted bank robbery, in violation of 18 U.S.C.§ 2113(d); Count 3, murdering Kay Peckat during an attempted bank robbery, in violation of § 2113(e); Count 4, possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); Count 5, murdering Kay Peckat with a firearm in furtherance of a crime of violence, in violation of § 924(c) and (j)(1); Count 6, being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); Count 9, murdering Chandler Simpson during an attempted bank robbery; and Count 10, murdering Chandler Simpson with a firearm in furtherance of a crime of violence.  DE 69.

The jury trial commenced on September 7, 2004, and on October 6, 2004, the jury convicted Corley as charged. DE 650. On October 27, 2004, following a penalty phase trial, the jury unanimously recommended death sentences on the four counts of murder. DE 722. On December 15, 2004, the trial court sentenced Corley to death on Counts 3, 5, 9 and 10 and to a total term of 600 months' imprisonment for Counts 1, 2, 4, and 6. DE 737. On March 25, 2005, Corley filed a notice of appeal. DE 795.

On appeal, the Seventh Circuit affirmed. *United States v. Corley*, 519 F.3d 716 (7th Cir. 2008). The court rejected Corley's claims, concluded that: (1) the government permissibly exercised a peremptory challenge to excuse a potential, *Id.* at 720-723; (2) this Court properly admitted evidence of an

unadjudicated murder, *Id.* at 723-727; (3) the prosecution engaged in no misconduct during its cross-examination of Corley or its closing argument; *Id.* at 727-729; and (4) this Court properly refused to give a residual doubt instruction during the sentencing phase trial, *Id.* at 729-730. The Supreme Court subsequently denied a petition for writ of certiorari. *Corley v. United States*, 555 U.S. 1140 (2009).

On January 19, 2010, Corley filed his motion to vacate convictions and sentences. DE 883. Corley was then granted an additional eight years, until June 18, 2018, to file a memorandum of law in support of his motion. DE 976. The government now responds to both the motion and memorandum.

## STATEMENT OF FACTS

A. Background

In the late 1980s, Corley met Edward Johnson in Michigan City, Indiana. Tr. Vol. 9, 193. They stayed in touch until Johnson was sent to prison for armed robbery. Tr. Vol. 9, 188-89. In prison, Johnson met Jeanna Ramsay, a kitchen worker with whom he developed a romantic relationship. Tr. Vol. 9, 190-191. After his release, Johnson moved to Mississippi for work. Tr. Vol. 9, 189. There Johnson received a call from Corley who indicated he "might have something" for Johnson in Indiana. Tr. Vol. 9, 186-187.

3

In August 2002, Johnson returned to Indiana and reconnected with Corley. Tr. Vol. 9, 194. Corley told Johnson about a bank robbery that he described as "an easy lift." Tr. Vol. 9, 187. Subsequently, the two men drove past the Pines branch office of the First State Bank of Porter in Corley's blue pickup truck. Tr. Vol. 9, 191, 200. They enlisted Andre McGregor as an additional accomplice. McGregor lived in Michigan City with a woman named Danyass Gay. Tr. Vol. 9, 197.

Corley, Johnson, McGregor, Gay and Ramsay carefully planned the robbery. *Corley*, 519 F.3d at 719.  Corley informed Johnson and McGregor he had been watching the bank for some time and was familiar with the area and the route to take. Tr. Vol. 10, 106. The conspirators discussed their wardrobe and their individual roles in the crime. Tr. Vol. 9, 196-198. Their disguises would consist of sunglasses, bandanas, oversized clothes and makeup (purchased by McGregor) to lighten their complexions.  Tr. Vol. 9, 140-141, 205-206, Tr. Vol. 10, 104-105. Johnson obtained the guns. Tr. Vol. 9, 202. Three days before the planned robbery, Ramsey purchased .45 and .357 caliber ammunition at a Michigan City Walmart. Tr. Vol. 9, 136-140, 222-23.

## B. The Attempted Robbery and Murders

On August 27, 2002, Johnson and Ramsey met Corley at McGregor's house. Tr. Vol. 9, 213. Corley knew of a tan car he could take for the robbery,

and Johnson and Ramsey drove him to retrieve that vehicle. Tr. Vol. 10, 118. They stopped at a gas station, where Corley, in an effort to divert the police, used a fake Arabic accent to call in a bomb threat against area schools. Tr. Vol. 9, 218.  McGregor drove the tan car behind the bank. Tr. Vol. 9, 221-22. The women each drove a getaway car: Gay took up a position by a gas station, while Ramsey stopped near the bank. Tr. Vol. 9, 218-220.

Corley entered the bank immediately, but Johnson spotted a security guard inside the building and stopped outside. *Corley*, 519 F.3d at 719. A security videotape captured much of what happened next. The guard, Keith Hill, went to the bank door as Corley entered. Tr. Vol. 7, 60-51, 82, Tr. Vol. 9, 222-25. Corley pushed the door in and fired his .45 caliber semiautomatic handgun at Hill, wounding him twice at close range and leaving him paralyzed. Tr. Vol. 9, 222-23. While heading toward the service counter, Corley fatally shot teller Chandler Simpson in the head. Tr. Vol 7, 63, Tr. Vol. 8, 172-180. He vaulted the counter, leaving a palm print on its surface, and then—just seven seconds after entering the bank—fatally shot teller Kay Peckat who was crouching in the work area. Tr. Vol. 8, 183-205.

At Corley's command, Johnson entered the bank and retrieved Hill's gun. Tr. Vol. 9, 222-26.  The would-be robbers then discovered the vault was locked and fled, 29 seconds after entering. As they left, Corley berated Johnson for failing to execute the plan and threatened, "This was going to be

federal case everywhere around the United States." Tr. Vol. 10, 124, Tr. Vol. 9, 229. During their getaway, Corley said, "I shot some people. I shot some people." Tr. Vol. 10, 124-125. While leaving the area, Corley stated, "I think I killed somebody." Tr. Vol. 10, 128. When Danyass Gay asked Corley what had happened, he told her "not to worry about it, that [she would] see it on America's Most Wanted." Tr. Vol. 10, 254.

At trial, Johnson, Gay and McGregor all testified against Corley. The government also introduced the bank's security videotape and the palm print left at the scene. FBI latent fingerprint examiner Danielle Archambault testified at length about the fingerprint. Tr. Vol. 8, 250-305. She had performed over 250,000 friction ridge comparisons, all of which another qualified examiner verified. *Id.* at 268. She had identified victims of war and terrorist attacks. *Id.* 297. Archambault agreed that fingerprints were absolutely unique to each person. *Id.* at 269.

In this case, Archambault examined high quality latent prints from the bank counter and compared them to Corley's known ink exemplars. Tr. Vol. 8, at 258. To make an identification, she had to determine there were no unexplainable differences between "the latent and the inked print." *Id.* at 263. She found no such differences between Corley's exemplar and palm prints from the crime scene. *Id.* at 263, 267. Recognizing the possibility of distortions in latent prints, she would have rejected an identification if she

found "one ridge characteristic that was not found in the inked print." *Id.* at 263-264. Her analysis "exhausted all the areas of identification." *Id.* 264-265. Archambault indicated, "I was then able to make, in the evaluation phase, my decision, and I determined that the left palm print and the latent palm print were made by . . . Odell Corley." *Id.* at 267.

## SUMMARY OF ARGUMENT

"Relief under [§ 2255] is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013). Corley can show no extraordinary situation that would warrant relief under this section.

The majority of Corley's claims allege ineffective assistance of counsel. The preference in the criminal justice system is to resolve legal error on direct appeal. *Cabello v. United States*, 884 F. Supp. 298, 301 (N.D. Ind. 1995). Generally, claims omitted on direct appeal are procedurally defaulted and barred from collateral review unless the petitioner shows (1) "cause" and "actual prejudice" or (2) "actual innocence." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

7

An ineffective assistance of counsel claim, however, is not subject to the procedural default rule. *Massaro*, 538 U.S. at 504. Such a claim may be raised in a § 2255 proceeding, whether or not the petitioner could have raised it on direct appeal. *Id.*

To prevail on a claim of ineffective assistance of trial counsel, Petitioner must show both that (1) counsel's performance was deficient, and (2) that deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Surmounting *Strickland*'s high bar is never an easy task" since *Strickland*'s standard "must be applied with scrupulous care." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). As to the first prong— performance—Petitioner must establish that counsel's performance "fell below an objective standard of reasonableness" and his attorneys therefore did not function "as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687-88. In evaluating such a claim, this Court should strongly presume "counsel's representation was within the wide range of reasonable professional assistance." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Harrington*). Deviation from "best practices" or "common custom" will not suffice to upend that presumption. *Id.* Rather, Petitioner must show that counsel's performance "amounted to incompetence under prevailing professional norms." *Id.* Thus, Petitioner must show "counsel's conduct so undermined the proper functioning of the adversarial

process that the trial cannot be relied on as having produced a just result."

*Id.* (internal quotation omitted).

On the second prong—prejudice—Petitioner must show a reasonable probability that counsel's ineffectiveness affected the outcome of the proceedings. *Harrington*, 562 U.S. at 104.

> A reasonable probability is a probability sufficient to undermine confidence in the outcome. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687-88 (citations and quotations omitted). Because a successful ineffective assistance claim requires satisfaction of both prongs of the *Strickland* test, this Court in its discretion can reject such contentions based solely on a failure to demonstrate prejudice. *Strickland*, 466 U.S. at 697.

The *Strickland* standard also applies to appellate counsel, who have latitude to exercise reasonable professional judgment in selecting the issues most promising for review. *Jones v. Barnes*, 463 U.S. 745, 752-53 (1983). Appellate counsel has no duty to raise every non-frivolous issue on appeal: "A brief that raises every colorable issue runs the risk of burying good arguments." *Id.* at 751-54. To prevail on a claim that appellate counsel was ineffective, Petitioner must show his attorneys "ignored significant and obvious issues." *Blake v. United States*, 723 F.3d 870, 888 (7th Cir. 2013) (internal citations omitted). Further, he must establish the "neglected issues

9

are 'clearly stronger' than the arguments that actually were raised on appeal." *Id.*

A district court need only hold an evidentiary hearing on a § 2255 motion when the petitioner alleges contested facts which, if proven, would entitle him to relief. *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015); *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006). In this case, a hearing is unnecessary. As explained below, neither trial nor appellate counsel were constitutionally inadequate, and Corley's allegations show no prejudice stemming from counsel's supposed errors. On the contrary, trial and appellate counsel performed admirably with the facts at hand. The weight of the evidence against Corley at the guilt phase was overwhelming, including the testimony of his co-defendants and palm print evidence linking him to the scene of the crime as well as a video of the crime itself. Likewise, Corley has failed to identify any issue that would have resulted in any different outcome on appeal, and has therefore failed to show prejudice as required under the second prong of the *Strickland*.  Corley's other claims not based on ineffective assistance are procedurally defaulted and, at any rate, fail on the merits. Briefly stated, even accepting every reasonable fact alleged as true, the "files [and] records of the case conclusively show that" petitioner is not entitled to relief. *Yu Tian Li v. United States*, 648 F.3d 524, 532-33 (7th Cir. 2011).

10

## ARGUMENT

**Ground One: This Court's Admission of the Government's Palm Print Evidence Was Proper and Did Not Violate Due Process.**

Corley claims the trial court erroneously admitted, in violation of his due process rights, evidence that police recovered his palm print on the counter of the bank. He contends that a National Academy of Science a report, issued after his trial, that discredits the palm print (or "friction ridge") evidence as inaccurate and unreliable. Doc. 883 at 1-8. Corley did not raise this claim on appeal. As explained below, he has thus procedurally defaulted his claim and has failed to demonstrate cause and prejudice to excuse the omission. Even if Corley had preserved his claim, he could not succeed on the merits, as he cannot show that the palm print evidence and accompanying testimony was incorrect or unreliable, much less that it rendered his trial fundamentally unfair.

A. Procedural Default

Corley's claim regarding the reliability of friction ridge evidence relies on facts within the record. He could have, but did not, raise any challenge to this evidence or to Archimbault's testimony on appeal. Accordingly, he defaulted these evidentiary claims for purposes of § 2255 review. *See United States v. Frady*, 456 U.S. 152, 165 (1982). Indeed, to the extent he failed to interpose timely and specific objections to this evidence at trial he has doubly

11

defaulted those contentions. *See id.* at 168; *United States v. Kovic*, 830 F.2d 680, 683 (7th Cir. 1987).

Corley cannot show that his defaulted palm print claims fall within any exception that might permit consideration by this Court. First, he cannot establish his actual innocence of the charged crimes. Actual innocence sufficient to overcome procedural default requires the petitioner to show that, in light of the new evidence alleged in the post-conviction petition it is "more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Even absent the palm print, the video evidence of Corley inside the bank, combined with his co-defendants' testimony provided overwhelming evidence and made it highly likely that any reasonable juror would still have convicted.

Second, Corley fails to show cause and prejudice. As to cause, Corley admittedly premises his present claim on a report issued after the rejection of his appeal. But the National Academy of Sciences report did not present some sea change, casting doubt on a once infallible procedure. Questions about the reliability of friction ridge evidence long predated the report, and its concerns actually animated the defense's cross-examination at trial. *See People v. Jennings*, 96 N.E. 1077, 1081 (1911) (upholding the validity of fingerprint analysis as a science). He cannot satisfy the "cause" standard simply by

12

standing on the existence of new evidence that did not alter his existing understanding of the issue.

Even if Corley could establish cause, he cannot demonstrate prejudice, which would require him to show that the errors complained of "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. As shown below, Corley cannot show error and therefore cannot meet the prejudice prong of *Frady*. Thus, the Court should deny Corley's claim based on his procedural default of the alleged error.

### B. Corley Received a Fair Trial

A court may not grant § 2255 relief on the basis of alleged evidentiary error absent a showing that the admitted material rendered the trial fundamentally unfair. *See United States v. Berry*, 624 F.3d 1031, 1039-40 (9th Cir. 2010) (citing *Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008)). To the extent that Corley has identified some previously-unavailable argument or evidence concerning the reliability of friction ridge evidence, that information concerns the weight—not the admissibility—of the evidence. *See United States v. Higgs*, 663 F.3d 726, 740-42 (4th Cir. 2011) (rejecting a claim that subsequently discredited scientific evidence materially affected the verdict). Fingerprint and palm print evidence remain to this day admissible

13

in federal courts under Federal Rule of Evidence 702 despite the *National Academy of Sciences* report. *See United States v. Rivas*, 2013 WL 5700742, *10 (N.D. Ill. Oct. 18, 2013) (noting the court denied a motion to exclude fingerprint evidence under "the Seventh Circuit's clear precedent"). Indeed, the Seventh Circuit, has repeatedly and consistently rejected reliability challenges to fingerprint analysis both before and after Corley's trial. *See United States v. Sutton*, 337 F.3d 792, 797 n.4 (7th Cir. 2003) ("There is no question that fingerprint analysis, as a general methodology, meets the requirements of *Daubert*"); *see also United States v. Herrera*, 704 F.3d 480, 487 (7th Cir. 2013) ("[R]esponsible fingerprint matching evidence, is admissible evidence, in general and in this case."); *United States v. Glover*, 479 F.3d 511, 517-518 (7th Cir. 2007) (affirming the admission of a qualified fingerprint expert's testimony and noting "this Court has long accepted the scientific validity of fingerprint testing in general").

In *Herrera*, the Seventh Circuit rejected the very argument Corley makes here: that fingerprint evidence is unreliable in the wake of a critical assessment by the *National Academy of Sciences;* 704 F.3d at 487. The *Herrera* court cited the National Academy of Sciences article, including portions that describe the latent print comparison process. *Id.* at 484. The court noted that Rule 702 permits the admission of "any evidence created or validated by expert methods and presented by an expert witness that is

14

shown to be reliable." *Id*. at 485. A qualified fingerprint examiner provides exactly such evidence. *Id*. at 486-487.

Indeed, on the record before this Court, Corley cannot identify anything approaching a violation of fundamental fairness in Archimbault's testimony. Archambault testified at length regarding her education, qualifications, process, and conclusions. Tr. Vol. 8, 250-305. She had performed over 250,000 friction ridge comparisons, all of which another qualified examiner verified. *Id*. at 268. She had identified victims of war and terrorist attacks. *Id*. 297.

In this case, Archambault examined high quality latent prints and compared them to Corley's known ink exemplars. Tr. Vol. 8, at 258.  To make an identification, she had to determine there were no unexplainable differences between "the latent and the inked print." *Id*. at 263.  She found no such differences between Corley's exemplar and palm prints from the crime scene. *Id*. at 263, 267. Recognizing the possibility of distortions in latent prints, she would have rejected an identification if she found "one ridge characteristic that was not found in the inked print." *Id*. at 263-264. Her analysis "exhausted all the areas of identification." *Id*. 264-265. Archambault determined, based on her training, experience, and examination of the evidence "that the left palm print and the latent palm print were made by . . . Odell Corley." *Id*. at 267. Having sufficiently explained the basis for her opinion, that expert opinion was permissible and did not violate due process.

15

*Herrera*, 704 F.3d at 483-86 (reversing district court decision to prohibit latent fingerprint testimony).

Having lacked any basis in law to exclude the friction ridge evidence, Corley appropriately took the opportunity to attack its reliability by way of cross-examination. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 325 (2009) (recognizing the value of confrontation to defendants facing government-sponsored expert testimony); *see generally California v. Green*, 399 U.S. 149, 158 (1970) (recognizing cross-examination as the "'greatest legal engine ever invented for the discovery of truth.'"). During cross-examination, counsel attacked Archambault's testimony that she performed 250,000 print examinations at the FBI. Tr. Vol. 8, at 272-273.  Counsel attacked Archambault's scientific methodology, questioning whether any independent tests verified it. *Id*. 277-278. Counsel questioned the error rate of Archimbault's methodology, extracting a concession that "each examiner will have their own error rate." *Id*. at 282. Counsel even cross-examined the crime-scene detectives who lifted the latent prints, eliciting their admission (like Archambault's) that they did not know when they were deposited. *Id*. at 228-229; *see Id*. at 253.

"Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616

16

(7th Cir. 2010). Here this Court appropriately admitted Archimbault's palm print testimony and permitted Corley to cross-examine and attack it. Nothing in the Court's handling of this issue was wrong, let alone fundamentally unfair.

**Ground Two:** **Appellate Counsel Exercised Appropriate Professional Judgment, and Did Not Violate the Sixth Amendment, in Omitting a Meritless Claim of Prosecutorial Misconduct.**

Corley claims that appellate counsel provided ineffective assistance by failing to assert on direct appeal that the prosecutor made allegedly inappropriate comments during closing arguments of the guilt phase. Doc. 883 at 25-29. Corley's protestations notwithstanding, the prosecutor's comments reflected an appropriate inference from the evidence and common experience that would not have sustained a successful claim on review. Corley cannot show that counsel's failure to raise a futile issue on appeal fell below any standard of reasonableness or prejudiced the outcome of the case. Corley raised stronger claims, including several directly related to the comments of the prosecutor, on his direct appeal, none of which managed to sway the appellate court.

At trial, Corley testified on direct examination that he was right-handed. Tr. Vol. 12, at 6. He also admitted on cross-examination that he had served in the Marines, where he was trained to use a .45. Tr. Vol. 12, at 67-69. In closing argument, defense counsel pointed out a photograph (Exhibit

17

85-D) that, in counsel's opinion, showed the killer shooting Hill with his left hand. Tr. Vol. 13, at 136-137. From this, defense counsel argued that Corley could not have been the shooter. Tr. Vol. 13, at 136-137.

In response, the prosecutor principally argued that the video tape and other photographs made clear that the killer was shooting with his right hand. Tr. Vol. 13, at 154-156. For example, the killer vaulted over the counter, embedding Corley's left palm print, and fatally shot Peckat through the back right-handed. The prosecutor also submitted, over objection, another possible "explanation is we have someone who is equally skilled with both hands. We have someone who is capable and has been trained to use both hands." Tr. Vol. 13, at 156. After an objection, the prosecutor continued, "I submit to you that this individual was someone who had been trained in the use of that weapon, or other weapons, and I submit to you when you are trained in the military, and you use your own common experience and knowledge, or you're trained as a police officer or someone that uses weapons, you are oftentimes trained in both hands. Because what happens if you're right-handed and get shot in the right side? You still need to function with that left hand. Tr. 13-158.

The familiar *Strickland* standard governs claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). But the rule applies with a nuance peculiar to appellate application: counsel

18

need not present every non-frivolous claim on direct appeal. *E.g., Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996). This rule underscores the fact that the hallmark of competent appellate representation involves a "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). Curating the issues presented permits counsel to comply with limitations on brief length and to ensure against dilution of the overall case: "the more issues a brief presents the less attention each receives." *Knox v. United States*, 400 F.3d 519, 521 (7th Cir. 2005). Accordingly, appellate counsel performs deficiently only when failing to argue an issue that is "obvious" and "clearly stronger" than the issues actually raised. *E.g., Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010); *Lee v. Davis*, 328 F.3d 896, 900–01 (7th Cir. 2003).

A. <u>Appellate Counsel had no Duty to Attack the Prosecutor's Argument</u>

Corley cannot establish that his appellate attorneys had an obligation to attack the comments of the prosecutor in rebuttal argument. This argument did not constitute error because it expressly and appropriately referred to juror's common knowledge and experience. Second, rejecting this claim permitted counsel to focus on issues with a greater chance of success than one that hinged on weakness in the government's case for guilt. Indeed,

19

the strength of the government's interlocking evidence of Corley's guilt would have foreclosed any effort by his appellate counsel to demonstrate that the prosecutor's isolated comment attacking a dubious inference would have deprived the defendant of a fair trial.

To evaluate a claim of prosecutorial misconduct, courts engage in a two-step analysis—they examine any challenged remark by itself to determine its propriety and, if they find error, examine the remarks in light of the record to determine whether the statement deprived the defendant of a fair trial. *See Corley*, 519 F.3d at 727; *United States v. Butler*, 71 F.3d 243, 254 (7th Cir.1995).  Prosecutors do not err when they argue facts reasonably inferred from the trial evidence (*see United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir.1990)), or drawn from common knowledge (*see United States v. LeFevre*, 483 F.2d 477, 479 (3d Cir.1973)).

Corley finds fault with the specific phrasing, "when you are trained in the military … you are often times trained in both hands." Trial Vol. 13, 157. The Prosecutor made the comment in direct response to counsel's argument that Corley was right-handed and the shooter was not. The statement is a permissible comment on the defense's primary argument that the gunman could not have been Corley, since the gunman had used his left hand to shoot. When the evidence supports multiple legitimate inferences, the Government is entitled to argue the one that shows guilt. *See Levine v. United States,* 25

20

F. Supp. 2d 905, 914 (N.D. Ind. 1998), *aff'd,* 221 F.3d 941 (7th Cir. 2000).

Jurors are allowed to rely on their common experience, and jurors who had

served in the military or knew others who had might have knowledge about

military training. The comments of the prosecutor were proper; thus, the

"failure" of counsel and appellate counsel to object to those comments cannot

constitute ineffective assistance of counsel.

### B. Corley Suffered No Prejudice

The government contends the statement above was not misconduct.

However, even if it was misconduct, it was not prejudicial to Corley's

fundamental rights. Even if a court finds that a prosecutor made an improper

statement, it will not result in reversal of a conviction unless the prosecutor's

comments "so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637,

643 (1974). They did not.

Even if the statements were improper, they were harmless.  The jury's

instructions and the weight of the evidence remedied any potential prejudice.

Corley received a fair trial. The jury was instructed that the lawyers'

statements are not evidence and that they could only base their verdict on

the evidence. Tr. 13-163. Such an admonition is typically adequate to ensure

the trial's fairness, even if the prosecution makes comments beyond the

evidence. *See Jordan v. Hepp*, 831 F.3d 837, 849 (7th Cir. 2016); *see also United States v. McMath*, 559 F.3d 657, 668 (7th Cir. 2009). Moreover, the Prosecutor did not state as a factual conclusion that Corley was trained in both hands; instead, he specifically asked the jury to use their own judgment, drawing their attention to the video and Corley's own testimony about being trained in the use of a .45 caliber handgun.

The outcome of Corley's appeal also shows that any failure by counsel to raise this argument on appeal was harmless. In evaluating whether the petitioner was prejudiced, the strength of the evidence against him is often decisive. *See Howard v. Gramley,* 225 F.3d 784, 793 (7th Cir. 2000) (the "most important [factor] is the weight of the evidence against the defendant"); *see also United States v. Morgan,* 113 F.3d 85, 90 (7th Cir. 1997) (the "weight of the evidence is generally the most important consideration"). In rejecting another claim of prosecutorial misconduct, the Seventh Circuit called the prosecutor's "overreaching" in closing harmless because the evidence against Corley was "substantial." *Corley*, 519 F.3d at 726.

Appellate counsel must carefully pick and choose their strongest arguments to present on appeal lest the winning argument be buried in weaker arguments. *Knox v. United States,* 400 F.3d 519, 521 (7th Cir. 2005). In this case, counsel made multiple stronger arguments alleging prosecutorial misconduct, to no avail. Accordingly, even if the comments were

22

improper, the petitioner suffered no prejudice due to the limiting instruction and the weight of the evidence against Corley.

**Ground Three: 18 U.S.C. § 2113(e) Is Constitutional, Particularly Since It Is Overwhelmingly Obvious That Corley Deliberately Killed Simpson and Peckat.**

Corley alleges that both trial counsel and appellate counsel were ineffective for failing to raise the issue that 18 U.S.C. § 2113(e) is unconstitutional as it permits a capital murder conviction without requiring proof of *mens rea*. Memorandum at 14. This argument must fail since the jury specifically found that Corley possessed a culpable mental state in the murders of Kay Peckat and Chandler Simpson.

Corley's argument seems to be that the jury under the court's instructions could have found that Corley was a knowing participant in the bank robbery and killed Peckat and Simpson but somehow lacked the *mens rea* to commit a murder. This is in direct contradiction to the case the government presented – there was never a trial theory other than that Corley himself had entered the bank to rob it and that Corley himself shot the victims deliberately. The videos itself rebut any claim that Corley's murders were anything but deliberate.

The jury in this case made specific findings at the penalty phase beyond a reasonable doubt that Corley deliberately chose to murder the victims. Tr. Vol. 23 at 8-19.  Even if the jury had not found that Corley

23

deliberately murdered the victims, the "reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." *Tison v. Arizona,* 481 U.S. 137, 157–58, (1987); see also *Schad v. Arizona,* 501 U.S. 624, 644–45 (1991) (plurality opinion). So, the jury necessarily found Corley guilty of a crime that involves sufficient disregard for human life to allow for a death sentence.

At any rate, trial and appellate counsel did not violate the Sixth Amendment by failing to mount a weak argument that it is unconstitutional to sentence someone to death for an 18 U.S.C. § 2113(e) killing. Multiple circuits have held that murder in the commission of a bank robbery under Section 2113(e) functions generally like felony murder in that the intent must be present for the underlying bank robbery. *See United States v. Jackson,* 736 F.3d 953, 958 (10th Cir. 2013), (adopting the Eighth and Sixth Circuits' reasoning, agreeing that § 2113(e) operates the same as common law felony murder.). *See also United States v. Allen,* 247 F.3d 741, 782–83 (8th Cir.2001) *judgment vacated on other grounds, Allen v. U.S.,* 536 U.S. 953 (2002).

Corley simply does not meet the *Strickland* burden for proving ineffective assistance of counsel. *Strickland* imposes a presumption that his

24

attorney's conduct falls within the wide range reasonable professional assistance. *See Resnover v. Pearson,* 965 F.2d 1453, 1459 (7th Cir. 1992). The *Resnover* court stated "We reiterate that *Strickland* requires us to focus, not upon whether counsel could have done a better job, but upon whether counsel provided the assistance necessary to ensure the fundamental fairness of the proceeding whose result is being challenged." *Strickland,* 466 U.S. at 696. In other words, the petitioner must demonstrate that there is "a reasonable possibility that, but for the [alleged] unprofessional error, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. That counsel simply could have done more is not a sufficient basis for finding a particular performance constitutionally inadequate. *Id.* at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance."). *See also United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1014 (7th Cir. 1987) ("[The reviewing court must] eliminate the distorting effects [of hindsight] ... and evaluate the conduct from counsel's perspective at the time."). Counsel was under no obligation here to raise a novel claim.

Nor could the Court fault appellate counsel for failing to raise such an argument. "The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel. *Smith v. Robbins,* 528 U.S. 259, 285 (2000). Appellate counsel is not required to present every non-frivolous claim on behalf of her client. E.g., *Mason v. Hanks,* 97 F.3d 887, 893

25

(7th Cir.1996). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986), quoting *Jones v. Barnes,* 463 U.S. 745, 751–52 (1983). In fact, when appellate judges address professional education programs on appellate practice, they usually stress this need for careful selection of just a few issues on appeal. "Lawyers must curtail the number of issues they present, not only because briefs are limited in length but also because the more issues a brief presents the less attention each receives, and thin presentation may submerge or forfeit a point." *Knox v. United States,* 400 F.3d 519, 521 (7th Cir.2005). *Makiel v. Butler,* 782 F.3d 882, 897–98 (7th Cir. 2015). Here there was nothing unconstitutional, facially or as applied, about imposing a death sentence for Corley's two murders in the course of his attempted bank robbery. Counsel's failure to raise the point at trial or on direct appeal was proper and in no way prejudicial.

**Ground Four: The Conspiracy Charge Was Proper, And Any Error Was Harmless as the Jury Plainly Did Not Convict on a *Pinkerton* Theory.**

At trial, this Court instructed the jury that:

> A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose.  To sustain the charge of conspiracy contained in Count 1 of the superseding indictment, the government must prove: First, that the conspiracy as charged in Count I existed; second, that the defendant knowingly became a member of the

26

conspiracy with an intention to further the conspiracy; and third, that an over act was committed by at least one conspirator.

If you find from your consideration of all the evidence that each of these propositions has been proven beyond a reasonable doubt, then you should find the defendant guilty. If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

A conspiracy may be established even if its purpose was not accomplished. It is not necessary that all of the overt acts charged in the indictment be proved, and the overt act proved may itself by a lawful act. To be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which the purpose was to be accomplished. The government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant.

A conspirator is a person who knowingly and intentionally agrees with one or more persons to accomplish an unlawful purpose. A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy.

Therefore, if you find beyond a reasonable doubt that the defendant was a member of a conspiracy at the time that one of his fellow conspirators committed the offenses—the offense charged in Counts II, III, IV, V, IX and X, in furtherance of and as a foreseeable consequence of that conspiracy, then you should find him guilty of Count II, III, IV, V, IX, and X.

Tr. Vol. 13, 169-170.

A. The Conspiracy Instruction is Accurate

There is no error in this conspiracy instruction and the appellant has

not pointed to any. The instruction correctly states the proposition that co-

27

conspirators are guilty of a substantive offense if that offense was committed in furtherance of and as a foreseeable consequence of the conspiracy. This is a basic tenet of conspiracy law. Since the evidence was sufficient to establish Corley's membership in the bank robbery conspiracy, it follows that Corley is criminally liable for the reasonably foreseeable acts others committed in furtherance of that conspiracy. *See United States v. Curtis*, 324 F.3d 501, 506, (7th Cir. 2003), citing *Pinkerton v. United States,* 328 U.S. 640, 647–48 (1946). Under the jury instructions relating to the conspiracy, the jury permissibly theoretically could have convicted Corley if he conspired to rob the bank, one of Corley's co-defendants murdered Simpson and Peckat, and it was reasonably foreseeable to Corley that these deaths would occur. This is a correct recitation of the law.

Regardless, even if it was error to give a *Pinkerton* instruction, that error was harmless on this record. Neither the government nor the defense ever argued that Corley was a conspirator but one of his co-defendants was the actual shooter.  Petitioner argues that it is unclear whether the jury actually found all of the elements of the offenses beyond a reasonable doubt. Motion at 21. This is simply untrue. The jury made individual findings as to each one of the counts when it found Corley guilty. The jury specifically found beyond a reasonable doubt that Corley intentionally killed both Kay Peckat and Chandler Simpson. Tr. Vol. 23, 8-9, 17-18.

28

Indeed, trial counsel explicitly approved of the conspiracy instruction during the jury instruction conference. Tr. Vol. 13, 37-56.  A defendant waives the right to object to a jury instruction on appeal if the record demonstrates that the defendant approved of the proposed instruction. *United States v. Griffin,* 84 F.3d 912, 924 (7th Cir. 1996). However, counsel was not ineffective, because the instruction is a correct statement of the law.

Corley did not object to this instruction in the district court. Since the issue was not properly preserved at the trial court level, appellate counsel cannot be deemed ineffective for failing to raise the issue. Failure to object at trial results in failure to preserve the issue for appeal. See *United States v. Requarth*, 847 F.2d 1249 (7th Cir. 1988). In addition, Federal Rule of Criminal Procedure 30 specifically requires litigants who disagree with a court's decision to omit a proposed instruction to state "distinctly the matter to which he[/she] objects and the grounds of his[/her] objection." Fed.R.Crim.P. 30. The function of the objection is to avoid avoidable mistakes at trial. *United States v. Kehm,* 799 F.2d 354, 363 (7th Cir.1986).

B. <u>The Government met its burden of proving all elements of the substantive offense</u>

Due process is violated if "there is a reasonable likelihood that the jury applied the challenged instructions in a way" that lessens the Government's burden. *Boyde v. California*, 494 U.S. 270, 280 (1990). The facts in the instant

29

case show there is no reasonable likelihood of such an occurrence; the Court instructed the jury, specifically and correctly, on the elements of each of the offenses that Corley faced. There was no argument ever presented to the jury that one of the co-defendants had committed the actual murders – instead, the Government rested on strong evidence that Corley was the lone man to pull a trigger. Indeed, trial counsel conceded that the entire governmental theory of the case was that Corley did not aid or abet, he actually committed the offense. Tr. Vol. 13, 53.

Regarding petitioner's somewhat confusing assertion, this is not a case where the jury sanctioned a death sentence in the absence of a killing. Memorandum at 20. The jury specifically found Corley intended to kill both victims and furthermore, that Corley intentionally killed two individuals in a single criminal episode. The jury specifically noted it found those facts beyond a reasonable doubt. (Tr. Vol. 23 at 8-20). There is no evidence that the Court's instruction was improper or that the jury failed to find the petitioner guilty of every element of the substantive offense.

**Ground Five: Corley's Dual Convictions for Using a Firearm to Commit Murder and Killing a Person during a Bank Robbery are Not Multiplicitous.**

Petitioner alleges the bank robbery murder and the firearm murder counts are multiplicitous in violation of the Double Jeopardy Clause. Memorandum at 37. Petitioner is incorrect, and his arguments on this point

30

fail. Multiplicity refers to different counts covering the same substantive offenses. If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Rutledge v. United States,* 517 U.S. 292, 297 (1996) citing *Blockburger v. United States,* 284 U.S. 299, 304 (1932).

Corley was convicted and sentenced under both 18 U.S.C. § 924 (Count Four) and 18 U.S.C. § 2113(e) (Counts Three and Nine). The court did *not* instruct the jury that, "These elements were satisfied by proof of murder committed in perpetration of or in attempt to perpetrate any robbery." Mot. at 25. Instead, the court told the jury: "Title 18, United States Code, Section 1111 provides in pertinent part, murder is the unlawful killing of a human being with malice aforethought. Every murder committed in the perpetration of or attempted to perpetrate [sic] any burglary or robbery is murder in the first degree." The court then continued to list the elements of murder with a firearm during a crime of violence. Tr. Vol. 13 at 175. The jury was further correctly instructed that elements of § 924(c) as charged in the superseding indictment were that Corley committed a crime of violence, that during that crime he used a firearm, that the firearm's use resulted in the deaths of the victim and that such homicide constituted a murder within the meaning of 18 U.S.C. § 1111. (Tr. Vol. 13 at 175). The elements of § 2113 as given to the jury were that Corley

31

killed the victim, that Corley performed acts constituting aggravated attempted bank robbery at the time charged in the superseding indictment, and that the bank was insured at the time by the Federal Deposit Insurance Corporation. *Id.* at 177. Each of these offenses required proof of a fact that the other did not. The § 924(c) murders required use of a firearm, while the § 2113 murders could have been committed with a knife, candlestick, or lead pipe. On the other hand, the § 2113 murders had to be committed in the course of a bank robbery, while the § 924(c) murders could be committed in furtherance of some other robbery or violent crime.

Even if the charges were multiplicitous, Corley cannot show prejudice entitling him to vacating any conviction. Corley alleges the jury was prejudiced in that the "extraneous counts" would have influenced the jury's sentencing calculus. This argument is absurd. This argument rests on the concept that the number of counts swayed the jury rather than the evidence showing Corley's culpability for multiple murders. The same jury that decided Corley's guilt phase also heard the penalty phase of the trial; the jury was well aware that the firearm murder and bank robbery murder involved the same two victims.

Corley cites *United States v. Jackson,* 736 F.3d 953 (10th Cir. 2013), in support of his argument that the rule of lenity applies to reduce multiple sentences even if multiple deaths occur in the single bank robbery. This argument is misplaced. *Jackson* deals with facts involving robbers fleeing from

32

the bank robbery and causing a single car accident, which killed two individuals. In the instant case, Corley took aim at Chandler Simpson and fatally shot him, before turning, vaulting over the counter and firing two deadly shots into Kay Peckat. There were two deliberate choices made to commit two separate murders.

Other courts have implicitly condoned the theory of multiple death sentences to account for multiple victims and multiple death-eligible crimes. The most analogous case to the instant case is *Higgs* at 663 F.3d 726, in which the Court of Appeals affirmed nine death sentences stemming from the murders and kidnappings of three women. The convictions included one count of first-degree premeditated murder for each victim, one count of first-degree murder in the perpetration or attempted perpetration of kidnapping for each victim, and one count of kidnapping resulting in death for each victim. The death of each of the three victims was thus death-eligible in three different crimes. These death sentences were all upheld.

The petitioner argues "[I]t is logical that Congress would have intended an enhanced penalty when a firearm is used during a bank robbery as it increases the risk of injury or death. However, when the crimes being charged already involve death as an element, the use of a firearm poses no additional risk." Mem. Law, 26-27. This argument would treat individuals who stabbed their victims to death and brandished a gun differently than those who

33

brandished the gun and then shot their victims, an absurd result. The evidence showed there were multiple other individuals at the bank. Each time Corley fired a weapon, he put those people at risk. The evidence was extraordinarily strong that Corley murdered two individuals. He also seriously wounded Keith Hill, leaving him severely disabled for life.

Corley cannot claim he suffered any prejudice. First, his counsel was under no duty to raise frivolous objections. The elements required to prove the petitioner guilty of each of the counts differed. Accordingly, counsel had no duty to raise an objection. The counts were not "multiplicitous." Any arguments as to altering the "trial landscape" in Corley's favor are pure speculation and cannot show prejudice. The overwhelming evidence at trial showed that Corley deliberately murdered two people and paralyzed a third during the course of an attempted bank robbery. No reasonable jury could have been misled by multiple counts. As the petitioner rightly points out, the same jury heard the guilt and punishment phases of the trial. They were intimately familiar with Corley's actions and took their job seriously, as indicated by the additional mitigation factors they wrote down. Nevertheless, the jury unanimously found death to be the appropriate punishment for Corley's actions. His counsel did not render deficient performance, and Corley was not prejudiced.

34

**Ground Six: The Federal Death Penalty is Constitutional.**

Corley next asserts that the federal death penalty is unconstitutional on due process grounds, but he offers no evidence that his race in any way influenced anyone's decisions in this case. Most importantly, in complying with Congress's enactment of 21 U.S.C. § 848(o), each juror explicitly certified that racial discrimination played no role in his or her imposition of the death penalty in this case. Tr. Vol. 23 at 26. The existence of this affirmation undercuts all of Corley's generalized arguments as the jury indicated that, *specifically in Corley's case,* they did not consider race or other impermissible grounds.

Petitioner raises two arguments regarding the constitutionality of the federal death penalty statute. Motion at 41. He raised neither issue at trial. Due to this procedural default, the issue can be reviewed only if he can show cause for the default and actual prejudice. *United States v. Frady*, 456 U.S. 152, 170 (1982). Corley cannot do so.

Petitioner argues that the federal death penalty statute is unconstitutional because it is disproportionately applied depending on the race of the victims and the accused. He cites general statistics but none specific to his own case. Motion at 41-43. The Supreme Court itself has found such general statistics insufficient. In *McCleskey*, 481 U.S. at 294-297, the Supreme Court held that statistical studies are insufficient to support a claim

of discriminatory application of the death penalty and that to prevail on such a claim, a defendant must show that the decision makers *in his case* acted with discriminatory purpose (emphasis added). In *McCleskey*, the Supreme Court noted "'decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations.'" *McCleskey v. Kemp*, 481 U.S. 279, at 295, n 15 (1987).

Corley fares no better than McCleskey. Corley cannot establish any error on an equal protection theory. Corley has no evidence of purposeful discrimination because of victim race in this case or any other. *McCleskey* establishes that general statistics, like those relied on by Corley, are insufficient to establish "that the decision-makers in *his* case acted with discriminatory purpose." *See* 481 U.S. at 292 (emphasis in original). In short, Corley has failed to provide the requisite "exceptionally clear proof" of intent to discriminate on the basis of the race of the victim. *Id.* at 297.

The Department of Justice's Protocol for Capital Prosecutions prohibits bias based on characteristics such as race or ethnicity, *see* USAM § 9-10.080, and, in most cases, the Department's decision-makers are not aware of the race of the defendant or the victim. Moreover, the FDPA guided the jury's discretion in this case by requiring it to "consider the circumstances of the crime and criminal before it recommended [a] sentence." *See Gregg v. Georgia,* 428 U.S. 153, 197 (1976). Further, each individual juror would have

made the same sentencing recommendation regardless of the race, color, religious beliefs, national origins or sex of the defendant. Tr. Vol. 23 at 26. Under these circumstances, the statistics relied on by Corley fall far short of "demonstrat[ing] a constitutionally significant risk of racial bias" affecting the federal sentencing process. *McCleskey,* 481 U.S. at 312-313.

Petitioner argues that counsel were ineffective for failing to raise this claim at trial. Mem. Law at 44. The constitutional standard for effective assistance does not require counsel to advance novel arguments or predict changes in the law. *Valenzuela v. United States*, 261 F.3d 694, 700 (7th Cir. 2001). Because Corley is not entitled to relief in connection with his generalized statistical claims, his counsel's failure to raise this issue was not deficient performance.  The omission has not prejudiced Corley.

**Ground Seven: Corley's Trial Counsel's Development and Presentation of Mitigating Evidence at Sentencing Was Sufficient to Comply with the Sixth Amendment.**

Corley asserts that his trial counsel was ineffective for failing to develop a more sympathetic version of mitigating evidence to present during the penalty phase. To prevail on such a claim, Corley cannot "simply state" that the testimony of an expert "would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991). Counsel for Corley pursued an almost completely opposite theory from what his attorneys now advance, and

37

that theory was also a rational one – an attempt to paint Corley as a sympathetic member of a tight knit family whose behavior had been erratic and out of the norm for him. This theory is a complete 180-degree turn from the current defense theory that Corley was such a sick and twisted individual due to family influences beyond his control that the jury should hold him less responsible for his murderous acts. Trial counsel interviewed and called numerous members of Corley's family to testify as to his important place in their family and his many good qualities. Corley cannot now claim this trial tactic prejudiced him and that he would have benefitted from an opposite argument.

The *Strickland* standard requires Corley to establish "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing," and "that had the jury been confronted with this ... mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins v. Smith,* 539 U.S. 510, 535, 536, (2003). Defense counsel has a duty at sentencing to offer relevant evidence to mitigate punishment. *Laux v. Zatecky*, 890 F.3d 666, 674 (7th Cir. 2018). At the same time, counsel is not "required to investigate the defendant's past with the thoroughness of a biographer." *Conner v. McBride,* 375 F.3d 643, 663 (7th Cir. 2004). It is up to defense counsel to decide how best to present a defendant's case and assess

38

the legal risks different strategies can pose. *Laux*, 890 F.3d at 675. For this reason, "*Strickland* cases, especially in the mitigation context, are not easy for petitioners to win." *Laux*, 890 F.3d at 675. A claim that "counsel did not present *enough* mitigating evidence will rarely succeed because such claims are 'ill-suited to judicial second-guessing' on appeal." *Woods v. McBride*, 430 F.3d at 826, citing *Conner*, 375 F.3d at 666. Moreover, in *Pole v. Randolph,* the Seventh Circuit held that "[w]e assess counsel's work as a whole, and it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." 570 F.3d 922, 934 (7th Cir. 2009) (internal quotation marks and citations omitted). Finally, the Supreme Court has noted that the probability of a different result—in this case, a different sentence—"must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86 (2011). Under this standard, the overall performance of Corley's sentencing counsel was not deficient. They presented a strong mitigating argument that that followed a cohesive theory of the case. The new evidence Corley argues should have been presented would have undercut the arguments Corley did make without providing any substantial probability of a different verdict.

A. Counsel's Penalty Phase Arguments Focused on Corley's Positive Traits

In closing arguments during the penalty phase, the defense repeatedly called the jury's attention to Corley's deep love for his grandfather and his

39

son. Tr. Vol. 21, 33. The defense reminded the jury that Corley's son Donald described his father as a hero and described the positive impact that Corley had on his son's life. *Id.* The defense recalled Corley's positive relationship with children, that other individuals would trust their children with him. *Id.* Another prong of the defense's argument was Corley's special kinship with the elderly, including his grandmother. *Id.* at 24. This line of defense, calling the jury's attention to Corley's most humanizing characteristics in a plea for sympathy, is entirely contrary to any argument Corley makes now.

During the second portion of the trial, the defense provided a litany of witnesses, including his siblings, mother and son, who testified about Corley's good character and emphasized his closeness with his family. Corley states the "evidence" the jury did not hear, ostensibly, would have humanized him. However, the jury heard from Corley's son and other family members, who explained that he was close to his family and particularly fond of the elderly and children. None of the evidence Corley points to could have humanized him more than the testimony of his son, explaining the positive guiding influence Corley was. Indeed, the jury members specifically indicated they found Corley positive influence on his son Donald to be perhaps the most positive factor in his life, with nine jurors agreeing. (Tr. Vol. 23 at 24) and with six jurors agreeing that Corley was shown to be caring with his elderly and disabled family and friends (Tr. Vol. 23, 25). The jurors not only listened

40

attentively to the evidence that Corley was a positive impact on his family, they took it upon themselves to write in these mitigators (and three others) themselves rather than relying on the court-provided forms (Tr. Vol. 23, 24). This alone indicates that Corley's family indeed moved the jurors with their pleas on his behalf.

### B. Corley's Proffered Mitigation Evidence is Unconvincing

Petitioner argues that his journal contained red flags for mitigation as to Corley's alleged traumatic upbringing, referring to inappropriate sexual behavior that allegedly occurred in front of children, including a young Corley. These include Corley's statement that he "became the aggressor toward my younger cousins and nieces (sic) participating in the perpetual onslaught of incest and molestation." There is simply no basis to believe that making Corley out to be an incestuous child molester as a result of his father's abandonment, his mother's harsh discipline, and his early exposure to sexual activity, would have been a more effective strategy than portraying him as a man who was gentle with the elderly and the young, who was beloved by his family and who was artistically talented. Defense counsel's decision to pursue the latter strategy does not fall outside the Sixth Amendment bounds of reasonable and effective assistance of counsel.

41

Presenting evidence of both a loving family who would miss him *and* evidence of a dysfunctional family traumatic enough to account for Corley's murderous actions would have been confusing to the jury and self-contradictory. Trial counsel's approach was reasonable.

The government read excerpts from Corley's journal that indicated he was a sexual predator who victimized his own family members. The excerpts included, "The detriment cause is that shortly I became the aggressor towards my younger cousins and nieces, participating in the perpetual onslaught of incest and molestation." Tr. Vol. 21, 48, and "Eventually, as my prey turned out younger, the more evil I felt about myself. The lust was there always and growing, but I would fight it. I would grit my teeth. I would not give in. These new babies would be safe from me. As evil as I am, I could not, would not, be a baby molester." *Id*. at 49. These lines are in direct contrast with the evidence Corley presented that his family members trusted their children with him and that he was a patient and loving father figure. Defense counsel might reasonably have crafted their mitigation strategy to undercut the journal and in so doing, make the journal less credible regarding both Corley's statements about molesting children and his statements about the offered aggravating circumstance of Wanda McNeal's murder. Trial counsel invited the jury to read the whole journal and to question whether it was true

42

or if any parts of it were true at all. Tr. Vol. 21, 20. This is a clear effort to undercut the validity of the journal as a work of fiction. If defense counsel had conceded the Government's position that the journal accurately depicted Corley as an incestuous child molester, it would have necessarily given credence to one of the most important aggravators – that Corley was responsible for the murder of Wanda McNeal. This is a point no reasonable defense counsel could have conceded. The petitioner now seeks to contradict that entire strategy but cannot overcome the presumption that trial counsel's strategy was sound.

In addition, Corley himself testified during the guilt portion of his trial. Corley testified that he was right handed and near sighted. Tr. Vol. 12, 6. Corley testified extensively about his whereabouts on the day in question, indicating he had been doing some handyman jobs in the Michigan City area. *Id*., 23-38. Corley also noted that he had been spending time with his grandmother on the day in question. The petition now attempts to dehumanize Corley and make him appear monstrous, in direct contradiction to the trial mitigation work. Petitioner even makes the claim that this proffered mitigating evidence would be especially important in a capital case where the crimes of conviction were "impulsive and poorly thought out." Memorandum, 35.  The notion that Corley's crimes were "poorly thought out"

43

is contradicted by the record.  The uncontroverted evidence introduced at trial was that Corley and his co-defendants plotted for an extensive period of time to rob a bank that Corley himself thought would be an easy mark. They purchased makeup to lighten their skin, wore disguises, had multiple getaway cars, and obtained guns and ammunition well in advance of the actual crime. Corley himself cased the bank prior to the attempted robbery and had plotted to set the robbery in motion for some time. On the day of the crime, they made a bomb threat to distract law enforcement.  This is the very opposite of an impulsive and poorly thought out crime. By its very nature, the crime suggests that Corley is capable of critical decision making and planning, rather than the impulsive, mentally ill degenerate the appellant now seeks to portray.

    C. <u>Counsel's Strategy was Reasonable</u>

Reasonableness is the benchmark by which Counsel's performance is measured. *Strickland,* 466 U.S. 668, 688–92. *The American Bar Association Guidelines for the Appointment and Performance of Counsel in Capital Cases* (the "ABA Guidelines") are not the standards to determine what is "reasonable" for defense counsel in capital litigation. Rather, the ABA Guidelines are merely meant to serve as models for what is reasonable; strict adherence is not required by the law. *Hummel v. Rosemeyer,* 564 F.3d 290,

302 (3d Cir. 2009) ("The [ABA] Standards are guides, but only guides, to what is reasonable."); *Showers v. Beard,* 635 F.3d 625, 633 (3d Cir. 2011) (stating that the *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases* are "informative," although not "dispositive" for determining whether counsel was ineffective). Under *Strickland,* in addition to proving deficient performance, a petitioner must show that he suffered prejudice as a result of his counsel's deficient performance, that is, he must establish that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine the confidence of the outcome." *Strickland,* 466 U.S. at 694. Corley cannot do so in this instance.

Establishing an ineffective assistance claim depends first on demonstrating that counsel's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the petitioner by the Sixth Amendment." *Strickland,* 466 U.S. at 687. In evaluating Corley's claim that his counsel did not adequately investigate or present mitigating evidence, the court must focus on the reasonableness of counsel's conduct. Trial counsel's conduct was eminently reasonable. Indeed, this case closely resembles *Laux.* There defense counsel presented evidence that the defendant was a devoted Catholic and father who

45

was remorseful after his crimes. *Laux*, 890 F.3d at 670. The Seventh Circuit rejected Laux's claim that his counsel was ineffective for failing to present a host of evidence: that his father was a spendthrift alcoholic who walked around the house nude and took his children to X-rated movies, while his mother was schizophrenic and distant. *Id.* at 671-72.

Similarly, in *Mertz v. Williams,* the government presented evidence that the defendant was involved in a previous murder and an arson, that he held some disturbing racial viewpoints and possessed nude images of children. Defendant argued his counsel had been deficient by failing to present a myriad of additional evidence, including family history, potential mental illness and expert testimony regarding defendant's possibly diminished mental state. 771 F.3d 1035, 1042 (7th Cir. 2014). The Seventh Circuit held that no reasonable probability existed that the trial judge would ultimately have sentenced Mertz to anything less than what he currently serves had sentencing counsel rebutted the evidence of the murder and arson and presented the mitigation evidence listed. *Mertz v. Williams,* 771 F.3d 1035, 1044 (7th Cir. 2014). The same holds true for Corley – the probability of a different sentence is just not substantial. Corley now wants to present an argument that undercuts any of the positive qualities that trial counsel presented to the jury and instead offer an argument as to why Corley became a murderer.

46

Hindsight is keen; however, this Court need not address whether one tactic or another would have been more strategically sound. "We address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic,* 466 U.S. 648, 665, n. 38 (1984). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S., at 690–691. However, this is not a case where counsel's investigation was insufficient. Trial counsel interviewed Corley's family, procured a mitigation expert and experts in future dangerousness, and crafted a plausible, if ultimately unsuccessful, defense that showed Corley as a valued member of society and his family, and a person who could function well in a prison setting.

Under the standard set forth in *Strickland,* a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689 [*quoting Michel v. Louisiana,* 350 U.S. 91, 101 (1955)]. See also *Bolden v. United States,* 171 F. Supp. 3d 891, 921 (E.D. Mo. 2016). Corley simply cannot overcome this presumption. Counsel's decision to forgo further investigation into the

47

petitioner's background was supported by reasonable, professional judgement. Additional testimony about his murderous, incestuous nature would have likely only served to alienate the jury even further. See *Burger v. Kemp,* 483 U.S. 776, 794, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987).

**Ground Eight: The Seventh Circuit Has Already Rejected Corley's Incorrect Claim that the Prosecutor's Penalty Phase Statements Constitute Reversible Error.**

During the sentencing portion of Corley's trial, the government presented witnesses who testified about the impact of Corley's actions. The families of Kay Peckat and Chandler Simpson discussed their beloved family members and described the tremendous loss to their families and communities. Keith Hill and his family described the paralysis caused by Corley's bullet and the ensuing complications for Mr. Hill.

The government was well within its purview to elicit testimony from family members as to the effect of Corley's shooting spree and "the specific harm caused by the defendant" on the victims' loved ones. *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S. Ct. 2597, 2608, 115 L. Ed. 2d 720 (1991). The specific harm caused by Corley was deep and widespread. The loss of their loved ones obviously grievously affected the families of the victims, but even customers at the small bank were emotionally devastated and closed their

48

accounts. Tr. Vol. 18, 24-25. This is impact testimony of the type explicitly approved by *Payne.*

Even if Corley's present claim were right on the merits, he cannot raise it here because he already raised, and lost, an identical argument on appeal. The Seventh Circuit rejected Corley's argument on direct appeal that the prosecutor committed error in closing argument by asking jurors not to assume that the victims in the case would perceive a life sentence as just. *Corley*, 519 F.3d at 728. The Seventh Circuit concluded that "one, isolated, ambiguous statement by the government in this case is not reversible error in the context in which it was made and in context of the closing argument and limiting instructions as a whole.[…]. As discussed above, the cross-examination was either proper or was properly handled with the limiting instruction, and therefore that argument must fail". *Id.* at 728-29. The appellate court's ruling that the statement was proper or properly handled with a limiting instruction leads to the inexorable conclusion that neither trial nor appellate counsel erred with regard to this issue.

Of course, the petitioner produced his own witnesses during the sentencing portion of the trial. Corley's mother, Barbara Aldridge, testified about her son's fondness for children and the elderly, his artistic talent and his caring nature for members of his own family. Tr. Vol. 19, 79 -96. She also

responded emotionally when asked what it would mean to the family if Odell was sentenced to death:

> If they kill my child, they going to kill me and my mother too. I just – I don't care if you give him 500 years in jail and lock him up, but don't kill him, don't kill him. I am his mother. What good would it do to kill him. Would it bring anybody back?

*Id.* at 97.

The defense also presented testimony from Corley's half-brother, Cameron Corley and his sister Kim Aldridge. Both explained what their brother's death would mean to the family. Corley's nephew said that the execution of his uncle would be "totally devastating. It would devastate everybody." *Id.* at 137.

Although the written record cannot convey the level of emotion present in the courtroom, it is clear that the defense witness's testimony was highly emotional. Trial counsel at one point requested a short break, stating "Your honor, we have one or two more live witnesses. One of them is very upset, one just said he wouldn't testify. I would like to take a short break and talk to him and see if he can compose himself, we'll put him on the stand". *Id.* at 130.

The petitioner now objects to a line in rebuttal closing argument in which the prosecutor noted, "Because there was no histrionics, because there

was no raw emotion, don't assume for a minute that the sentence of life will be perceived as justice by the victims of this case." Tr. Vol. 21 at 39. This statement appears to be a direct, invited response to the petitioner's earlier arguments to the jury to compare "the fear and anguish of Barbara Aldridge, who is faced with the death of her son. [...]the emotion that overcame Donald when he was unable to express his emotions" as compared to the "quiet dignity" of Chandler Simpson's widow, Nancy Simpson, and the fact that the families had "begun to move on." *Id*. at 37. Trial counsel conceded that the Government had not asked the family what they believed the proper sentence would be. *Id*. at 52. Government counsel indicated "This was rebuttal, it was in response to [...] Their closing argument. [...] What Mr. Schlesinger said about the death issues and all that went with it". *Id*. at 52-53. The comments about histrionics and raw emotion were clearly meant to remind the jury that the displays of calmness and "quiet dignity" by members of the victims' families were not the same as condoning Corley's atrocious act.

Furthermore, the judge made very clear that the opinions of the prosecutor are not testimony and here, no evidence was presented on the views of the victims' family members as to the appropriateness of the death penalty in this case. The government did not elicit any statements as to the righteousness of the death penalty from the family but instead made only

51

permissible argument regarding the impact Corley's actions had on individuals and the community at large. Thus, *Booth v. Maryland*, 482 U.S. 496 (1987) and *Payne* are inapplicable as both of those cases deal with actual victim impact testimony – not the prosecutor's arguments regarding that impact testimony. Defense counsel cites *Morgan* and *United States v. Kelly,* 991 F.2d 1308 (7th Cir. 1993) in support of the argument that the prosecutor's comments impermissibly asked the jury to weigh something other than the guilt of the petitioner – however, this line of cases is easily distinguished. Corley's guilt was not at issue during this portion of the trial. The same jury had already found him guilty of the bank robbery and murders. This section of the trial was about weighing aggravators and mitigators; Corley's guilt had already been determined.

The jury was properly instructed that in order to impose the death penalty, they would have to find at least one of the aggravating factors beyond a reasonable doubt and then engage in a weighing process of the aggravator(s) and any mitigators they found. The jury did so. To assess the probability of a different outcome under *Strickland*, the court must consider the totality of the mitigation evidence from trial and the evidence claimed to exist currently – and reweigh it against the aggravation evidence. *See Sears v. Upton,* 561 U.S. 945, 955–56 (2010).

52

Furthermore, even if the prosecutor's commentary was objectionable, Corley is now barred from re-arguing his ineffective assistance of counsel claim. This argument has already been raised and denied on direct appeal. Petitioner complains that, "[A]ppellate counsel, however, lumped this argument into a general prosecutorial misconduct claim." Mem. Law. 55. Even if Corley's appellate counsel argued this point in a manner current counsel disagrees with, it does not fall so short of the ordinary standards of the legal profession as to be objectively unreasonable within the meaning of *Strickland*. The argument was raised and considered by the appellate court. It was denied. Again, counsel's decision did not unduly prejudice Corley. For these reasons, Corley's prosecutorial misconduct and ineffective assistance of counsel claim is without merit.

**Ground Nine: This Court Properly Instructed the Jury on How to Consider Wanda McNeal's Statement.**

At the penalty phase of Corley's trial, the government presented evidence that in 1988, in Atlanta, Corley set Wanda McNeal on fire, and she ultimately died of her injuries. *Corley*, 519 F.3d at 723-728; see also Tr. Vol. 18, 64-252. Before she died, McNeal said that "Will and his cousin" (not Corley) had set her on fire. *Id.* at 98. The Court admitted this statement through a hearsay exception as a dying declaration. The statement was, understandably,

the linchpin of Corley's argument that he was not responsible for McNeal's death.

Petitioner complains that he was "compelled to defend himself against prejudicial evidence that he had previously murdered Wanda McNeal." Mem. Law at 66. The claim that the McNeal evidence should not have been admitted was already raised and denied in *Corley,* 519 F.3d at 723-726. Nearly all evidence offered against a defendant in a criminal trial is prejudicial; that does not mean the jury should not hear it.

Corley further alleges that he was entitled to a specific instruction that the jury could consider McNeal's statement of identification as admissible not just to impeach the government's case, but as substantive evidence. *Id.* But there is no reason to think the jury failed to understand this point. The entire issue before the jury was whether Corley murdered McNeal, and the prosecutor never suggested it could not substantively considered McNeal's statement on that point. No instruction suggested the jury could not consider the point. The only jury instruction Corley points to said that the jury could consider out-of-court statements of witnesses "inconsistent with the witness's testimony here in court" only for impeachment purposes. Tr. Vol. 13, at 165. This instruction plainly does not apply to McNeal's identification statement of her murderer because McNeal did not testify in court. She only made one statement, she was deceased at the time of trial and did not testify and the

54

Court admitted that single hearsay statement for the truth of the matter asserted.

Corley's defense counsel never actually requested an instruction at trial, nor did he submit a proposed instruction on this issue or otherwise object to the district court's final instructions. Therefore, plain error review applies. *United States v. Irorere,* 228 F.3d 816, 825 (7th Cir. 2000). There is clearly no plain error.  Corley cannot fulfill the first prong – he suffered no prejudice; if anything, he benefitted by admission of the statement. Therefore, neither trial nor appellate counsels' representation was constitutionally deficient.

**Ground Ten: Because Bank Robbery is a "Crime of Violence," Corley's Section 924(c) Convictions Are Valid.**

Corley was charged, convicted and sentenced to death for possessing a firearm during a crime of violence that resulted in murder in violation of 18 U.S.C. § 924(j) and (c)(3). To qualify as a crime of violence, the underlying act (in this case, the bank robbery), must fall under either the elements clause or the residual clause of § 924(c). The Court granted Corley additional time for his counsel to consider the impact of *Sessions v. Dimaya* on his case. The Supreme Court issued the opinion April 17, 2018 and found that Dimaya's California conviction for burglary was not a crime of violence *under the residual clause.* This is of no import to the matter at hand – Corley's

55

convictions constitute crimes of violence under the elements clause, and that is sufficient to withstand scrutiny.

Since *Sessions v. Dimaya,* 138 S.Ct. 1204 (2018) does not actually control, Corley's claim on this ground, which was not included in his initial timely filed motion, is untimely and should be denied on that basis alone. Even if this court is inclined to find that petitioner's claims are not time-barred, they still lack merit. Petitioner's counsel correctly concedes that *United States v. Armour*, 840 F.3d 904 (7th Cir. 2016), forecloses his argument. *Armour* held that armed bank robbery is a predicate crime of violence because federal bank robbery constitutes a crime of violence under the elements clause of Section 924(c), *Dimaya* has no impact on the petitioner's conviction.

Despite this clear rule, petitioner argues that *Armour* was incorrectly decided. The *Armour* court found that intimidation in § 2113(a) means the threat of force. *See also United States v. Campbell*, 865 F.3d 853, 856 (7th Cir.), cert. denied, 138 S. Ct. 347, 199 L. Ed. 2d 232 (2017). The same court also concluded that bank robbery by intimidation was a crime of violence under the elements clause of § 924(c). *Id.*

Even if Corley claimed he only aided and abetted the robbery, he would still be liable for committing a crime of violence. *See* 18 U.S.C. § 2(a); *see also, e.g.,),United States v. Armour*, 840 F.3d 904, 908–09 (7th Cir. 2016), *as*

56

*amended* (June 26, 2017); *accord United States v. Richardson*, 906 F.3d 417, 426 (6th Cir. 2018) (citing *United States v. Garcia-Ortiz*, 904 F.3d 102, 104–05, 109–10 (1st Cir. 2018) ); *United States v. Deiter*, 890 F.3d 1203, 1216 (10th Cir. 2018); *In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016). However, the evidence presented at trial showed the government's theory that Corley was the main actor and the actual triggerman who deliberately and callously shot three individuals. The jury agreed with this theory, finding Corley guilty on each count. Therefore, there is no argument that Corley's actions and convictions do not constitute crimes of violence – they are the very definition of crimes of violence.

## **CONCLUSION**

For the forgoing reasons, this Court should deny Petitioners' Motion to Vacate his Conviction without an evidentiary hearing. Alternatively, if the Court is inclined to grant Petitioner's motion on any ground, the government

requests an evidentiary hearing to present further evidence and argument against such a result.

Respectfully submitted,

THOMAS L. KIRSCH II
United States Attorney

By:  */s/ Caitlin M. Padula*
Caitlin M. Padula
Assistant United States Attorney
5400 Federal Plaza, Suite 1500
Hammond, Indiana  46320
Tel:   (219) 937-5500
Fax:  (219) 852-2770
E-mail:  Caitlin.Padula@usdoj.gov