UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ODELL CORLEY a.k.a. NASIH RA'ID,

    Petitioner,

    v.

UNITED STATES OF AMERICA,

    Respondent

Case No. 3:02-CR-116 JD

## OPINION AND ORDER

On August 27, 2002, armed with a .45 caliber semiautomatic handgun, Odell Corley[1] entered a bank in the Town of Pines, Indiana, intending to rob it. One cohort hesitated and stayed outside, and three others were nearby ready to assist with the escape. Within twenty-nine seconds, Mr. Corley had murdered two people and paralyzed another. He fled the bank without getting any money. A jury subsequently convicted and sentenced him to death on four counts of the superseding indictment stemming from the two murders. He seeks to vacate those convictions and sentences pursuant to 28 U.S.C. § 2255. The Court has previously found that of the ten grounds Mr. Corley advances, only Ground Seven—trial counsel's alleged failure to develop and present mitigating evidence at the sentencing phase of the trial—requires an evidentiary hearing. However, all other grounds can be decided without a hearing and will be addressed in turn. But as explained below, none of them warrant granting habeas corpus relief.[2]

---

[1] Although tried and convicted under the name of Odell Corley, Petitioner calls himself Nasih Ra'id. Because his name has not been formally changed with this Court, to avoid any confusion, the Court will continue to refer to Petitioner as Odell Corley.

[2] Although Mr. Corley filed his § 2255 motion in 2010, his attorneys asked for multiple extensions to file a memorandum of law in support of the motion, which were granted by the previously assigned judges. The undersigned received this case in June 2020 and set the motion, as it relates to the Seventh Ground for relief, for an

### A. Procedural Background and Jury Trial

### 1. *Charges*

On November 21, 2002, a grand jury returned a ten-count superseding indictment against Mr. Corley and his co-defendants. (DE 69.) He was charged in eight of those counts as follows:

- Count 1, conspiracy to commit bank robbery in violation of 18 U.S.C. § 371;

- Count 2, aggravated attempted bank robbery, in violation of 18 U.S.C. § 2113(d);

- Count 3, murdering Kay Peckat during an aggravated attempted bank robbery, in violation of 18 U.S.C. § 2113(e);

- Count 4, possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c);

- Count 5, murdering Kay Peckat with a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) and (j)(1).

- Count 6, being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g);

- Count 9, murdering Chandler Simpson during an aggravated attempted bank robbery, in violation of 18 U.S.C. § 2113(e); and

- Count 10, murdering Chandler Simpson with a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) and (j)(1).

(Superseding Indict., DE 69.)

### 2. *Summary of Trial Evidence*

---

evidentiary hearing to be held in December 2020. Shortly before the hearing, the Government moved for permission to conduct discovery, which the Court granted. Since then, the Government has requested several extensions of time, without opposition from Mr. Corley. As a result, the discovery matters remain ongoing and, although the evidentiary hearing has not yet been conducted, the Court is issuing this order because the questions addressed here can be decided independently of Ground Seven.

Mr. Corley and Edward Johnson were long-time friends who reconnected in August 2002. (Tr. Vol. 9 at 194.) Soon after, Mr. Corley asked Mr. Johnson to help him rob a bank. (Tr. Vol. 9 at 187.) They enlisted Andre McGregor as another accomplice. Jeanna Ramsay, a woman Mr. McGregor developed an amorous relationship with while in prison, also joined in as did Danyass Gay with whom Mr. McGregor was living at the time.

The five of them planned the robbery. Mr. Corley said he had been watching the bank for some time and was familiar with the area and the route to take. (Tr. Vol. 10 at 106.) They discussed their wardrobe and individual roles in the robbery. (Tr. Vol. 9 at 196–98.) Their disguises would consist of sunglasses, bandanas, oversized clothes, and makeup to lighten their complexions. (Tr. Vol. 9 at 140–41, 205–06; Tr. Vol. 10 at 104–05.) Mr. Johnson obtained the guns. (Tr. Vol. 9 at 202.) Three days before the robbery, Ms. Ramsey purchased ammunition.

On August 27, 2002, Mr. Johnson and Ms. Ramsey met Mr. Corley at Mr. McGregor's house. (Tr. Vol. 9 at 213.) Mr. Corley knew of a tan car he could take for the robbery, so he and Mr. Jonson went to retrieve it. (Tr. Vol. 10 at 118.) On the way to the bank, they stopped at a gas station, where Mr. Corley, in an effort to divert the police, used an Arabic accent to call in a bomb threat against an area school. (Tr. Vol. 9 at 218.) Mr. McGregor drove the tan car behind the bank (Tr. Vol. 9 at 221–22) while each of the women drove getaway cars (Tr. Vol. 9 at 218–20).

Mr. Corley entered the bank immediately but Mr. Johnson saw a security guard and stopped outside. *United States v. Corley*, 519 F.3d 716, 719 (7th Cir. 2008). A security camera captured what happened next. The guard, Keith Hill, went to the bank door as Mr. Corley entered. (Tr. Vol. 7 at 60–61, 82; Tr. Vol. 9 at 222–25.) Mr. Corley opened the door and fired his .45 caliber semiautomatic handgun at Hill at close range, wounding him twice and leaving him

paralyzed. (Tr. Vol. 9 at 222–23.) While heading to the servicer counter, Mr. Corley shot teller Chandler Simpson in the head. (Tr. Vol. 7 at 63; Vol. 8, 172–80.) He vaulted the counter, leaving a palm print on its surface and then—just seven seconds after entering the bank—shot teller Kay Peckat who was crouching in the work area. (Tr. Vol. 8 at 183—205.)

At Mr. Corley's command, Mr. Johnson entered the bank and took Mr. Hill's gun. (Tr. Vol. 9 at 222–26.) They found that the vault was locked and fled without any money. During their getaway, Mr. Corley said, "I shot some people. I shot some people." (Tr. Vol. 10 at 124–25.) In addition, while leaving the area he stated, "I think I killed somebody." (Tr. Vol. 10 at 128.) When Ms. Gay asked him what had happened, he told her "not to worry about it, that [she would] see it on America's most wanted." (Tr. Vol. 10 at 254.)

At trial, Messrs. Johnson and McGregor, and Ms. Gay testified against Mr. Corley. The government also introduced in evidence the bank's security videotape and the palm print from the counter. FBI latent fingerprint examiner Danielle Archambault testified about the palm print. (Tr. Vol. 8 at 250–305.) She testified that fingerprints were unique to each person. (*Id*. at 269.) Her experience included over 250,000 friction ridge comparisons, all of which were verified by another person. She had identified victims of war and terrorist attacks.

In this case, Agent Archambault examined the high quality palm prints from the bank counter and compared them to Mr. Corley's known exemplars. (Tr. Vol. 8 at 258.) To make an identification, she had to determine there were no unexplainable differences between the latent and the inked print. (*Id*. at 263.) She found no such differences between Mr. Corley's exemplar and palm prints from the crime scene. (*Id.* at 263, 267.) In conclusion, Agent Archambault opined that Mr. Corley left the latent print on the bank counter. (*Id.* at 267.)

After a month-long trial, the jury convicted Mr. Corley on all charges (DE 650) and, during the penalty phase of the trial, unanimously recommended death sentences on the four murder counts. (DE 722.) On December 15, 2004, the trial court followed the jury's recommendations and sentenced Mr. Corley to death on Counts 3, 5, 9, and 10, and to a total term of 600 months of imprisonment on Counts 1, 2, 4, and 6. (DE 737.)

### 3.  *The Appeals*

On appeal, the Court of Appeals for the Seventh Circuit affirmed. *Corley*, 519 F.3d 716. The court rejected Mr. Corley's claims concluding that: (1) the government permissibly exercised a peremptory challenge to excuse a potential juror, *id.* at 722–23; (2) during the penalty phase of trial, the court properly admitted evidence of an unadjudicated murder, *id.* at 723–27; (3) the prosecution engaged in no misconduct when cross-examining Mr. Corley or during its penalty phase closing arguments, *id.* at 727–29; and (4) the trial court properly refused to give a residual doubt instruction during the sentencing phase of trial, *id.* at 729–30. The Supreme Court subsequently denied a petition for writ of certiorari. *Corley v. United States*, 555 U.S. 1140 (2009).

Mr. Corley then timely moved to vacate convictions and sentences. (DE 883.) After numerous and prolonged continuances while the case was pending before reassignment, the motion is now briefed, and ready for ruling on all grounds, except ground 7, which requires an evidentiary hearing.

### B.  Standard of Review

5

Section 2255(a) of Title 28 provides that a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." *Id*. The Seventh Circuit has recognized that § 2255 relief is appropriate only for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004). Relief under § 2255 is extraordinary because it seeks to reopen the criminal process to a person who has already had an opportunity of full process. *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006)).

Most of Mr. Corley's § 2255 motion rests on his claim that he received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. A criminal defendant is entitled to the assistance of counsel for his defense, U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and a defendant who was denied effective assistance of counsel can receive relief under § 2255, *Edmond v. United States*, 899 F.3d 446, 452–53 (7th Cir. 2018). To prevail on a claim of ineffective assistance of counsel, a defendant must show: 1) that his counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and 2) that he was prejudiced by the deficiencies in his counsel's performance, meaning that there is a reasonable probability that the results of the proceeding would have been different with effective representation. *Strickland*, 466 U.S. at 687; *Edmond*, 899 F.3d at 452–53; *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011). "Surmounting *Strickland*'s high bar is never an easy task" since "the *Strickland* standard must be applied with scrupulous care." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

As to the first prong, the petitioner must establish that counsel's performance "fell below an objective standard of reasonableness" resulting in a failure to function "as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the "wide range" of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 689). "This means identifying acts or omissions of counsel that could not be the result of professional judgment. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011) (internal quotation marks and citations omitted). "The important inquiry is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Koons*, 639 F.3d at 351(internal quotation marks and citations omitted).

But even if the petitioner shows that counsel's performance fell below an objective standard of reasonableness, he would still have to show that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]'" *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington*, 562 U.S. at 104 (citations and quotation marks omitted). "'In weighing the effect of counsel's errors, the court must consider the totality of the evidence. . . . A verdict or conclusion that is overwhelmingly supported by the record is less

likely to have been affected by errors than one that is only weakly supported by the record.'" *Id.* (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001)) (internal alterations omitted).

The *Strickland* standard also applies to appellate counsel, who have latitude to exercise reasonable professional judgment in selecting the issues most promising for review. *Jones v. Barnes*, 463 U.S. 745, 752 (1983). After all, "[a] brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." *Id.* at 753.

> [W]here an ineffective assistance claim is based on an attorney's failure to raise a viable issue on appeal, we must first analyze the trial court record to determine whether the defendant's appellate attorney, in fact, ignored significant and obvious issues. For an attorney's performance to be considered ineffective on such grounds, it must be shown that the neglected issues are clearly stronger than the arguments that actually were raised on appeal.

*Blake v. United States*, 723 F.3d 870, 888 (7th Cir. 2013) (citations, quotations marks, and brackets omitted).

"It is well-established that a district court need not grant an evidentiary hearing in all § 2255 cases. Such a hearing is not required if 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (citing 28 U.S.C. § 2255).

## C. Discussion

### (1) Ground 1: fingerprint evidence

Mr. Corley is challenging the use of fingerprint evidence at trial. The Government used the fingerprint evidence to establish that Mr. Corley was inside the Pines Branch of the First State Bank of Porter and that he was the assailant who vaulted over the teller counter and shot Ms. Peckat. (Tr. Vol 7 at 30 (opening statement); Tr. Vol. 8 at 268 (Agent Archambault's

testimony).) Mr. Corley argues that fingerprint evidence is unreliable to the point that his due process and Eighth Amendment rights were violated. (Pet.'s Br., DE 976 at 14–15.) He submits that the 2009 National Academy of Sciences report on forensic evidence discredited forensic fingerprint practices. (DE 883 at 22–24.) He suggests that there is no certainty in matching fingerprints, and that Agent Archambault's testimony that the fingerprints matched is merely her subjective opinion with no evidentiary weight.

In its response, the Government points out that Mr. Corley could have raised this argument on appeal but didn't. The Government therefore argues that he has procedurally defaulted this argument. Mr. Corley appears to concede, since he did not respond to this contention in his reply brief.

Indeed,

> [a] claim cannot be raised for the first time in a § 2255 motion if it could have been raised at trial or on direct appeal. Likewise, a § 2255 appellant cannot raise for the first time on appeal a claim not presented to the district court in the § 2255 proceedings below. A federal prisoner cannot bring defaulted claims on collateral attack unless he shows both cause and prejudice for the default. Absent a showing of both cause and prejudice, procedural default will only be excused if the prisoner can demonstrate that he is "actually innocent" of the crimes of which he was convicted.

*McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016) (citations omitted).

Mr. Corley has not shown cause and prejudice. Presumably, his cause is that the National Academy of Sciences Report was issued several years after his trial and sentencing. But concerns about fingerprints aren't new,[3] and the report did not eliminate fingerprint forensics. Regardless,

---

[3] *See, e.g.*, *People v. Jennings*, 252 Ill. 534, 549, 96 N.E. 1077, 1082 (1911) ("We are disposed to hold from the evidence of the four witnesses who testified, and from the writings we have referred to on this subject, that there is a scientific basis for the system of finger print identification, and that the courts are justified in admitting this class of evidence; that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it. Such evidence may or may not be of independent strength, but it is admissible, the same as other proof, as tending to make out a case. If inferences as to the identity of persons based on the voice, the appearance, or age are admissible, why does not this record justify the admission of this finger print testimony under

the Supreme Court recognizes that, even if a potential for error or abuse in fingerprint forensics exists,

> [c]onfrontation is one means of assuring accurate forensic analysis. While it is true . . . that an honest analyst will not alter his testimony when forced to confront the defendant, the same cannot be said of the fraudulent analyst. Like the eyewitness who has fabricated his account to the police, the analyst who provides false results may, under oath in open court, reconsider his false testimony. And, of course, the prospect of confrontation will deter fraudulent analysis in the first place.
> Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well. Serious deficiencies have been found in the forensic evidence used in criminal trials.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 318–19 (2009) (citations omitted).

Moreover, as Judge Easterbrook observed, when discussing fingerprint analysis in *United States v. Bonds*, 922 F.3d 343 (7th Cir. 2019), a mere possibility for error does not automatically disqualify fingerprint evidence just as, for example, a possibility of mistaken eyewitness identification does not automatically disqualify eyewitness testimony:

> To say that an error rate is troubling is not to suggest that ACE-V[4] is too uncertain for use in litigation. Assessment must be comparative. What are the alternatives? Grainy pictures taken by bank surveillance cameras of robbers wearing masks, or confederates who testify for the prosecution, have problems of their own. Witnesses may lie on the stand; there is no science of credibility enabling jurors to detect who is telling the truth, and some witnesses who *think* that they are telling the truth nonetheless may be confused or incorrect. Eyewitness identification is notoriously subject to the vagaries of memory. A judicial system that relies heavily on fallible lay testimony cannot be improved by excluding professional analysis that may well have a lower error rate—or by diverting jurors' attention to particular errors made by other analysts years earlier. What the judicial system *can* do is subject the forensic evidence to cross-examination about a method's reliability and whether the witness took appropriate steps to reduce errors.

---

common-law rules of evidence? The general rule is that whatever tends to prove any material fact is relevant and competent.").

[4] ACE-V is a method of fingerprinting that stands for "analysis, comparison, evaluation, and verification." *United States v. Bonds*, 922 F.3d 343, 344 (7th Cir. 2019).

*Id.* at 346. In conclusion then, even what may be purported as cause for Mr. Corley's failure to raise on appeal the argument regarding the Government's use of fingerprints, is really no cause at all, as the issues surrounding the use of fingerprints aren't new and could have been raised on appeal.

In fact, in examining Agent Archambault, Mr. Corley's counsel touched on some of the issues raised in the report. For that very reason Mr. Corley cannot identify any prejudice from procedural default. His counsel cross-examined Agent Archambault's testimony, her methodology, the number of examinations she performed, her error rate, and the ability of others to verify her findings. (Tr. Vol. 8 at 272–282.) Further, under cross-examination, Agent Archambault acknowledged that neither she nor those who lifted the prints knew when they were deposited. (*Id.* at 228–229; 253.) Under these circumstances, it cannot be said that Mr. Corley suffered unfair prejudice as a result of the procedural default.

Finally, although Mr. Corley claims actual innocence, he has not presented a cogent argument to back up his claim. But then again, any argument would be futile. First, Mr. Corley cannot show actual innocence. Even absent the palm print, the co-defendants' testimony that Mr. Corley went inside the bank alone, together with the video evidence from within the bank, flatly contradict any claims of his actual innocence so it is not "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Accordingly, the Court finds no justification to vacate Mr. Corley's conviction or sentence on the basis of his argument in Ground 1.

### (2) Ground 2: Counsel's Failure to Raise an Issue of Prosecutorial Misconduct on Appeal

Next, Mr. Corley claims that his appellate counsel were ineffective when they failed to raise on direct appeal a claim of prosecutorial misconduct during trial.

At trial, Mr. Corley testified on direct examination that he was right-handed. (Tr. Vol. 12 at 6.) On cross-examination, he admitted that he had served in the Marines and was trained to use a .45 caliber semiautomatic gun. In closing arguments, defense pointed out a still picture from a video surveillance camera at the bank (Gov't Ex. 85-D) suggesting that it showed the killer shooting Mr. Hill with his left hand. [5] (Tr. Vol. 13 at 136–37.) Defense then argued that "if you're going into a situation where it's life and death and you're going to shoot somebody, you're not going to use a hand that is not the hand you use," thus insisting that Mr. Corley couldn't have been the shooter.

In rebuttal, the government responded with just the opposite assertion, that the evidence showed the robber holding the gun in the right hand when shooting Mr. Hill:

> But one of the factors in deciding, I submit, is look at the door. The door is being pushed open. If the gun had been in the shooter's left hand, it would be to the left of the door. Think about it if you were coming in and you were pulling that door open. Left hand pull, right hand gun. If it's the other way around, how are you pulling that door open? If the gun's in your left hand, are you pulling it this way and fighting with the dimension? . . .
>
> Showing you Government's Exhibit 85-D, we see Mr. Hill falling to the ground having already been shot. And defense would argue that the gun's in the left hand. And again, you'll see these actual pictures when you get back. I can only trust the monitors to give you an idea now.
>
> The government submits the clenched fist that you see in the right is holding the firearm at that point, and the hand is pointing at that point, the shooter being right-handed.
>
> Government's Exhibit 85-E, Keith Hill is laying prone on the ground already shot, and again, you see the right hand extended, and I submit to you that picture shows the .45 in that hand.
>
> Government Exhibit 85-F, right at Miss Peckat's window, and you can see clearly, the gun is in the right hand.

---

[5] Copies of Government Exhibits 85-B–F are attached as an appendix.

(Tr. Vol. 13 at 155–156.)

Government's counsel then offered his explanation why in other still photos the shooter is seen holding the gun in his left hand:

> What's the explanation? And I submit to you the explanation is we have someone who is equally skilled with both hands. We have someone who is capable and has been trained to use both hands.

(*Id.* at 156.)

At this point, defense objected on the grounds that there was "no testimony that [Mr. Corley] was trained to use both hands." (*Id.*) The court held a sidebar and ruled that the Government could proceed with its argument. Government's counsel then continued:

> I submit to you that this individual was someone who had been trained in the use of that weapon or other weapons, and I submit to you when you are trained in the military, and you use your own common experience and knowledge, or you're trained as a police officer or someone that uses weapons, you are oftentimes trained in both hands. Because what happens if you're right-handed and you get shot on the right side? You still need to function with that left hand.

(*Id.* at 158.)

Government's counsel finished his argument with a suggestion that, although as attested by Mr. Johnson the plan was to wear gloves and nobody was to be killed, Mr. Corley wore no gloves so he could have full use of the weapon and kill at will. Switching the gun between his hands while he was inside the bank was part of "having fun" because "he took pleasure in what he did." (*Id.* at 158–59.)

Mr. Corley submits that Government's counsel engaged in prosecutorial misconduct by essentially introducing new evidence during his rebuttal. Mr. Corley points out that there was no evidence at trial that the Marines are trained to shoot with both hands and insists that this unprovoked speculation deprived him of a fair trial, especially because the court did not provide

the jury with a curative instruction. Finally, because the prosecutor made this statement during the rebuttal, the defense had no opportunity to refute this argument.

Mr. Corley argues that, had his appellate counsel raised this issue on appeal, there's a reasonable probability that the court would have reversed his conviction. The Government responds that the prosecutor's comment was based on reasonable inference, and Mr. Corley's argument on appeal would have been meritless, given that he raised stronger claims—including one that challenged the prosecutor's statement during the closing arguments of the penalty phase—none of which swayed the court of appeals.

The courts examine allegations of prosecutorial misconduct in two steps. "The first step is to examine the disputed comment in isolation to determine whether it was in fact improper. If the comment was improper, we must then examine the comment in light of the record as a whole to determine whether the defendant was deprived of a fair trial." *United States v. Ward*, 211 F.3d 356, 365 (7th Cir. 2000) (citations omitted). "[I]n closing argument, a prosecutor may argue reasonable inferences from the evidence that the jury has seen and heard. *Id*. (citation and quotation marks omitted). The argument must arise out of the evidence, and it cannot be made "solely to inflame the passions of the jury." *Id.* (quoting *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995)).

As for the appeal, "[e]ffective advocacy does not require the appellate attorney to raise every non-frivolous issue under the sun, of course. After all, one of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects." *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996) (citation, quotation marks, and brackets omitted). "An appellate counsel's performance is deficient if he or she fails to argue an issue that is both obvious and clearly stronger than the issues raised." *Martin v. Evans*, 384

F.3d 848, 851 (7th Cir. 2004). The courts do not second guess counsel's appellate strategy. *Id.* "But when appellate counsel omits (without legitimate strategic purpose) a significant and obvious issue, we will deem his performance deficient, and when that omitted issue may have resulted in a reversal of the conviction, or an order for a new trial, we will deem the lack of effective assistance prejudicial." *Id.* (citation and quotation marks omitted). "There is a strong presumption that counsel's performance is reasonable and this presumption has particular force when the ineffective assistance claim is based solely on the trial court record." *Martin*, 384 F.3d at 852.

The Court will now examine whether the Government's counsel committed prosecutorial misconduct and, if so, whether Mr. Corley's appellate counsel were ineffective by failing to raise this issue on appeal. Counsel's statement during the rebuttal that Mr. Corley was trained to shoot with both hands while serving in the military was not based on trial evidence. Therefore, standing alone, the statement was improper. The next step then is to "examine the comment in light of the record as a whole to determine whether the defendant was deprived of a fair trial." *Ward*, 211 F.3d at 365. "In assessing the effect of improper remarks on the fairness of the trial, a court should consider the nature and seriousness of the remarks; whether the remarks were invited by the conduct of defense counsel; whether the district court sufficiently instructed the jury to disregard the remarks; whether the defense could counter the improper remarks through rebuttal; and finally, whether the weight of the evidence was against the defendant." *United States v. Klebig*, 600 F.3d 700, 720–21 (7th Cir. 2009). Two out of five of these factors favor Mr. Corley but the overall examination shows no prosecutorial misconduct.

The Court will first consider the two factors favorable to Mr. Corley. First, the Government's counsel's remark that, as a Marine, Mr. Corley was trained to shoot with both

hands was not invited by any of the defense counsel's conduct. In his closing argument, Mr. Corley's counsel focused on the evidence suggesting that the bank robber shot the gun with his left hand whereas Mr. Corley testified that he was right-handed. This was a reasonable argument and it did not stray outside the legal boundaries of a closing argument. In other words, Mr. Corley's counsel in no way provoked the Government's counsel. Second, because the Government counsel made the statement during the rebuttal portion of the closing argument, Mr. Corley's counsel had no opportunity to counter it. While Mr. Corley's counsel objected to the Government's characterization of the evidence, the trial court overruled the objection and allowed the Government to continue. Yet the discussion as to whether Mr. Corley was deprived of a fair trial does not end with the consideration of these two factors. There are three more, and they do not favor Mr. Corley's argument; actually, they undermine it.

After all, the examination of the remaining three factors shows that the fairness of the trial was not compromised. First, the nature of the remark mitigates its negative impact. There's no suggestion in the record that the Government's counsel made the statement maliciously or that the statement was designed to appeal to the passions of the jury so it would find Mr. Corley guilty despite the evidence to the contrary. The Government's primary theory was that Mr. Corley was in fact shooting with his right hand. Its counsel recounted the sequence of the events and suggested that it would have been impractical for Mr. Corley to enter the bank while holding the gun in the left hand. In addition, the Government's counsel argued that the still images show the gun in the right hand of the shooter. He pointed to such evidence at the moments both Mr. Hill and Ms. Peckat were shot. The suggestion that Mr. Corley was ambidextrous with a handgun was only an alternative theory to explain what may have been a momentary switching of the hands. In other words, the Government insisted that the bank robber's use of the gun was

consistent with him being right-handed. The Government's counsel did not concede that the shooter was left-handed, even as he proposed that Mr. Corley must have learned to handle the gun with the left hand while serving in the military. Importantly, although the Government's counsel argued that the jury could infer that Mr. Corley was ambidextrous in the use of a handgun from his own testimony that he was trained in the use of a .45 caliber handgun, the Court instructed the Jury that it could draw only reasonable inferences. That is to say, the Court's instructions limited the reach of the Government's argument.

In addition, the jurors were also instructed that "the lawyers' statements to you are not evidence. The purpose of these statements is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts." (Court's Jury Instructions, Tr. Vol. 13 at 163.) "As always, we presume that the jury followed the court's instructions, absent evidence of an 'overwhelming probability' that it was unable to do so." *United States v. Corley*, 519 F.3d 716, 728 (7th Cir. 2008) (quoting *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007). Here, there's nothing to suggest that the Government's counsel's statement was so overpowering that the jury abandoned its fact-finding role. Just the opposite can be said: the statement was brief, was said only once, and was presented not as an absolute fact but as an invitation to draw an inference.

Finally, the weight of the evidence was against the defendant. In fact, "the evidence against [Mr.] Corley was substantial." *Id*. Mr. Corley's co-defendants testified that he initially entered the bank alone, and he told others during the getaway that "I shot some people. I shot some people" (Tr. Vol. 10 at 124–25) and "I think I killed somebody." (Tr. Vol. 10 at 128.) When Ms. Gay asked him what had happened, he told her "not to worry about it, that [she would] see it on America's most wanted." (Tr. Vol. 10 at 254.) Consistent with this evidence, the

17

still pictures from the bank showed that there was a single shooter. In addition, the shooter vaulted over the counter where he left high quality fingerprints which matched Mr. Corley's fingerprints.

Again, having examined the comments of the Government's counsel in light of the record as a whole, the Court finds that he was not deprived of a fair trial. But even if the Court had reached the opposite conclusion, it would be too narrow to say that his appellate counsel had no option but to raise the Government's comments so as to secure a new trial. As noted already, "[t]here is a strong presumption that counsel's performance is reasonable and this presumption has particular force when the ineffective assistance claim is based solely on the trial court record." *Martin*, 384 F.3d at 852. The courts do not second guess counsel's appellate strategy. Only "when appellate counsel omits (without legitimate strategic purpose) a significant and obvious issue, we will deem his performance deficient, and when that omitted issue may have resulted in a reversal of the conviction, or an order for a new trial, we will deem the lack of effective assistance prejudicial." *Id*. "An appellate counsel's performance is deficient if he or she fails to argue an issue that is both obvious and clearly stronger than the issues raised." *Id*. at 851 (7th Cir. 2004). Here, Mr. Corley appellate counsel made multiple stronger arguments on appeal with no avail. Mr. Corley argued that the trial court allowed racially discriminatory use of peremptory challenges and that, at the sentencing phase of the trial, it allowed into evidence unadjudicated conduct and pictures of the charred body of a woman Mr. Corley had set on fire years earlier in Atlanta. He also raised three other instances of alleged misconduct by the government. Yet, he lost on all these issues. To hold that he would have won a new trial but for counsel's failure to appeal the Government's comments during closing does not correspond with the reality of his case on appeal. "The ultimate question we ask is whether, but for counsel's

18

errors, there is a reasonable probability that the outcome of the proceeding [here, Mr. Corley's appeal] would have been different." *Mason*, 97 F.3d at 893 (citation and quotation marks omitted; text inside brackets changed). Here, the answer is no. Accordingly, Mr. Corley cannot prevail on Ground 2.

### 3. Ground 3: Constitutionality of 18 U.S.C. § 2113(e)

As it pertains to Counts 3 and 9, 18 U.S.C. § 2113(e) provides that anyone who kills any person during an attempted bank robbery must be punished by life imprisonment or death: "Whoever, in committing any offense defined in this section . . . kills any person . . . shall be punished by death or life imprisonment." 18 U.S.C. § 2113. As to these counts, the trial court instructed the jury as follows:

> To sustain the charge of murder during an attempted bank robbery as charged in Count 3 of the superseding indictment, the Government must prove the following propositions: First, the defendant killed Kay Peckat; second, the defendant performed such act or acts during the course of committing the offense of aggravated attempted bank robbery as charged in Count 2; and third, that at the time charged in the superseding indictment, the First State Bank of Porter had deposits insured by the Federal Deposit Insurance Corporation.

(Tr. Vol. 13 at 173 (here and elsewhere, all Roman numerals have been converted to Arabic ones); *see id.* at 177 (jury instruction regarding the killing of Chandler Simpson).)

Mr. Corley argues his conviction and sentence pursuant to § 2113(e) is unconstitutional as applied to him because § 2113(e) does not impose any burden upon the Government to prove any culpable mental state with respect to the deaths of Ms. Peckat and Mr. Simpson. He argues that the trial court failed to instruct the jury that it had to find that Mr. Corley acted with intent in order to convict him of a bank robbery resulting in death under § 2113(e). Mr. Corley suggests that the jury may have convicted him for aggravated robbery but concluded that he carried out

one of the lesser roles in the crime. He therefore claims that his trial counsel were ineffective in failing to ensure that the jury was instructed that it must find some culpable mental state before it convicted him under § 2113(e), and appellate counsel were ineffective for failing to litigate these issues on appeal.

Although, as shown below, it is clear that the jury did find that Mr. Corley intentionally killed Ms. Peckat and Mr. Simpson, it is irrelevant whether he actually intended to kill them. "It is reasonably clear that the language [of § 2113(e)] dispenses with any requirement of proving intent to kill, and in this respect duplicates the general federal felony-murder statute, 18 U.S.C. § 1111(a)." *United States v. Vance*, 764 F.3d 667, 675 (7th Cir. 2014) (citing *United States v. Jackson*, 736 F.3d 953, 957–58 (10th Cir. 2013), and cases cited there); *United States v. Allen*, 247 F.3d 741, 782–83 (8th Cir. 2001), vacated on other grounds by 536 U.S. 953 (2002)). "The text and structure of § 2113(e) indicate Congress intended to omit a mens rea requirement. Section 2113(e) makes no mention of a mens rea and even describes the killing in the passive voice ("if death results"). These facts suggest Congress intended to omit a mens rea requirement. Further, the structure of § 2113 indicates that the omission was purposeful." *United States v. McDuffy*, 890 F.3d 796, 801 (9th Cir. 2018) (citation omitted). "Committing the basic crime of bank robbery is already wrongful conduct. *See Dean* [*v. United States*, 556 U.S. 568, 576 (2009)]. Thus, there is no need to add an additional mens rea requirement." *Id.*

In any case, there's no doubt that the Jury's guilty verdicts on Counts 3 and 9 were based on the jury's finding that Mr. Corley possessed a culpable mental state in murdering Ms. Peckat and Mr. Simpson. In fact, the jury made specific findings at the penalty phase of the trial that it was beyond a reasonable doubt that Mr. Corley intentionally killed Ms. Peckat and Mr. Simpson:

> As to Count 3, that the defendant intentionally killed Kay Peckat, proven beyond a reasonable doubt.

(B), that the defendant intentionally inflicted serious bodily injury that resulted in the death of Kay Peckat, proven beyond a reasonable doubt.

(C), that defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other that one of the participants in the offense, and Kay Peckat died as a result of the act, proven beyond a reasonable doubt.

That this defendant intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death . . . such that participation in the act constituted a reckless disregard for human life, and Kay Peckat died as a result of the act, proven beyond a reasonable doubt. (Tr. Vol. 23, at 8–9.)

(C), that the defendant in committing the offense described in Count 3 intentionally killed or attempted to kill more than one person in a single criminal episode, proven beyond a reasonable doubt. (*Id.* at 10.)

[same findings as to Count 9] (*Id.* at 17–19.)

In making these findings, the Jury showed that it necessarily found that Mr. Corley had a highly culpable mental state at the time of the killings. *Cf. Tison v. Arizona*, 481 U.S. 137, 157–58 ("[W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.").

Accordingly, Mr. Corley is wrong in maintaining that trial and appellate counsel violated the Sixth Amendment by not arguing that using § 2113(e) to convict him was unconstitutional. Given the precedent in the Seventh Circuit and the corresponding holdings in other circuits, *see supra* at 20, this would have been a weak issue to argue both for the trial and appellate counsel. Consequently, Mr. Corley has not shown that there is "a reasonable possibility that, but for the [alleged] unprofessional error, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Most importantly, Mr. Corley's argument has no merit. What is more, raising a losing issue in an appeal had the potential of diluting the stronger arguments. After all, "[l]awyers must curtail the number of issues they present, not only because briefs are limited in length but also because the more issues a brief presents the less attention each

21

receives, and thin presentation may submerge or forfeit a point. 'Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.'" *Knox v. United States*, 400 F.3d 519, 521 (7th Cir. 2005) (citing *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). Consequently, Mr. Corley cannot prevail on Ground 3.

### 4. Ground 4: the Conspiracy Charge (Count 1)

At trial, the court instructed the jury as to the conspiracy charge in Count 1:

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. To sustain the charge of conspiracy contained in Count 1 of the superseding indictment, the government must prove: First, that the conspiracy as charged in Count 1 existed; second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy; and third, that an overt act was committed by at least one conspirator.

If you find from your consideration of all the evidence that each of these propositions has been proven beyond a reasonable doubt, then you should find the defendant guilty. If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

A conspiracy may be established even if its purpose was not accomplished. It is not necessary that all of the overt acts charged in the indictment be proved, and the overt act proved may itself be a lawful act. To be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which the purpose was to be accomplished. The government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant.

A conspirator is a person who knowingly and intentionally agrees with one or more persons to accomplish an unlawful purpose. A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy.

Therefore, if you find beyond a reasonable doubt that the defendant was a member of a conspiracy at the time that one of his fellow conspirators committed the offenses—the offense charged in Counts 2, 3, 4, 5, 9 and 10, in furtherance of and

> as a foreseeable consequence of that conspiracy, then you should find him guilty of Count 2, 3, 4, 5, 9 and 10.

(Tr. Vol. 13, 169–170.)

Mr. Corley singles out the last two paragraphs of this jury instruction and argues that the jury was improperly instructed that it could convict him—not only of conspiracy but also of capital murder—even if they only found that the murder was a foreseeable consequence of the conspiracy. In other words, Mr. Corley argues that, although the court instructed the jury on the necessary elements for finding him guilty of murder, the conspiracy charge superseded those instructions, thus lessening the government's burden in violation of the Fifth, Sixth, and Eighth Amendments. Furthermore, Mr. Corley insists that the instruction suggests that the jury could convict him of all counts even if the conspiracy extended to only one of the counts. For example, if the jury believed that a coconspirator committed the offenses in Counts 2 or 4, neither of which required a killing to occur, according to the instruction, they could then find Mr. Corley guilty, not only of those two counts, but also of every other count, including Counts 3, 5, 9, and 10 (murder counts). In that case, the Government would be relieved of its burden of proof as it could achieve murder convictions through lesser crimes. Mr. Corley assigns error to his trial counsel for not objecting to this instruction and to his appellate counsel for not raising this issue for a plain error review and thus failing to provide him effective assistance of counsel.

Due process is violated if "there is a reasonable likelihood that the jury applied the challenged instructions in a way" that lessens the Government's burden of proof. *Boyde v. Cal.*, 494 U.S. 370, 380 (1990). But in this case, the jury was instructed correctly. The two paragraphs on which Mr. Corley is focusing instructed the jury of the *Pinkerton* doctrine. *See United States v. Rawlings*, 341 F.3d 657, 660 (7th Cir. 2003) (". . . the *Pinkerton* doctrine . . . makes a conspirator liable for any foreseeable crimes committed by his fellow conspirators during and in

furtherance of the conspiracy . . . ."); *United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000) ("Under Pinkerton, a coconspirator may be held criminally liable for the foreseeable overt acts of others in furtherance of a conspiracy.") (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)). The instruction states that co-conspirators are guilty of a substantive offense if that offense was committed in furtherance of and as a foreseeable consequence of the conspiracy. There's no error in that. *See United States v. Murray*, 474 F.3d 938, 940 (7th Cir. 2007) ("Now it is true that even if the defendant was not the triggerman, his conviction would be unaffected. The *Pinkerton* doctrine would make the defendant liable for the killing even though one of his coconspirators had pulled the trigger, since it is foreseeable that an armed robbery of a drug dealer may result in a death. However, the sentence might be affected."); *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003) ("Since we have found that the evidence was sufficient to establish [Defendant's] membership in Allen's crack distribution conspiracy, it follows that [Defendant] is criminally liable for the reasonably foreseeable acts committed by his co-conspirators in furtherance of that conspiracy.") (citing *Pinkerton,* 328 U.S. at 647–48). Pursuant to this instruction, the jury permissibly could have convicted Mr. Corley of the murders if he conspired to rob the bank, a co-conspirator murdered Ms. Peckat and Mr. Simpson, and it was reasonably foreseeable to Mr. Corley that these deaths would occur.

Furthermore, Mr. Corley is incorrect that the instruction suggests that the jury could convict him of all counts even if the conspiracy extended to only one of the counts. Granted, the wording of the last paragraph could have been clearer, but that's not what the instruction says. Here it is again:

> Therefore, if you find beyond a reasonable doubt that the defendant was a member of a conspiracy at the time that one of his fellow conspirators committed the offenses—the offense charged in Counts 2, 3, 4, 5, 9 and 10, in furtherance of and

24

as a foreseeable consequence of that conspiracy, then you should find him guilty of
Count 2, 3, 4, 5, 9 and 10.

(Tr. Vol. 13 at 170.)

There does not appear to be a set of written court's jury instructions in the record, and the
transcript does not reflect why the trial judge first said "the offenses" and then "the offense." A
common sense understanding of the instruction, though, is that the judge referred to "the
offenses" charged in the listed Counts because each of them constitutes a separate offense—six
in total—not a single offense arranged in six Counts. In fashioning his argument, Mr. Corley
reads the instruction as if the word "offense" trumps the word "offenses," but even if the
instructions can be read as referring to _the offense_ "charged in Counts [2, 3, 4, 5, 9, and 10],"
such wording would betray the judge's error of reading aloud or a typographical error, not an
error of law, as these counts represent multiple offenses, not a single collective offense.
Importantly, jurors have common sense and can derive the intended meaning from the instruction
that may be inartfully stated. After all, as the Supreme Court in _Boyde v. California_, 494 U.S.
370, 380–81 (1990), observed, "[j]urors do not sit in solitary isolation booths parsing instructions
for subtle shades of meaning in the same way that lawyers might. Differences among them in
interpretation of instructions may be thrashed out in the deliberative process, with commonsense
understanding of the instructions in the light of all that has taken place at the trial likely to
prevail over technical hairsplitting." The Government presented evidence as to each Count, and
the Court explained the burden that the Government bears as to each Count. The Court further
instructed the Jury that: "[e]ach count of the superseding indictment charges the defendant with
having committed a separate offense. Each count of the evidence relating to it should be
considered separately and a separate verdict should be returned as to each count. Your verdict of
guilty or not guilty of an offense charged in one count should not control your decision as to any

other count." (Tr. Vol. 13 at 179–180.) In light of these instructions, it is unreasonable to assume that the Jury could have found Mr. Corley guilty of Counts 2–5 and 9–10, just because they believed a coconspirator committed a crime charged in just one of those counts.

But in reality, as explained above, Mr. Corley was convicted of all counts because of his own conduct. While the Jury was instructed about the *Pinkerton* doctrine, there was no evidence that any of Mr. Corley's coconspirators entered the bank injuring one and killing two of its employees. In other words, the *Pinkerton* instruction was extraneous because there was no evidence of coconspirator liability.

Because the instruction correctly states the *Pinkerton* doctrine and when read with common sense does not imply that Mr. Corley can be found guilty of all charges in the indictment even where a coconspirator has committed a crime charged in only one of the counts, neither trial nor appellate counsel can be faulted for failing to raise these issues. And in any case, given the actual evidence, the instruction was moot. Therefore, Mr. Corley has not shown that his trial counsel's performance fell below an objective standard of reasonableness so as to violate the Constitution. The same is true of Mr. Corley's contention regarding his appellate counsel. In short, Mr. Corley has not stated a basis for relief in Ground 4.

### 5.  *Ground 5: Double Jeopardy*

The trial court instructed the jury on the three elements the Government must prove beyond a reasonable doubt to convict on Counts 3 and 9 (murder during an attempted bank robbery, in violation of § 2113(e)):

> First, the defendant killed [the victims]; second, the defendant performed such act or acts during the course of committing the offense of aggravated attempted bank robbery as charged in Count 2; and third, that at the time charged in the superseding

> indictment, the First State Bank of Porter had its deposits insured by the Federal Deposit Insurance Corporation.

(Tr. Vol. 13 at 173; 177.)

Likewise, the court instructed the jury as to the Government's burden of proof to convict on the charges in Counts 5 and 10 (murder with a firearm during a crime of violence, in violation of § 924(c) and (j)(1)):

> First, that the defendant committed a crime of violence, as I have described that term for you; second, that in the commission of that crime of violence, the defendant used a firearm; third, that such use resulted in the death of [the victims]; and fourth, that the homicide constituted murder within the meaning of [18 U.S.C. § 1111].

(*Id.* at 175.)

Mr. Corley argues that the bank robbery murder and the firearm murder counts are multiplicitous in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. He believes that "the jury was instructed that a conviction under § 924 could be sustained based solely on the evidence used to establish a violation of § 2113(e)." (Pet.'s Br., DE 976 at 34.) In addition, he submits that his rights to due process and against cruel and unusual punishment were also violated because of the numerical emphasis placed upon the offenses eligible for the death penalty. Mr. Corley suggests that "[i]t is likely that the psychological impact of believing [Mr. Corley] was guilty of four counts of capital murder (two for each victim) tipped the scale in favor of the death penalty in one or more of the jurors' sentencing decisions." (Pet.'s Br., DE 976 at 40.) Lastly, Mr. Corley argues that he should have received only one sentence for the § 2113(e) murders, not two. He blames his trial counsel for failing to object to duplicative charges and his appellate counsel for failing to raise these

issues before the court of appeals, arguing that he thus received ineffective assistance of counsel, in violation of the Sixth Amendment.

To the extent that Mr. Corley is seeking relief on the grounds that he was subjected to double jeopardy and his due process rights were violated, since he did not raise these claims on direct appeal and has not even attempted to show here that he had cause for the failure and suffered actual prejudice, he has procedurally defaulted. *See United States v. Barger*, 178 F.3d 844, 848 (7th Cir. 1999) (" . . . a § 2255 motion is not to be used as a substitute for a direct appeal. For constitutional challenges to a conviction to be properly brought under a § 2255 proceeding, a defendant must make a showing of good cause for, and prejudice from, the failure to raise the issues on direct appeal.") (citing *Theodorou v. United States*, 887 F.2d 1336, 1339 (7th Cir. 1989)). However, to the extent that he raises these issues as part of his claim that his trial and appellate counsel were ineffective, the Court will consider it under the *Strickland* standard. The Court will first address the issue of whether Mr. Corley was subjected to double jeopardy.

"If 'the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *Rutledge v. United States*, 517 U.S. 292, 297 (1996) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "[T]he *Blockburger* test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial." *Illinois v. Vitale*, 447 U.S. 410, 416, (1980).

There was no double jeopardy violation in prosecuting Mr. Corley both under §§ 924(c) and 2113(e). The two sections do not have identical elements nor did the district court include

the same elements for both jury instructions. In fact, each offense—as reflected in the jury instructions and the corresponding statutes—required proof of a fact that the other did not. The use of a firearm is an element under the § 924(c) murder but not under § 2113(e). That is, a person can be guilty of the § 2113(e) murder even if he did not use a firearm whereas he cannot be found guilty of the § 924(c) murder unless a firearm is used. Moreover, the § 2113(e) murder happens only during a bank robbery, whereas the § 924(c) murder can be committed in furtherance of some other robbery or crime of violence. Finally, the § 924(c) charge requires a finding of murder consistent with 18 U.S.C. § 1111. That the trial evidence allowed a conviction under both statutes is an immaterial consideration for purposes of double jeopardy. *Vitale*, 447 U.S. at 416. Accordingly, the Court finds no violation of the double jeopardy clause for simultaneous prosecution under the two statutes. *Cf. United States v. Bauer*, 956 F.2d 239, 241 (11th Cir. 1992) ("[Defendant's] claim that the Double Jeopardy Clause forbids cumulative punishment for armed bank robbery (Section 2113(d)) and for using a firearm during a crime of violence (Section 924(c)) is without merit."). As a result, it cannot be said that Mr. Corley's attorneys failed to provide effective assistance of counsel, that is, that their performance was below an objective standard of reasonableness, when they failed to raise the double jeopardy issue either at trial or on appeal.

Next, the Court considers Mr. Corley's argument that he should have received only one sentence for the § 2113(e) murders charged in Counts 3 and 9. Section 2113(e) provides that "whoever, in committing any offense defined in this section . . . kills any person" will be punished by death or life imprisonment. Mr. Corley argues that the phrase "any person" is ambiguous—it's not clear whether it contemplates one or multiple persons—preventing the imposition of multiple punishments for the killing of multiple people during a single bank

robbery. (Pet.'s Br., DE 976 at 36.) The Government brushes aside his argument but offers no convincing authority or argument to the contrary. As explained below, the Court finds that Mr. Corley's counsel's performance may have been deficient both at trial and on appeal, but he has not shown that he was prejudiced by their deficiencies, meaning that there is no reasonable probability that the results of the proceeding would have been different with effective representation. *See Strickland*, 466 U.S. at 687.

The Court agrees with Mr. Corley that he should have received a single punishment for Counts 3 and 9. While there's no case directly on point in the Seventh Circuit, *United States v. Fleming*, 504 F.2d 1045 (7th Cir. 1974), is instructive. In *Fleming*, four defendants were convicted of two counts under § 2113(d)[6] for assaulting and putting in jeopardy by use of a dangerous weapon the lives of two bank tellers during the course of a bank robbery. *Id*. at 1052. As relevant, each defendant received two consecutive 20-year sentences on each § 2113(d) offense, for a total of 40 years.[7] *Id*. On appeal, they contended that "their maximum sentences should have been those imposed by the [district judge] for one subsection (d) violation: 20 years," *id.*, and the court of appeals agreed:

> The crime is bank robbery, not personal assault. Subsection (d) is merely an aggravated form of bank robbery. Congress's concern was penalizing the robbery of the institution, perpetrated by whatever means, and not penalizing the robbery of each individual teller.
> We are not suggesting that these defendants might not be liable for assaulting each teller separately under state law. *Cf. Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684. We only hold that placing the lives of more than one person in jeopardy during a single bank robbery constitutes only one offense under § 2113(d).

---

[6] Section 2113(d) states that "[w]hoever, in [robbing or attempting to rob a bank], assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both."

[7] The Court is simplifying the math here because one of the defendants was actually sentenced to 20 years on one count and 10 years on the other, but that's irrelevant for current discussion.

*Id.* at 1054. The court of appeals then vacated one of the 20-year sentences for each defendant except for the one defendant who was sentenced to 20 and 10 years, respectively. For that defendant, the case was remanded to district court for resentencing, since the court of appeals could not determine which sentence the district judge would have intended. *Id*. at 1055.

*Fleming* relied on the principle that "doubt will be resolved against turning a single transaction into multiple offenses." *Id.* at 1053 (citing *Bell v. United States*, 349 U.S. 81, 84 (1955)). This principle is rooted in the rule of lenity, which holds that ambiguities in a criminal statute "should be resolved in favor of lenity," rather than impose a "harsher punishment." *Bell*, 349 U.S. 81, 83 (1955). In *Fleming*, the statutory ambiguity arose out of the statute's language prohibiting bank robbers from assaulting "*any* person" or putting "in jeopardy the life of *any* person by the use of a dangerous weapon or device[.]" 18 U.S.C. 2113(d) (emphasis added). "Any," in this context, can be interpreted as either singular or plural.

Subsection (e) uses language that is ambiguous in precisely the same manner. Subsection (e) punishes individuals who, "in committing any offense defined in this section in avoiding apprehension for committing such an offense] . . . kill[] *any* person . . . . ," and specifies that the punishment imposed will be "death or life imprisonment." 18 U.S.C. § 2113(e) (emphasis added). Like subsection (d), subsection (e)'s use of "any" could refer to multiple people being killed during the bank robbery or a single person being killed. Because this is ambiguous, the principle to interpret the statutory ambiguity in favor of leniency applies.

Other Circuits have reached the same conclusion. Both the Eighth and the Tenth Circuits have ruled that subsection (e) does not allow for multiple punishments where multiple killings occurred in the course of, or when evading an arrest for, a bank robbery. In *United States v. Delay*, 500 F.2d 1360 (8th Cir. 1974), the defendant abducted the president of a bank and his

31

wife and daughter. He directed the president to go to the bank, withdraw funds, and return to the abduction site. The president did as directed, indicating to bank employees the nature of his coerced withdrawals. An hour and a half later, the three were found tied to trees and shot dead. *Id.* at 1362. As it pertains to § 2113(e), the defendant was found guilty of each of the three charges under this section, and committed to consecutive 100-year terms of imprisonment. *Id.* at 1367. However, the court of appeals vacated two of the sentences, concluding that § 2113(e) "prohibits the pyramiding of offenses on the basis of separate victims of the crime." *Id.* at 1368.

In *United States v. Jackson*, 736 F.3d 953 (10th Cir. 2013), after robbing a bank, "during the ensuing police chase, [defendant] lost control of the minivan and crashed into another car, killing two women." *Id.* at 955. The district court sentenced the defendant pursuant to § 2113(e) to two concurrent life terms. On appeal, the defendant argued that sentencing him to two violations of § 2113(e) constituted double jeopardy because the two deaths arose from only one bank robbery-related accident. The court agreed: "Based on the interpretations in *Bell* [349 U.S. 81 (1955)] and *Ladner* [358 U.S. 169 (1958)], we conclude that "any person" as used in § 2113(e) could be interpreted either in the singular or plural, making it sufficiently ambiguous as to require lenity. This determination is further supported by case law rejecting the pyramiding of offenses within § 2113 in favor of lenity." *Jackson*, 736 F.3d at 956. The court further expressed its agreement with the holding in *Delay*:

> We agree with the Eighth Circuit's analysis and hold that lenity limits § 2113(e) to only one unit of prosecution based on its ambiguity. Therefore, Mr. Jackson's sentence for two violations of § 2113(e) arising from a single car accident in the course of a single bank robbery is violative of double jeopardy, and upon remand the district court should vacate one of the sentences.

*Id.* at 956.

In its response to Mr. Corley's argument that he couldn't be sentenced for each of the § 2113(e) offenses, the government merely cites *United States v. Higgs*, 663 F.3d 726, 729 (4th Cir. 2011), stating that "[o]ther courts have implicitly condoned the theory of multiple death sentences to account for multiple victims and multiple death-eligible crimes." (Gov't Resp. Br., DE 986 at 42.) It provides no analysis of the case and does not even try to distinguish the different statutes—18 U.S.C. § 1111(a) and 18 U.S.C. § 1201(a)(2)—implicated in that case. Nor does the government acknowledge that the issue in *Higgs* was whether the defendant's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated, not whether his sentences were multiplicitous. The only other case that it refers to is *Jackson*, suggesting that Mr. Corley made two deliberate choices to kill, whereas the defendant in *Jackson* killed the two women in a single car crash. None of this persuades the Court that § 2113(e) allows for multiple punishments for multiple killings committed during the same bank robbery. The *Jackson* court did not base its decision on the subjective intent of how many persons the perpetrator intended to kill relative to robbing the bank. Instead, it based its decision on the interpretation of the phrase "any person," which it construed to mean both "one person" and "multiple persons." The circumstances of the victims' deaths had no legal significance to the court. In addition, *Jackson* is in agreement with *Delay*, which it cites favorably, where, similar to the factual circumstances in the instant case, the defendant kidnapped and shot dead three persons. There, the defendant did not cause the deaths of his three victims through a singular act, yet the Government fails to explain how *Jackson*'s agreement with *Delay* is consistent with the Government's position. Accordingly, the Court finds that sentencing Mr. Corley on two counts under § 2113(e) violated the due process clause.

This brings the Court to the second part of Mr. Corley's contention: whether by failing to object to duplicative sentences his trial counsel, and later his counsel on appeal, provided him with ineffective assistance of counsel. Here, too, the government's brief is of no help as its argument is a mere lip service to the general principles of habeas corpus law.

The Court finds that even if counsel's performance was deficient, it was not prejudicial. "Deference must be given to counsel's strategic decisions, but 'strategic choices made after less than complete investigation [of law and facts] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Bridges v. United States*, 991 F.3d 793, 803 (7th Cir. 2021) (quoting *Hinton v. Alabama*, 571 U.S. 263, 274 (2014)). "'An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.'" *Id.* (citing *Hinton v. Alabama*, 571 U.S. 263, 274 (2014)).

Trial counsel's failure to recognize a double jeopardy issue regarding the two § 2113(e) counts may have constituted deficient performance or it may have been an acceptable tactical decision. At the time of trial in 2004, the Seventh Circuit had not directly held that convicting an individual on multiple counts under Section 2113(e) for a single robbery constituted double jeopardy. Rather, the Seventh Circuit in *Fleming*, 504 F.2d 1045, held that there was a double jeopardy issue surrounding analogous language in Section 2113(d). Counsel may have recognized the possible double jeopardy issue, but reasoned that pursuing that argument would (1) expend limited resources and (2) be fruitless. After all, even a single conviction for killing another individual during a bank robbery under 2113(e) results in a mandatory sentence of life or

34

death. Counsel may have, in fact, made a well-thought out and sensible decision by refraining to pursue the double jeopardy argument to allow him to prepare other matters that would have more of a practical effect. However, without an evidentiary hearing to understand why counsel didn't pursue the double jeopardy argument, the Court cannot conclude counsel's performance was either deficient or a reasonable strategy.

Such an evidentiary hearing is unnecessary, though, because even if counsel's performance was deficient, it did not prejudice Mr. Corley. *See Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006) ("[A] district court *must* grant an evidentiary hearing when the petitioner alleges facts that, if proven, would entitle him to relief."). First, the mere fact that Mr. Corley was convicted twice under Section 2113(e), rather than once, does not affect the available sentences: pursuant to Section 2113(e), Mr. Corley faced either a mandatory life sentence or death, regardless of whether only one count was charged.[8] Therefore, even if his counsel had raised the double jeopardy objection, the jury would have had to make the same decision at sentencing: whether to give a sentence of life imprisonment or death.

Not only is there no change to the available sentences if convicted of only one charge under § 2113(e), there has not been a showing that having one fewer conviction would have a reasonable probability of changing the jury's choice to give Mr. Corley the death penalty.[9] Mr.

---

[8] The Court is mindful that an evidentiary hearing will be held to determine the merits of Mr. Corley's claim in Ground Seven. If the Court ultimately sides with the Government on Mr. Corley's claims in Ground Seven, the Court's analysis of Ground Five will not be impacted. If the Court sides with Mr. Corley, then the Court's analysis of Ground Five will become moot.

[9] That is to say, Mr. Corley has identified no collateral consequences of being convicted of and sentenced on both § 2113(e) counts. "Even on direct appeal, courts are free to pretermit decision about convictions producing concurrent sentences, when the extra convictions do not have cumulative effects." *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012). Of course, "[a]s a practical matter, the concurrent-sentence doctrine was abrogated for direct appeal when Congress imposed a special assessment of $50 (now $100) for each separate felony conviction." *Id*. As such, an appellate court may vacate a conviction and sentence even when the only collateral consequence is the additional imposition of the special assessment. *See, e.g., Ruiz v. United States*, 990 F.3d 1025, 1032 (7th Cir. 2021) ("Perhaps the closest Ruiz gets to identifying a realistic collateral consequence is his mentioning the $300

Corley argues that, if the jurors were presented with a single § 2133(e) count that included two killings, there is a reasonable probability they would have treated him differently at sentencing. The Court disagrees. To begin, the total number of counts eligible for the death penalty would have gone from four to three. At the same time, the number of victims and the manner in which they were injured or killed—the most serious factors—would have remained unchanged. Eliminating one count from the Jury's consideration either at the guilt phase or at the sentencing phase would not have changed the aggravating facts presented to the jury:  immediately upon entering the bank, Mr. Corley shot Mr. Hill twice paralyzing him; he next went to the counter and shot Mr. Simpson in the head; he then vaulted the counter—just seven seconds after entering the bank—and shot Ms. Peckat who was crouching in fear. In short, the overwhelming evidence at trial showed that Mr. Corley deliberately murdered two people and paralyzed a third one during an attempted bank robbery.

Finally, the special verdict form shows the Jury clearly considered the mitigating factors by making the following findings on their own: nine of them found that Mr. Corley was a positive influence in the life of his son; three of them found that he had taken and received certificates of completion in various Bible courses; six of them found that he had shown to be caring and helpful with his elderly and disabled family members and friends; two of them found that, as a juvenile, he had a positive influence on his nephew; and seven of them found that he had artistic talent and his family had benefited from his artistic expression. (DE 722 at 32–33.) As a result, even if Mr. Corley's trial counsel successfully challenged the duplicity of the charges

---

special assessment that the district court ordered him to pay for the § 924(c) convictions. *See* 18 U.S.C. § 3013(a)(2)(A). Though this position would have merit on direct appeal, it falls short here because § 2255 serves as a remedy to contest a prisoner's custody—not the imposition of fines or other special assessments."). Not so on a motion under § 2255 because "[a] collateral attack under § 2241, § 2254, or § 2255 contests only custody, . . . and not fines or special assessments." *Ryan*, 688 F.3d 845, 849; *see also Jefferson v. Williams*, No. 20-CV-595-DWD, 2022 WL 16639276, at *6 (S.D. Ill. Nov. 2, 2022) ("This discretionary doctrine applies primarily in habeas cases, although[] the Seventh Circuit has also applied it in some limited circumstances on direct appeal.").

under § 2113(e), the underlying facts remain the same. There seems no reasonable probability that the jury's sentencing decision would be any different.

Multiple circuits presented with analogous claims have reached similar conclusions. In *Ruiz v. United States*, 990 F.3d 1025, 1031 (7th Cir. 2021), *cert. denied*, 212 L. Ed. 2d 406, 142 S. Ct. 1421 (2022), the Seventh Circuit was presented with a similar set of facts and found that any error was harmless. The defendant there was convicted for several crimes for his participation in a deadly kidnapping scheme. He "received seven concurrent life sentences plus an additional consecutive term of 45 years' imprisonment for using a firearm during the underlying crimes of violence in violation of 18 U.S.C. § 924(c)." *Ruiz*, 990 F.3d at 1027. After the change in law concerning § 924(c) offenses, the defendant moved to vacate the sentences comprising the 45 years consecutive to his seven life sentences. The Court of Appeals refused to reach the merits of his petition, because it was "was difficult to see how any relief—even a complete vacatur of the § 924(c) convictions and their accompanying sentences—would reduce the time that [the defendant] must serve in prison." *Id.* at 1031. In other words, he could not "show any prejudice befalling him from any erroneous § 924(c) convictions," and could not show that he will suffer "non-speculative collateral consequences if we decline to reach the merits of his [] claim, let alone any consequences affecting his 'custody' for purposes of habeas relief." *Id.* Accordingly, the court held that "any error with his § 924(c) convictions" was harmless. *Id.* at 1033.

In addition, the court drew support from the concurrent sentence doctrine. "This discretionary doctrine allows courts to 'pretermit decision about convictions producing concurrent sentences, when the extra convictions do not have cumulative effects.' Put another way, the doctrine 'allows appellate courts to decline to review a conviction carrying a concurrent

37

sentence when one 'concurrent' conviction has been found valid.'" *Id*. at 1033 (citing *Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012)). The court recognized that the 45-year sentence was actually a consecutive sentence but reasoned that "the same considerations of futility, speculation, and preservation of judicial resources" applicable to concurrent sentences is true to some consecutive sentences. The court therefore found that "the concurrent sentence doctrine reinforces our harmless error analysis" and that Ruiz had failed to demonstrate "that he will suffer actual prejudice[.]" *Id.* at 1034.

The Seventh Circuit's analysis in *Ruiz* appears equally applicable here. Simply put, any error regarding double jeopardy had no consequential effect on the sentence ultimately imposed on Mr. Corley. *Id.* The Seventh Circuit's analysis in *Ruiz*, while couched as a "harmless error" review, is applicable to determining whether there is prejudice under *Strickland*. The Fifth Circuit in *Thomas v. Vannoy*, 898 F.3d 561, 573 (5th Cir. 2018), upheld a finding that there was no prejudice under *Strickland* where the defendant's counsel's performance was deficient for failing to move to quash the jeopardy-barred charge, but that the defendant did not "show a reasonable probability that his final *sentence* would be any different, due to his status as a habitual offender." In other words, the Fifth Circuit in *Thomas* considered the fact that the defendant's sentence would remain the same after correcting the alleged deficiency in the *Strickland* prejudice analysis, rather than under a separate harmless error analysis.

Whether described as a lack of prejudice under *Strickland* (as the Fifth Circuit does in *Thomas*), or harmless error (as the Seventh Circuit does in *Ruiz*), it is clear that Mr. Corley's ultimate sentence was not affected by the inclusion of the § 2113(e) convictions. As described above, given the overwhelming amount of evidence presented at the sentencing stage, there is not a reasonable probability that the jury would have sentenced Mr. Corley any differently if it

had considered one conviction under § 2113(e), rather than two. To put it simply, Mr. Corley has not sufficiently alleged that, but for the fact that he was charged and sentenced in two counts for the § 2113(e) murders, he would not have received the death penalty. For all these reasons, Mr. Corley is entitled to no relief on Ground 5.

### 6. Ground 6: The Legality of the Death Penalty

Mr. Corley argues that the process the Department of Justice uses to authorize death penalty prosecutions is unconstitutional because it disproportionately affects defendants of racial minorities. Citing statistics from the Federal Death Penalty Resource Counsel, he submits that at the time of his death penalty prosecution, "the federal government sought death sentences against twice as many African Americans as whites, despite a national population where whites outnumber African Americans by about five times." (Pet.'s Mot., DE 883 at 43.) With nothing more, he argues such data infers that race is a factor in the authorization process. Mr. Corley claims that trial counsel were ineffective by failing to pursue a pretrial challenge to the Government's racially discriminatory actions. He also believes that, by not raising this issue on appeal, trial counsel further prejudiced him.

Missing in Mr. Corley's argument is any showing that his race in any way influenced anyone's decision here. The Supreme Court has found that general statistics are insufficient to challenge death penalty prosecutions. *See McCleskey v. Kemp*, 481 U.S. 279, 294–297 (1987) (explaining that each particular decision to impose the death penalty is made by a unique petit jury, making inferences drawn from the general statistics inapplicable to individual cases). Rather, to prevail, Mr. Corley "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* at 292. "Similarly, the policy considerations behind a prosecutor's

traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, 'often years after they were made.'" *Id.* at 296–97. "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297; *see also Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021) ("A plaintiff must show discriminatory purpose 'in his case.' And discriminatory purpose 'implies more than . . . awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'") (citing *McCleskey*, 481 U.S. at 292).

Mr. Corley has no evidence of purposeful discrimination on the basis of his race, let alone exceptionally clear proof. He has not shown so much as to suggest that the decision makers even knew of his race or that they disregarded the Justice Manual which prohibits, among other things, discrimination on the basis of race: "Arbitrary or impermissible factors—such as a defendant's race, ethnicity, or religion—will not inform any stage of the decision-making process." USAM § 9-10.030. Most importantly, in complying with 21 U.S.C § 848(o), each juror specifically certified that racial discrimination played no role in his or her imposition of the death penalty. (Tr. Vol. 23 at 26.)

Consequently, Mr. Corley's argument that his trial and appellate counsel were ineffective has no merit. While Mr. Corley insists that he has made a prima facie showing that the administration of the federal death penalty is unduly influenced by race and it is now incumbent upon the Government to show that race did not play a factor its decision to seek the death penalty in this case (Pet.'s Br., DE 976 at 43 (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985) ("It is appropriate to judge selective prosecution claims according to ordinary equal protection

standards."), he overlooks the fact that any discriminatory animus must be demonstrated in his case, not as a general proposition. *See* Conley, 5 F.4th 781, 789 ("As equal protection claims, both selective prosecution and selective enforcement require proof 'that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose.'"). Without actual evidence suggesting that race was a factor in his prosecution, he cannot show that his counsel's objective performance was lacking or that he suffered prejudice as a result of their failure to challenge the prosecution on the grounds of discriminatory motive. Accordingly, Mr. Corley is entitled to no relief on Ground 6.

### 7. *Ground 7: Mitigation Evidence*

Earlier, the Court granted Mr. Corley's request to hold an evidentiary hearing on his argument that trial counsel were ineffective in presenting mitigating evidence during the penalty phase of the trial. Accordingly, the Court will decide this issue after the evidentiary hearing.

### 8. *Ground 8: Government's Closing Argument During the Penalty Phase*

During the sentencing phase of the trial, the government presented witnesses who testified about the impact of Mr. Corley's killings. The family members of Ms. Peckat and Mr. Simpson testified about the loss their own families and the community have been suffering. Mr. Hill and his family described the effects of his paralysis. During the rebuttal portion of the closing arguments, the Government's counsel told the jury that just "[b]ecause there were no histrionics, because there was no raw emotion, don't assume for a minute that the sentence of life will be perceived as justice by the victims of this case." (Tr. Vol. 21 at 39.) Mr. Corley submits that this statement, in light of the family members' testimony, "played on the jurors' sympathies for the

families struggling with the loss of a loved one, emphasized these families' need for justice and inhibited the jury's ability to make the 'reasoned moral response' to the evidence before it that the Eighth Amendment requires. . . . Furthermore, the argument violated [Mr. Corley's] due process rights because the prejudicial effect greatly outweighed its probative value." (Pet.'s Br., DE 976 at 60.)

Mr. Corley presented the same argument on direct appeal but the court "conclude[d] that one, isolated, ambiguous statement by the government in this case is not reversible error in the context of the closing argument and limiting instruction as a whole."[10] *United States v. Corley*, 519 F.3d 716 (7th Cir. 2008). Since his argument here remains essentially the same, and this Court finds no basis for a different conclusion. Mr. Corley fails to observe the context in which this statement was made. His mother testified about her son's love for children and the elderly, his artistic talent, and his caring for members of his own family. (Tr. Vol. 19 at 79–96.) She responded emotionally when asked what it would mean to the family if he was sentenced to death: "If they kill my child, they are going to kill me and my mother too. I just—I don't care if you give him 500 years in jail and lock him up, but don't kill him, don't kill him. I am his mother. What good would it do to kill him. Would it bring anybody back?" (*Id.* at 97.) His half-brother, Cameron, his sister Kim, and his nephew also testified. The nephew spoke of devastation to the family that would result if he's sentenced to death. All of this was highly

---

[10] Mr. Corley seems to suggest that his trial and appellate counsel's error was that they did not explicitly frame their arguments in terms of the Eighth Amendment violation. He believes that, had they done that, "there is a reasonable probability that a mistrial would have been granted, that a curative instruction would have been issued, or that the sentence would have been reversed on appeal." (Pet.'s Br., DE 976 at 65.) But ultimately, it's not the form of the objection that controls, but the substance of the argument, so it's difficult to see how the same argument with a different name would have helped Mr. Corley. What's more, the Court of Appeals recognized that Mr. Corley's argument had the Eighth Amendment undertones, *see United States v. Corley*, 519 F.3d at 729 ("Corley appears to base his challenge on the Supreme Court's holding that it is a violation of the Eighth Amendment for family members of a victim to testify as to the appropriate sentence."), yet rejected them, *see id*. ("But here we are faced not with any such testimony, but with a statement by the government at closing argument.").

emotional testimony. (*See id.* at 137 (Mr. Corley's counsel addressing the Court: "Your honor, we have one or two more live witnesses. One of them is very upset, one just said he wouldn't testify. I would like to take a short break and talk to him to see if can compose himself, we'll put him on the stand.").) Therefore, the prosecutor's comments about histrionics "could be read as asking the jury not to draw any inferences from the lack of emotions in the testimony by the victims' families, as compared with the very emotional testimony of Corley's mother." *Corley*, 519 F.3d at 728. In addition, trials aren't sterile and "[e]very criminal case involving a victim will create some sympathy." *Pierson v. O'Leary*, 959 F.2d 1385, 1391 (7th Cir. 1992). What's also important here is that there was strong evidence upon which the Jury could reasonably base its decision that Mr. Corley deserved the death penalty. Therefore, when considered in totality, the one comment by the Government's counsel did not likely sway the jury from properly considering Mr. Corley's sentence.

But even if the prosecutor's statement was meant to say that the family members will not perceive a life sentence as just, it was an attorney's statement during closing, not the testimony of the victims' family members as to the appropriate sentence. The jury had been instructed on the burden of proof and that counsel's statements are not evidence, and it is presumed that juror's follow court instructions. *See United States v. Wantuch*, 525 F.3d 505, 516 (7th Cir. 2008). Thus *Booth v. Maryland*, 482 U.S. 496, 502 (1987), *rev'd in part by Payne v. Tennessee*, 501 U.S. 808 (1991), and *Payne*—cases prohibiting witnesses from testifying as to the appropriate sentence for the defendant—are inapplicable as both dealt with actual witness impact testimony, not the prosecutor's argument.

Then again, both the trial and appellate counsel did not just ignore this statement as Mr. Corley now seems to suggest. Granted, the trial counsel's objection was vague, merely

suggesting that he thought they had eliminated that argument earlier in discussions with the Government's counsel. He did not seek a sidebar and, although defense counsel later sought a mistrial, they did not seek any curative instruction. *See Corley*, 519 F.3d at 729. And as already discussed, the appellate counsel challenged the statement on appeal. Although the trial counsel could have been more eloquent and assertive and appellate counsel could have been razor-sharp in formulating their arguments, that's not what *Strickland* requires. Rather, the petitioner must establish that counsel's performance "fell below an objective standard of reasonableness" resulting in a failure to function "as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. Yet Mr. Corley has failed to make such a showing, and, given the considerations already discussed, he has not established that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Koons*, 639 F.3d at 351.

What is more, Mr. Corley has not convinced the Court that, given the context and ambiguous and isolated nature of the comment, anything would have been different, even if both sets of the attorneys had performed to Mr. Corley's liking. Certainly, there's no indication that the Court of Appeals would have ruled differently. After all, the Court of Appeals recognized that Mr. Corley's challenge suggested an Eighth Amendment violation, yet it dismissed it in passing. And as for trial counsel, even if they had managed to get a curative instruction, in light of all other evidence, there's no likelihood that anything would have changed. Simply put, the statement did not constitute the crux of the Government's case at sentencing and it certainly wasn't the crucible that turned the jurors' minds. Finally, it's worth underscoring that the Court could find no circuit cases indicating that the government's counsel's statements at closing argument can violate *Payne*, as opposed to the testimony of the victim's family members. In

short, Mr. Corley has not shown that he was prejudiced by the performance of his counsel. *See Harrington*, 562 U.S. at 104 ("It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.")

For all these reasons, the Court cannot grant his request in Ground 8.

### 9.  Ground 9: Wanda McNeal's Out-of-Court Statement

At the penalty phase of the trial, the government presented evidence of unadjudicated conduct, namely, that in 1998, in Atlanta, Mr. Corley set Wanda McNeal on fire, and she died of her resulting injuries. *Corley*, 519 F.3d at 723–28; (Tr. Vol. 18 at 64–252). To contradict this evidence, Mr. Corley's counsel elicited evidence from a witness, Officer Flisser, that before dying, Ms. McNeal said that "Will [Johnson] and his cousin" had set her on fire. (Tr. Vol. 18 at 98.) The statement came in without an objection from the Government and without any comment from the court. Mr. Corley now argues that the court should have explicitly instructed the jury that the statement was not mere hearsay but was introduced for the truth that someone else, namely, Will Johnson, killed Ms. McNeal. Mr. Corley believes that the absence of such instruction "effectively gutted" his defense that he did not set Ms. McNeal on fire. (Pet.'s Mot., DE 883 at 68.) He submits that "[b]ased on the little guidance it did receive, jurors likely believed [the statement] could be considered only to impeach the Government's case, not as affirmative evidence of innocence." (*Id.* at 69.) The "guidance" Mr. Corley is referring to is the court's jury instruction regarding inconsistent out-of-court statements by witnesses who testified at trial:

> You have heard evidence that before the trial, certain witnesses made statements
> that may be inconsistent with the witness's testimony here in court. If you find any

witness's earlier statement is inconsistent with the witness's testimony, you may consider the earlier statement only in deciding the truthfulness and accuracy of that witness's testimony in this trial. You may not use it as evidence of the truth of the matters contained in their prior statements.

(Tr. Vol. 13 at 165.)

While Mr. Corley is arguing that he should have been given a specific instruction regarding Ms. McNeal's statement, there's no indication that the jury misunderstood the purpose of the statement, that is, that it was admitted for the truth of the matter asserted: that someone else other than Mr. Corley had set her on fire. Certainly, no instruction suggested otherwise and the Government never indicated that the Jury could not substantively consider Ms. McNeal's dying words. After all, the issue before the Jury was whether Mr. Corley murdered Ms. McNeal. In addition, the instruction regarding inconsistent out-of-court statements clearly did not apply to Ms. McNeal's statement because she wasn't a witness at the trial, and had not made a prior inconsistent out-of-court statement: "If you find any witness's earlier statement is inconsistent with the witness's testimony, you may consider the earlier statement only in deciding the truthfulness and accuracy of that witness's testimony in this trial." (Tr. Vol. 13 at 165.) Mr. Corley's argument seems to imply that this evidence was vital to his defense, and the court, therefore, should have instructed the jury about this statement. But this would have amounted to the court singling out the evidence, which is highly disfavored. *See United States v. Bookie*, 229 F.2d 130, 135 (7th Cir. 1956) ("It is generally recognized that the trial court may properly refuse any instruction which directs the jury as to the strength or weakness of testimony, or as to its weight or sufficiency.")

Accordingly, since there was no error in the court's failing to give an instruction concerning Ms. McNeal's statement, and the instruction regarding prior inconsistent statements did not

apply to Ms. McNeal, Mr. Corley's argument that his counsel provided ineffective assistance fails, and the Court cannot grant his request in Ground 9.

**10. Ground 10: Bank Robbery as a "Crime of Violence"**

For his last ground, Mr. Corley raises an issue foreclosed by the Court of Appeals for the Seventh Circuit. He argues that his convictions under Counts 4, 5, and 10 for possessing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c) & (j)(1) cannot stand because the underlying offense, bank robbery in violation of § 2113(d), lacks the scienter and violent force elements that § 924(c)(3)(A) requires. He "acknowledges that under Seventh Circuit's current framework [in *United States v. Armour*, 840 F.3d 904 (7th Cir. 2016)] his convictions qualify as a 'crime of violence.'" (Pet.'s Br., DE 976 at 71.) Yet he insists that "*Armour* was wrongly decided because it failed to consider that a bank robbery under § 2113(a) can be committed by means which does not qualify as physical force as required by § 924(c)(3)(A)." (*Id.* at 71.) According to Mr. Corley, federal bank robbery in which a killing occurs, as defined by § 2113(a) & (d), can be accomplished by intimidation, and the killing can be accidental. Thus the crime doesn't require the use, attempted use, or threatened use of "violent force." Furthermore, armed bank robbery, as defined by § 2113(d), can be accomplished by merely openly carrying a dangerous weapon and likewise fails to qualify as a crime of violence under § 924(c) force clause. (*Id.*)

The Court disagrees that *Armour* failed to consider the scenarios Mr. Corley invokes. The court of appeals specifically held that "robbery by intimidation under § 2113(a) and robbery by assault by a dangerous weapon or device under § 2113(d) have as an element the use, attempted use, or threatened use of physical force against the person or property of another and thus qualify

as crimes of violence under § 924(c)." *United States v. Armour*, 840 F.3d 904, 909 (7th Cir. 2016), as amended (June 26, 2017). This holding covers both intimidation and openly carrying a dangerous weapon, the two scenarios Mr. Corley proposes, so his dispute is really with the Seventh Circuit. As for this Court, it "is bound by a decision of the Seventh Circuit unless it is 'powerfully convinced that the [Seventh Circuit] would overrule it at the first opportunity.' The Court has to be 'almost certain that the higher court would repudiate the doctrine if given the chance to do so' before it can disregard a higher court's precedent." *Corpeno-Argueta v. United States*, 341 F. Supp. 3d 856, 863 (N.D. Ill. Sept 20, 2018). Here, no such certainty exists, given that Mr. Corley's argument merely repeats the arguments that *Armour* specifically addressed. As a result, Ground 10 is denied.

### D. Conclusion

For the reasons stated above, the Court DENIES Mr. Corley's § 2255 motion as to Grounds 1–6 and 8–10. A ruling regarding Ground 7 will be issued after an evidentiary hearing is conducted.

SO ORDERED.

ENTERED: June 21, 2023

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court